UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 26-mj-03259-LFL
No. 26-mj-03260-LFL

IN THE MATTER OF EXTRADITION OF
TRISTAN TATE

_____/

IN THE MATTER OF EXTRADITION OF
EMORY ANDREW TATE

_____/

### ANDREW AND TRISTAN TATE'S MOTION FOR RELEASE PENDING EXTRADITION PROCEEDINGS AND OPPOSITION TO THE GOVERNMENT'S REQUEST FOR DETENTION

The question presented by this motion—whether Andrew and Tristan Tate should be released on bail pending extradition proceedings—has already been answered by courts that heard these same facts and determined that the Tate brothers posed neither a risk of flight nor a danger to the community.

Andrew and Tristan Tate are American citizens. In December 2022 they were arrested in Romania, a country of which they are not citizens, and charged with serious sexual offenses. The Bucharest Court of Appeal released them—first on house arrest, then judicial control. In February 2025, after reviewing the brothers' conduct, the Romanian prosecutor determined that Andrew and Tristan had "rigorously complied" with every obligation and "there are no plausible reasons to

consider that they would have any intention of evading criminal prosecution and trial; on the contrary, they have constantly demonstrated interest in the correct establishment of the facts." *See* March 12, 2024 Judgment No. 38/F, Case no. 1714/2/2024 (846/2024) (Romania Bucharest Court of Appeal–First Criminal Division) (A. Tate), attached as **Exhibit 1**; March 12, 2024 Judgment No. 37/F, Case no. 1713/2/2024 (845/2024) (Romania Bucharest Court of Appeal–First Criminal Division) (T. Tate), attached as **Exhibit 2.**

While the brothers remained under judicial control, their travel restrictions were lifted and they were authorized to travel internationally. More than once while on release, Andrew and Tristan came to the United States, their own country, with the Romanian court's authorization, and remained subject to Romanian judicial supervision. The brothers traveled to nine other countries and on every occasion, they returned to Romania to check in with authorities because their release conditions required it. The brothers made no effort to hide—they published their movements almost daily on social media, under their own names, to an audience of millions.

Every prediction the government now asks this Court to make about the brothers' future conduct—that they will flee if released—has already been made and answered by three years of data showing that they do not flee.

The United Kingdom knows this better than anyone. In January 2024, it obtained the very warrants on which the Tate brothers now sit in custody, and sought their extradition from Romania. A Romanian court granted that request. It ordered the brothers surrendered to the U.K., postponed surrender until the Romanian proceedings against the brothers conclude, and released the brothers the next day on the same conditions they had been honoring all along. The United Kingdom accepted that judgment and lived with it for two and a half years while the brothers lived openly in Romania.

Then, on July 18, 2026, on the same U.K. warrants and with the Romanian surrender order still in place, the United Kingdom asked the United States to arrest the brothers on an urgent basis. As to what made the request urgent, the government's papers offer only a single unsupported sentence: that the brothers "would likely flee if [they] learned of the existence of a warrant for [their] arrest." But what the government's papers do not say matters more.

Neither the sworn complaint nor the detention memorandum disclosed to this Court (i) the Romanian order providing for the brothers' surrender to the U.K., (ii) that the brothers were in this country lawfully, (iii) the years of documented compliance with release conditions, or (iv) the finding that the brothers were neither a risk of flight nor a danger. And when the government told this Court in its detention memorandum that the brothers traveled to countries that have no extradition treaty

with the U.K., the government omitted the most important part: that the brothers always returned to Romania—a country that has such a treaty and that had already ordered the brothers surrendered to the U.K.

These facts present the special circumstances warranting release: A standing order from Romania surrendering the brothers to the requesting country. A requesting country that obtained that order and accepted it for two and a half years. A provisional arrest with no identified urgency. And two brothers, United States citizens, whose reliability is not a matter of speculation but one of record. That combination is not a circumstance common to extradition defendants. Indeed, it may be unique to just this one.

Andrew and Tristan now sit in administrative segregation in the Special Housing Unit at the federal detention center in Miami, charged with no crime in this country. Every fact offered to justify their continued detention—the gravity of the charges, the foreign prosecution, the pending British extradition, the sentence they face if convicted, their capacity to travel—was already placed before the Romanian courts. Those courts found detention unnecessary. The brothers then proved those judges right, over a span of three years and while traveling across nine countries.

What the United Kingdom seeks now is to shop for a second forum and a second judge in order to jump ahead of the Romanian proceedings and bypass the

Romanian order that deferred surrender of the brothers. The Court should decline and release the brothers on conditions.

## BACKGROUND

On July 18, 2026, at the request of the United Kingdom (U.K.), the United States government filed a Complaint for Provisional Arrest with a View Towards Extradition. [DE#3 in both cases]. The U.K. sought the provisional arrest and detention of Andrew and Tristan Tate as "an urgent situation" under Article 12 of the Extradition Treaty between the United States and the U.K.

The U.K. seeks to extradite Andrew and Tristan Tate in connection with a January 19, 2024 U.K. warrant for their arrests on rape charges.[1] The Tates have not been tried or convicted of these offenses.

On July 19, 2026, the government filed a Memorandum of Extradition Law and Request for Detention Pending Extradition Proceedings. [DE#4 in both cases]. The government seeks to detain Andrew and Tristan during the extradition proceedings.

---

[1] The warrant was issued in 2024. However, the complaint references an allegation by Complainant B against Andrew that took place between August 31 and December 31, 2025 in Manchester. Undersigned believes the 2025 date is a typographical error because (1) Andrew was not in the U.K. in 2025 and (2) conduct with Complainant B in 2025 would have occurred after the 2024 warrant issued.

Neither the complaint nor the memorandum contains the U.K.'s request for the Tates' provisional arrest. When defense counsel requested these materials at the July 27, 2026 status conference, the government declined to produce any documents.

## I.   <u>**The Romanian Proceedings**</u>

Andrew and Tristan Tate have resided in Romania since 2017. In December of 2022, the Romanian authorities charged the Tates with several crimes. In two sworn affidavits, the Tates' Romanian counsel, Eugen Constantin Vidineac, explains the Romanian proceedings, one explaining case no. 1305/D/P/2022, attached as **Exhibit 3** and one explaining case no. 2557/D/P/2023, attached as **Exhibit 4.**

The Romanian authorities arrested the Tates on December 30, 2022 in criminal case no. 1305/D/P/2022, and held them in pre-trial detention from December 30, 2022 until March 31, 2023. **Ex. 3**, p. 1.

On March 31, 2023, the Bucharest Court of Appeal replaced pre-trial detention with house arrest for 30 days with the following obligations:

- To appear before the criminal investigation authority, the judge of rights and freedoms, the preliminary chamber judge, or the trial court whenever summoned;

- Not to communicate, by any means, either directly or indirectly, with the other co-defendants, the alleged injured parties, or the witnesses in the case.

*Id*.

The Voluntari Town Police monitored the Tates' compliance, and there is no evidence of any breach. *Id*. The Court successively extended the house arrest and

related conditions in 30-day increments until August 4, 2023, when the Bucharest

Court of Appeal replaced house arrest with judicial supervision (judicial control) for

a 60-day period, from August 4 until October 2, 2023, under the following

conditions:

- To appear before the preliminary chamber judge or the trial court whenever summoned;

- To immediately inform the judicial authority that ordered the measure, or before which the case is pending, of any change of residence;

- To report to the police authority designated to supervise compliance, namely the police station having territorial jurisdiction over their residence, in accordance with the supervision schedule established by the police authority or whenever summoned;

- Not to leave . . . Bucharest, except with the prior authorization of the preliminary chamber judge or the trial court;

- Not to approach the other co-defendants, the alleged injured parties, or the witnesses in the case;

- To periodically provide relevant information regarding their means of subsistence;

- Not to possess, use, or carry firearms.

*Id.*, pp. 1-2.

On November 23, 2023, the court relaxed the Tates' travel restrictions,

allowing them to travel outside Bucharest but requiring they remain within the

territorial limits of Romania. *Id.*, p. 2.

In June, 2023, the prosecutor in charge issued an indictment and committed

Andrew and Tristan for trial in case no. 1305/D/P/2022. *Id.* The prosecutor severed

some of the allegations, resulting in criminal case file no. 2557/D/P/2023 to be registered before the Directorate for Investigating Organized Crime and Terrorism ("DIICOT"). Thus, as of June 2023, two criminal cases were proceeding in parallel. *Id*.

In case no. 1305/D/P/2022, the Tates remained on judicial control, subject to review every two months. *Id*., p. 3. On February 25, 2025, the prosecutor lifted the restrictions prohibiting Andrew and Tristan from leaving Romania. *Id*. The prosecutor assessed all of the legal requirements necessary for this measure, and found Andrew and Tristan strictly complied with all conditions of release from the beginning of their judicial control. *Id*. The prosecutor also determined there was no risk the brothers would evade the criminal proceedings or otherwise obstruct the administration of justice. The prosecutor found:

> Specifically, it is considered that *there are no plausible grounds to conclude that they intend to evade criminal prosecution and trial*; on the contrary, they have consistently demonstrated a genuine interest in establishing the factual circumstances correctly and in ensuring the resolution of the present case.

*Id*. (emphasis added). The order is attached as **Exhibit 5**.

The Tate brothers remained on judicial control in case no. 1305/D/P/2022 without incident until April 6, 2026. **Ex. 3**, p. 3. According to a July 20, 2026 assessment and the lead prosecutor's findings, Andrew and Tristan complied fully,

accurately, and in a timely manner with all release obligations imposed upon them for three years, from December 30, 2022 until April 6, 2026. *Id*.

The Tates were also subject to pretrial release on conditions in the parallel (severed) proceeding, case no. 2557/D/P/2023. **Ex. 4**. On August 23, 2024, the Bucharest Tribunal denied DIICOT's application for pre-trial detention, imposed house arrest for Andrew, and Tristan remained under judicial control. *Id*., ¶ 2. On February 14, 2025, the Court replaced Andrew's house arrest with judicial control. *Id*., ¶ 3. Then, on February 25, 2025, the court lifted the Tates' travel restrictions in case no. 2557/D/P/2023. *Id*., ¶ 5. That order is attached as **Exhibit 6**.

Andrew and Tristan remain on judicial control in case no. 2557/D/P/2023 (Andrew until September 25, 2026 and Tristan until August 31, 2026) with the following conditions of release:

- To appear before the criminal investigation authorities, the preliminary chamber judge, or the trial court whenever summoned;

- To immediately inform the criminal investigation authorities, the preliminary chamber judge, or the court of any change of residence;

- To report to the police authorities designated to supervise compliance, in accordance with the supervision schedule established by them or whenever summoned;

- Not to communicate, either directly or indirectly, with the defendants, the alleged victims/injured parties and the witnesses in this case.

**Ex. 4**, ¶ 8. Under these conditions, Andrew and Tristan must still check in with the authorities in Bucharest as requested.

Since the travel restriction was lifted in both cases, the Tates have traveled to the U.S., Dubai / the U.A.E., Croatia, the Bahamas, Turkey, Kazakhstan, Oman, Hong Kong, Uzbekistan, Russia, and Cyprus. A summary of their travel from February 2025 until their arrest on July 18, 2026 is attached as **Exhibit 7.** The U.S., the U.A.E., Turkey, Croatia, and Cyprus all have extradition agreements with the U.K. *See* Extradition Treaty, U.S.-U.K., Mar. 31, 2003, T.I.A.S. No. 07-426; Extradition Treaty, U.K.-U.A.E., Dec. 6, 2006, 2008 Gr. Brit. T.S. No. 6 (Cm. 7382); Trade and Cooperation Agreement, EU-U.K., art. 596, Dec. 30, 2020, 2021 O.J. (L 149) 10 (governing U.K.-Cyprus and U.K.-Croatia surrender); European Convention on Extradition, Dec. 13, 1957, E.T.S. No. 24, 359 U.N.T.S. 273 (United Kingdom, Turkey, Croatia, and Cyprus all parties).

As stated in the declaration of the brothers' Romanian counsel, Andrew and Tristan complied fully, accurately, and in a timely manner with all release obligations in both criminal cases. *See* **Ex. 3, p. 3; Ex. 4, p. 4**.

## II.    The U.K. Charges and the Extradition Proceedings in Romania

The U.K. did not begin investigating the Tates until several years after the conduct alleged in the complaints.

On January 19, 2024, based on the accounts of three accusers whose identities remain undisclosed, the Crown Prosecution Service obtained TaCA arrest warrants

for Andrew and Tristan for rape.[2] U.K. counsel Andrew Ford represents the brothers for these charges, and his declaration is attached as **Exhibit 8.**

On March 11, 2024, based on the TaCA warrants, the U.K. initiated extradition proceedings in Romania against the Tates. **Ex. 8**, ¶ 6. The Tates were released one day after their arrest under their previous release conditions. *See* **Ex. 1,** p. 9; **Ex. 2,** p. 10.

The Romanian court held an extradition hearing on March 12, 2024. *Id*. At the hearing, Andrew told the court that

> he was falsely accused years ago and did not understand how much his life would be ruined by those accusations. Over time, he understood that those hardships were given to him in order to grow, develop and evolve, especially since he knows deep in his heart that he is innocent and has strived to prove this. His brother mentioned that if he were to go to England, he would be free, because the institution of pre-trial detention does not exist there, but nevertheless, he wishes to remain in Romania, to prove that he has always told the truth and *wishes for the trial in Romania to be concluded, after which he will go to England on his own to resolve his issues there as well, thus he will not flee anywhere.*

**Ex. 1**, p. 3 (emphasis added).

Tristan made the following statement:

> From the beginning of the process, he has made two requests to leave Romania: the first for his mother's birthday and the second due to the fact that his mother suffered a heart attack. The prosecutor rejected both

---

[2] A TaCA warrant is an international arrest warrant used for streamlined extradition between the United Kingdom and European Union member states under the EU-UK Trade and Cooperation Agreement. *See* https://www.cps.gov.uk/prosecution-guidance/extradition-uk-0#a12.

requests, stating that if he were to leave for England, he would evade criminal responsibility in Romania. Even though he has not seen his mother to this day, and now there is a special opportunity to do so, even though his family and friends are there, and even though he could work to support his family [in the U.K.], *he wishes to remain in Romania to prove that the accusations against him are false and that he does not intend to flee.* He does this for the sake of his reputation, his family, and his daughters. Although he desires to be in the United Kingdom, he requests to remain in Romania under the judicial control measure, as this is his opportunity to prove his innocence, even though it is possible that drastic measures will be taken against him—measures that do not exist in the U.K. *However, he places his full trust in the Romanian judicial system and is awaiting the start of the trial to clarify everything. Only after that will he go to see his mother* (in the U.K.).

**Ex. 2**, pp. 4-5 (emphasis added).

The court agreed to enforce the TaCA warrants and to surrender the Tates to the U.K. at the conclusion of the Romanian criminal case:

[H]aving regard to the fact that, at present, the requested person TATE EMORY ANDREW is being investigated in the case forming the object of criminal file no. 18906/3/2023 pending before the Bucharest Tribunal – First Criminal Division, the Court finds that, in the present case, the provisions of art. 114 para. 1 in relation to art. 58 para. 1 of Law no. 302/2004, republished, are applicable, according to which, in the event that a requested person is being criminally investigated by the Romanian judicial authorities, *his surrender shall be postponed until the final settlement of the case, and, if he is sentenced to imprisonment to be served under a detention regime, until his release as a result of conditional release or until the sentence is fully served*.

**Ex. 1**, p. 8 (emphasis added).  On the same day, the court issued a parallel order for Tristan with almost identical language. **Ex. 2**, p. 9.

For the next two and a half years, the U.K. respected the Romanian order deferring the surrender of the brothers to the U.K. until the proceedings in Romania concluded.

### III.   The Present Case

On July 18, 2026, the U.K. requested that the United States government file a complaint for the provisional arrest of the Tate brothers with a view toward extradition. [DE#3 in both cases]. The complaints arise from the same allegations and the same warrants that the U.K. submitted to Romania for the surrender of the brothers.

Andrew and Tristan were arrested in Miami on July 18, 2026; they made their initial appearance before this Court on July 20. DE#11 (Tristan); DE#10 (Andrew). Since then, the brothers have been detained in the SHU at FDC-Miami, effectively held under solitary confinement conditions.

### IV.   The Document Requested at the July 27 Status Conference

At the July 27 status conference, undersigned asked the government to produce the U.K.'s request for the brothers' provisional arrest—the document on which the arrest, and the government's claim of urgency, rest. Counsel's request was prompted by an omission: neither the sworn complaints nor the detention memoranda filed by the government disclosed the Romanian proceedings, the U.K.'s extradition request to Romania, the Romanian court's order surrendering the

brothers to the United Kingdom at the conclusion of the Romanian proceedings, or the brothers' three years of compliance with the conditions of their release. The government declined to produce the document.

The Tates renew their request and ask that the Court direct the government to produce the United Kingdom's provisional arrest request or submit it for *in camera* review. The document bears directly on the questions before the Court: what the United Kingdom told the United States about the brothers' status and release compliance in Romania, and what made urgent, in July 2026, a matter the United Kingdom had left undisturbed since January 2024.

## ARGUMENT

Though unusual and extraordinary, bond is available in international extradition proceedings. *Matter of Extradition of Rangel Prentt*, 2024 WL 2219823, at *12 (S.D. Fla. May 7, 2024) (Matthewman, J.) (citing *Matter of Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1213 (D. Nev. 1993)). In **Appendix 1** to this motion, undersigned has collected 40 cases where courts have found special circumstances and granted bond pending extradition proceedings.

The current state of the law was set out by this Court in *In the Matter of the Extradition of Cesar Horacio Duarte Jaquez*, Case No. 20-mc-022829-UNA, DE#24 (S.D. Fla. September 14, 2020): Courts have held that there is a presumption against bond in extradition proceedings. *Id.* at 3 (citing *Martin v. Warden, Atlanta*

*Pen*, 993 F.2d 824, 827 (11th Cir 1993)).[3] "A defendant in an extradition case will be released on bail only if he can prove 'special circumstances.'" *Id*. (citing *Matter of Extradition of Ricardo Alberto Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1293 (S.D. Fla. 2017)).

The law is not settled on what burden of proof the Tates must meet to obtain release. Judge Matthewman held in *Rangel Prentt* that the extraditee bears the burden of establishing by clear and convincing evidence that he is not a risk of flight, is not a danger to the community, and that "special circumstances" exist that warrant his release. 2024 WL 2219823, at *13.

Judge Matthewman noted, however, that other courts apply a preponderance of the evidence standard. *Id*.; *see In re Extradition of Garcia*, 761 F. Supp. 2d 468, 474-75 (S.D. Tex. 2010) ("[T]here is disagreement among the federal district courts regarding the burden of persuasion that a potential extraditee must satisfy, which adds to the uncertainty of making a bond determination.").

---

[3] The Tates maintain that the current interpretation that *Wright v. Henkel*, 190 U.S. 40 (1903) burdens an extraditee with proving that "special circumstances" justify bail is unconstitutional and incompatible with American jurisprudence. *See Stack v. Boyle*, 342 U.S. 1, 8 (1951) ("Admission to bail always involves a risk that the accused will take flight. That is a calculated risk which the law takes as the price of our system of justice").

The Tates submit that it is sufficient that they establish by a preponderance of the evidence that they meet the criteria for bail, but they can meet the higher clear and convincing standard, as well.

## I.      SPECIAL CIRCUMSTANCES EXIST WARRANTING RELEASE ON CONDITIONS

### *No Diplomatic Necessity for Detention – the Romanian Surrender Order*

The driving force regarding bail in extradition proceedings is the "overriding national interest in [the United States] complying with treaty obligations" and the need to avoid the "diplomatic embarrassment" that would result if the United States were to release a fugitive pending extradition and the defendant absconded. *Wright v. Henkel*, 190 U.S. 40, 62 (1903); *United States v. Taitz*, 130 F.R.D. 442, 444 (S.D. Cal. 1990). Thus, where "there is a lack of any diplomatic necessity for denying bail," courts have found special circumstances. *In re Extradition of Chapman*, 459 F. Supp. 2d 1024, 1026–28 (D. Haw. 2006).

No diplomatic necessity exists here because the U.K. already obtained a surrender order from Romania based on the same warrants that are before this Court. The U.K. is using this Court to bypass the Romanian proceedings and deny Romania its right to hold a trial and impose any sentence that may result. In short, the U.K. is trying to use this Court to jump the line.

Nothing in the government's complaint suggests the U.K. disclosed the pending extradition order in Romania or the fact that the U.K.'s Crown Prosecution Service acknowledged and respected the order for the past two years. *See* **Ex. 8,** ¶ 9.

Also, despite seeking a provisional arrest, which is available under Article 12 of the treaty in an "urgent situation," the government's submissions omit the fact that the Tates had been on pretrial release for almost three years, had complied with all the conditions of that release, and were in the United States under the authority and judicial supervision of the Romanian courts. Further, the government failed to disclose a written prosecutorial finding in Romania that flight by the brothers was "implausible," and a judicial finding that they are not a risk of flight. *See* **Ex. 5,** p. 4;  **Ex. 6,** p. 4.

These omissions are especially egregious because the Tates came to and remained in the United States with the Romanian government's authorization. The Tate brothers did not flee Romania or come to the United States (a country with an extradition treaty with the U.K.), to avoid a future surrender to the U.K. As the government concedes in its complaint, upon arriving in the U.S., the Tates posted pictures of themselves in Washington, D.C. and Andrew publicly announced his agreement to host a boxing match in Miami. DE#3.

The U.K.'s access to the Tate brothers does not depend on their detention by this Court. A standing order already provides that Romania will surrender the Tates

to the U.K. once the Romanian proceedings close. The Court has three years of a proven record of the brothers' compliance with bail conditions, including more than two years (starting in February 2025) of international travel with the brothers returning to Romania as required. In sum, there is no diplomatic necessity for detention in this case, and the Tates' release on conditions, including surrendering passports, 24/7 GPS monitoring, and other conditions this Court deems necessary, preserves the United States' treaty obligations and protects against any diplomatic concerns.

### *No Diplomatic Necessity for Detention – Delay and Availability of Bond in the U.K.*

There are other reasons to allow a bond here. When a requesting country significantly delays seeking extradition, the diplomatic necessity for detention is reduced. In *Chapman*, for example, a relevant factor in allowing bail was that Mexico had waited three years before bringing extradition proceedings and had "not made prosecution of this offense a priority," instead "wait[ing] three years before bringing extradition proceedings against the [defendants], during which [time the defendants] were living openly and notoriously, aware of the charges against them in Mexico." 459 F. Supp. 2d at 1027.

The U.K. sought the extradition of the Tates in 2024 after obtaining a  warrant for their arrest, but the charges stem from conduct that occurred eight to ten years

before the warrant was signed. The complainants did not report the allegations to authorities until 2020 and 2022.

In addition, any diplomatic concern arising from a U.S. court's decision to grant bail is substantially diminished where the requesting nation (the U.K.) permits bail in extradition proceedings. *See Taitz*, 130 F.R.D. at 446 ("Certainly, there can be no diplomatic concern by South Africa if a United States court releases on bail a person who is facing extradition to South Africa where bail is available in South Africa for persons facing extradition to the United States."); *United States v. Kollmar*, No. 19-MJ-70677-MAG-1 (KAW), 2019 WL 2163005, at *2-5 (N.D. Cal. May 17, 2019) ("Finally, the Court finds that the fact that Canada would grant bail to defendants facing extradition for similar offenses is a special circumstance"); *Nacif-Borge*, 829 F. Supp. at 1221 ("Nacif has established by clear and convincing evidence that bail would be available in Mexico on the underlying substantive offense, and that this constitutes a 'special circumstance.'"); *but see Matter of Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1298-99 (S.D. Fla. 2017) (availability of bail in Panama was not a special circumstance).

In the U.K., the governing rule is a "presumption in favour" of bail if the defendant has not yet been convicted, subject to conditions designed to mitigate any

risk of flight.[4] *See* Ex. 8, ¶¶ 20-21. Likewise, in the U.K., rape is a bailable offense.[5] *Id*. at ¶ 23. Therefore, in the reciprocal situation, a defendant in the U.K. whose extradition was being sought by the United States for rape would be entitled to a presumption in favor of bail.

***There Was No "Urgent Situation" Justifying the Brothers' Provisional Arrest, And None Justifies Their Continued Detention***

The U.S. / U.K. extradition treaty authorizes provisional arrest "[i]n an urgent situation." Treaty art. 12(1). Neither the government's sworn complaint nor its detention memorandum identifies any facts constituting an "urgent situation" justifying the provisional arrest of the Tate brothers.

To the contrary, the government's allegations run the other way. The complaints note the U.K. warrants were issued more than two years before the brothers' arrest in Miami on July 18, 2026, and concern conduct that allegedly occurred more than a decade before that. Leading up to the Miami arrest, the government was tracking the brothers and their social media accounts and knew exactly where they were. DE#3, ¶¶ 7(g), 9 ("On July 17, 2026, authorities observed TATE in Miami, Florida").

---

[4] www.cps.gov.uk/prosecution-guidance/extradition-uk#a02

[5] www.legislation.gov.U.K. /U.K. pga/1994/33/section/25

There is no basis for the government proceeding provisionally other than a single conclusory allegation that the brothers "would likely flee if [they] learned of the existence of a warrant for [their] arrest." *Id.,* ¶ 11. This claim is *ipse dixit*, and the government's detention memorandum refutes it. The memorandum concedes that the brothers had "been aware of the charges" for some time (and did not flee). DE#4, p. 22. From March 2024, the Tates' English solicitors corresponded directly with the Officer in the Case at Bedfordshire Police and with the Crown Prosecution Service about these very charges. **Ex. 8, ¶** 12. On August 29, 2025, the Tates commenced judicial review against the Director of Public Prosecutions. **Ex. 8**, ¶ 15. Four days before the Miami arrest, the brothers publicly posted their exact location: the United States Capitol. DE#3, ¶ 7(g). Under the circumstances, the brothers' documented public life undermines the premise of urgency for a provisional arrest.

A summary of the Tates' social media activity is attached as **Exhibit 9**. It shows that throughout the 31 months preceding their Miami arrest (January 2024 through July 2026), the Tates maintained an unbroken public presence. Andrew's video channel published in every one of those 31 months without exception—633 uploads total. **Ex. 9**, Parts I, III.

From December 14, 2025 through July 17, 2026 — the last full day before the arrests, a span of 216 consecutive days — Andrew posted publicly on X on all 216 days, without a single silent day; Tristan posted on 214 of those same 216 days. **Ex.**

**9,** Parts I, IV. The Director of Public Prosecutions himself described the brothers as "notorious" in correspondence dated March 7, 2025. R (Tate) v. Dir. of Pub. Prosecutions [2026] EWHC (Admin) 1600 [17], [41] (Eng.). That characterization is corroborated by independent measurement: YouGov's quarterly ratings for the second quarter of 2026 place Andrew Tate among the three most widely recognized internet personalities measured in the United States. **Ex. 9**, Part VI.

The brothers' February 2025 arrival in Florida was publicly announced. *See* Andrew Tate, Brother Arrive in Florida from Romania, NPR (Feb. 27, 2025), www.npr.org/2025/02/27/nx-s1-5311621/andrew-tate-brothers-romania-florida.

The following charts demonstrate this prolific social media activity:



*Figure 1. Items published on Andrew Tate's video channel, by month, January 2024 – July 2026. No month is zero. Ex. 9, Part III.*



*Figure 2. Days on which each brother published at least one post on X, December 14, 2025 – July 17, 2026. A filled square marks a day on which a post was published. Ex. 9, Part IV.*

In March 2025, the brothers flew voluntarily to Romania to satisfy a reporting condition of their pretrial release, *see* Influencer Brothers Andrew and Tristan Tate Return to Romania After Weeks in U.S., CBS News (Mar. 22, 2025), https://www.cbsnews.com/news/andrew-tate-tristan-leave-united-states-return-to-romania/; Andrew and Tristan Tate Check In at Police Station in Romania, Complying with Judicial Measures, Associated Press (Mar. 24, 2025), https://www.ksat.com/news/world/2025/03/24/andrew-and-tristan-tate-check-in-at-police-station-in-romania-complying-with-judicial-measures/.

The brothers' public presence was matched by a record of documented compliance with the release conditions imposed on them. When Romanian judicial control required it, the brothers flew back from Florida (or elsewhere in the world) to Romania and reported. Twenty-five days before their Miami arrest, the Tates' counsel appeared before the High Court of Justice in London to pursue a judicial review proceeding against the Director of Public Prosecutions. **Ex. 8**, ¶ 15.

To be sure, normal (non-urgent) process has worked successfully with the brothers. More than two years ago, the Bucharest Court of Appeal received the January 19, 2024 Westminster warrants that the government offers for the brothers' provisional arrest. As described above, the Bucharest court executed the U.K. warrants on March 12, 2024, granted the U.K.'s request for surrender of the brothers, postponed surrender pending conclusion of the Romanian proceedings, and released the brothers on conditions.

In this way, the U.K. obtained, through ordinary channels, everything it asked Romania to provide, including an order of surrender of the Tate brothers. The U.K.'s claim that those same U.K. warrants now require urgent execution by provisional arrest in the United States has no support.

There was no "urgent situation" justifying the brothers' provisional arrest, and there is none justifying their continued provisional detention. The absence of a genuine exigency, together with a documented record of appearance and compliance spanning years and jurisdictions, contributes to the special circumstances warranting release on conditions.

***Full Compliance with Romania's Conditions of Release***

There is no greater "special" circumstance than the Tates' demonstrated compliance with Romania's conditions of release for more than three years.

The brothers spent 1,193 days under Romanian conditions: detention, then house arrest, then judicial supervision. *See generally* Vidineac Decs, **Ex. 3; Ex. 4**. In February 2025, the lead prosecutor, after determining the Tates strictly complied with all obligations of the preventive measures, found there was no risk the Tates would evade the criminal proceedings or otherwise obstruct the administration of justice. The prosecutor issued an order in both criminal cases (file nos. 1305 and 2557) removing the travel restrictions on the Tates and permitting them to leave Romania. **Ex. 5;  Ex. 6.** The 1305 Order states:

> As can be observed, the defendants TATE Andrew and Tristan have been under the preventive measure of judicial control since 04.08.2023. The obligations attached to both preventive measures were fully complied with, the defendants demonstrating respect for all the obligations imposed during the nearly 1 year and 6 months of preventive measures restrictive of liberty and rights.
>
> Likewise, the defendants TATE Andrew and Tristan are American and British citizens, and during the period of over 1 year and 6 months in which they were subject to preventive measures, they interrupted all ties with their states of citizenship and with the family members located in those states. Therefore, they suffered a significant restriction in the exercise of the right to private and family life, which is why it is considered that such a restriction no longer finds an objective justification, given that the defendants, for over 2 years, rigorously complied with all the obligations imposed.
>
> At the same time, having regard to the conduct of the defendants TATE Andrew and Tristan in the two files in which they are being investigated, in concrete terms, it is considered that there are no plausible reasons to consider that they would have any intention of evading criminal prosecution and trial; on the contrary, they have constantly demonstrated interest in the correct establishment of the facts and the resolution of the present file.

Therefore, I consider that the admission of the present request would not affect the proper conduct of the criminal proceedings, given that the defendants TATE Andrew and Tristan remain subject to the other obligations attached to the preventive measure. Thus, their appearance at the summonses of the judicial bodies and at the police body designated for their supervision would ensure their participation in the proceedings, while the prohibition on contacting the alleged injured persons and the witnesses would continue to be effective in ensuring the establishment of the truth in the case.

**Ex. 5,** pp. 8-9.

Similarly, in the 2557 Order, the Court noted:

At the same time, having regard to the conduct of the defendant Andrew TATE within the two files in which he is being investigated, concretely, it is considered that there are no plausible reasons to consider that he would have the intention to evade the criminal prosecution and the trial; on the contrary, he has constantly demonstrated an interest in the correct establishment of the facts and the resolution of the present file.

Therefore, I consider that admitting the present request would not affect the proper course of the criminal proceedings, given that the defendant Andrew Tate remains subject to the other obligations attached to the preventive measure. Thus, his appearance at the summonses of the judicial bodies and at the police body designated for supervision would ensure his participation in the proceedings, while the prohibition on contacting the alleged injured persons and the witnesses would continue to be effective for ensuring the ascertainment of the truth in the case.

**Ex. 6,** p. 4.

After these Orders, the Tates left Romania and traveled the world, but continued to report to Romanian authorities as required without incident.

The Tates' continued compliance in the face of Romanian and U.K. charges could not be clearer or more convincing evidence that they will not flee. Courts have

considered a defendant's demonstrated compliance to be a special circumstance. For example, in *In re Extradition of Bowey*, the court in the Northern District of Florida held that Bowey's "previous conduct in this case is another factor showing that special circumstances exist." 147 F. Supp. 2d 1365, 1368 (N.D. Ga. 2001) ("This is not the extreme case where a parent abducts the children, takes them to a non-treaty country, and eliminates all contact with the other parent. Rather, Mr. Bowey returned home to Georgia in order to file for divorce and have a court determine custody of the children. His actions show that he is accepting responsibility rather than avoiding it.").

### *Lack of Probable Cause, Harsh Conditions of Confinement, and Anticipated Length of Proceedings*

Due process requires the Tates' release because they are being held in highly restrictive conditions of confinement without probable cause for an indefinite period of time. As Judge Matthewman held in *In re Extradition of Shaw*: "[i]n an appropriate case, where a review of the record establishes there is a complete lack of probable cause supporting the charges in the foreign country, due process would likely require the release [on bond] of a defendant in a foreign extradition proceeding." 2015 WL 521183, at *7 (S.D. Fla. Feb. 6, 2015).

Probable cause requires a showing of reliable evidence a crime was committed and that the accused committed it. This Court has anonymous allegations (made years after the alleged events) but no corroborating evidence. Moreover, the

complainants reported the allegations to authorities several years after the alleged conduct, after seeing "in the media" that the Tates were being investigated.

Importantly, under Section 1 of the U.K.'s Sexual Offences Act 2003, a person only commits rape where he "does not reasonably believe" there is consent. The Tates' counsel have repeatedly requested the Crown Prosecution Service to disclose accusers' identities, and upon refusal they unsuccessfully appealed this issue to the U.K.'s higher courts.

Without the identity of the complainants, the Tates cannot investigate this element of the offense. For example, the government's proffer indicates the parties engaged in consensual, rough sexual activity. This point raises substantial questions about the accusers' credibility and motivation and whether the alleged conduct was criminal. In particular, the government contends Tristan and his accuser were in a relationship from April 2012 to December 2013, that Tristan sexually assaulted her in 2012, but that this accuser continued having a relationship with Tristan for another *year*. Tristan's reasonable belief that his romantic partner consented to all of their sexual activity would be a complete defense to the charges against him.

Along these lines, the U.K. has not submitted a formal extradition request, and the U.K. has until September 16, 2026 to submit its papers to the executive authority. DE#11-1, p. 6. Under the circumstances, the Tates face months of detention before seeing any evidence to purportedly support their extradition, and then there may be

months of proceedings. Several courts have considered this provisional warrant situation in the special circumstances calculus. *See, e.g., Matter of Extradition of Molnar*, 182 F. Supp. 2d 684, 687-89 (N.D. Ill. 2002) (following "a more liberal view in determining bail" as the extradition was "under a provisional arrest and there was no urgency to his apprehension and incarceration").[6]

Courts have also found the projected length of the extradition proceedings may constitute a special circumstance when extensive investigation will be required to challenge probable cause. *See, e.g.*, *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 60-61 (D. Mass. 2010) (finding undue delay a special circumstance where defendant "has made it clear that he intends to challenge the Government's showing of probable cause," evidence beyond the charges would have to be translated, and years of immigration proceedings would have to be reviewed); *Chapman*, 459 F. Supp. 2d at 1027 (D. Haw. 2006) (finding a "high probability of delay in the extradition proceedings" a special circumstance, because the underlying offense occurred more than three years ago and "it may be difficult to track down

---

[6] On Westlaw, there is an indication that this February 1, 2002 Order was stayed and the defendant was detained on March 18, 2002. Undersigned pulled the docket sheet on PACER and it appears that statement is inaccurate—the Order was stayed on February 11, 2002 and the defendant was detained, but the court held another bond hearing on March 4 and 5, 2002 and issued an order granting bail and setting conditions of release. *See* Case No. 1:02-mc-00005 (N.D. Ill.), DE#36.

witnesses and prepare evidence for the hearing"); *In re Extradition of Morales*, 906 F. Supp. 1368, 1375 (S.D. Cal. 1995) (finding the likelihood of delay to constitute a special circumstance because government had filed a new complaint resulting in several months of delay, and there were "a number of factual and legal issues to be researched, briefed, heard, and resolved," including a challenge to the government's showing of probable cause); *Taitz*, 130 F.R.D. at 445-46 (granting bail where "[i]f this court were to decide the extradition request today, the various district and circuit court proceedings would likely last for as long as two years. Taitz would have to be incarcerated during this lengthy period.").

The fact that the brothers are being held in administrative segregation at FDC-Miami makes this point more compelling. Without any disciplinary sanctions, the Tates are in the SHU as a protective measure solely because of their notoriety. A pretrial detainee "may not be punished at all." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Holding a pretrial detainee in segregation, under conditions harsher than those imposed on convicted prisoners, without individualized justification and without the periodic reviews the Bureau of Prisons' own regulations require, violates due process. *See Magluta v. Samples*, 375 F.3d 1269, 1273-74, 1279-80 (11th Cir. 2004); 28 C.F.R. § 541.26.

The Tates have limited contact with their families, no television, no radio, and no commissary access.[7] They sleep without pillows, on bunks shorter than they are tall. Further, in their first fifteen days they were permitted outdoor recreation four times, one hour each (that is, eleven of fifteen days they had no time out of their cells). The Tates currently have no access to commissary, and they are losing weight. They are denied basic grooming products. Their attorney-client meetings take place in rooms monitored by cameras, and undersigned counsel was turned away from the facility twice in the past week alone. FDC Miami has already denied counsel's written request for non-SHU housing, but as the Court is aware, the United Kingdom's formal papers are not due for more than a month.

In *Matter of Extradition of Toledo Manrique*, the combination of the anticipated length of the proceedings and the conditions of Toledo's confinement created a special circumstance that justified release. 2019 WL 5168587, at *1 (N.D. Cal. Oct. 10, 2019).[8] Toledo had already been held for three months in solitary confinement, due to his status as a former head of state and his request for protective

---

[7] Counsel Joseph McBride is available to answer any questions about the conditions of confinement.

[8] The government's motion for relief from this judgment was granted and Toledo was detained on March 4, 2020, but a few weeks later, on March 19, 2020, Toledo was again released on bail and other conditions. *See Matter of Extradition of Toledo Manrique*, 445 F. Supp. 3d 421 (N.D. Cal. 2020). Toledo remained on bond until he surrendered to Peru in 2023.

custody, where he was confined to a small cell for all but an hour of every two days. *Id*. The Court held "the severity of this restraint on liberty raise[d] serious due process concerns" *especially for a person who had not been convicted of a crime. Id*. (citing *Davis v. Ayala*, 135 S. Ct. 2187, 2208–10 (2015) (Kennedy, J., concurring)).

Andrew and Tristan have not been convicted of any crime, in any country; they are not criminal defendants in this country; they are civil detainees held at the request of a foreign government, even further from anyone the law permits to punish. The Tates' continued detention in solitary confinement based solely on unsupported, anonymous allegations at the provisional stage (before the U.K. has even submitted a formal extradition request) is fundamentally inconsistent with due process.

### The Tates' Extraordinary Public Visibility

The Tates' extraordinary notoriety and recognizability is a special circumstance. As a practical matter, it would be extraordinarily difficult for Andrew or Tristan to travel undetected or avoid attention, either from the press or law enforcement.

The Tates are among the most recognizable public figures on the internet with a massive social media following. Andrew has more than ten million followers on X and was the third-most Googled person in the world in 2023. Tristan has more than three million followers on X. Their content generates billions of views across

multiple platforms, including more than 20 billion views associated with the hashtag #AndrewTate on TikTok. Before their detention, both Andrew and Tristan routinely publicized their whereabouts on social media, often posting real-time updates of their locations. *See* **Ex. 9**. Their activities are the subject of constant public scrutiny, media coverage, and online discussion.

In particular from January 2024 through their arrest on July 18, 2026, the Tates have operated under their own names on several social media accounts that they have held since 2011 and 2013, published their own movements in real time, and appeared at pre-announced ticketed events. Their work is built around public posts and appearances. Indeed, when federal marshals were sent to take the Tates into custody, the marshals did not have to search but instead attended a publicly advertised boxing match in downtown Miami where the Tates were scheduled to appear.

In another celebrity case, *In re Extradition of Chapman*, a magistrate judge released Duane Lee Chapman, also known as Dog the Bounty Hunter, on bond because he was a "visible, well-known public figure[] who could not easily go into hiding" and was not a risk of flight. 459 F. Supp. at 1027. Chapman's show, Dog the Bounty Hunter, was the most popular show on A&E, attracted millions of viewers each week, and was highly lucrative for Chapman. *Id*. at 1025.

The *Chapman* court's reasoning applies with full force. Unlike most extradition cases, millions of followers, media outlets, and critics around the world continuously monitor the Tates' identities, appearance, travel patterns, business activities, and public statements. The Tates' public visibility substantially reduces any risk that they could abscond or evade detection.

Individually and collectively, these circumstances are extraordinary, compelling, and eliminate any meaningful justification for detention pending the completion of these proceedings. *See Taitz*, 130 F.R.D. at 446.

## II.   THE TATES POSE NEITHER A FLIGHT RISK NOR A DANGER TO THE COMMUNITY.

The government's request for detention rests almost entirely on the presumption against bail in extradition proceedings. DE#4, pp. 15-22. However, the government claims that Andrew and Tristan present a flight risk because:

- They face a lengthy prison sentence in the United Kingdom and will almost certainly be extradited;

- They have "demonstrated a defiant unwillingness to participate in judicial proceedings in the United Kingdom" and have "refused to voluntarily return to face [their] accusers";

- They have "simultaneously fought hard to obtain the identity of the complainants against [them]" and in the past, Andrew has offered a reward of $10,000 for a man's identity and workplace;

- Despite having several assets seized in the U.K., the Tates "appear to have the financial means-and the will-to continue evading justice" because they "travel frequently to countries that do not have extradition treaties with the United Kingdom";

- Andrew posted a video tour on social media of a $50 million super yacht which he is reportedly having built in Bodrum Turkey for completion in 2027; and finally

- Tristan has made statements suggesting he and Andrew are "not protected by Romania at all" and "We're just gonna have to fucking stay in Dubai and the United States and stop traveling and fucking get some extradition lawyers," and Andrew posted a comment on X criticizing the British government.

*Id.* at pp. 20-22.

These assertions fail to establish that either Andrew or Tristan present a risk of flight.

First, there is already an order surrendering the Tates to the U.K. **Ex. 1**. The threat of a "lengthy prison sentence" in the U.K. is not new. They have not fled. They are living openly and notoriously. They continue to post their whereabouts on social media. And for years they returned to Romania, even after entry of the order granting extradition to the U.K.

Second, the Tates have not demonstrated a "defiant unwillingness to participate in judicial proceedings in the United Kingdom." To the contrary, the Tates are represented by U.K. counsel who is actively defending against these charges. As counsel states in his declaration,

> **15.** Andrew and Tristan have never been interviewed in relation to the allegations underpinning the TaCA warrants (and now the UK's request for extradition from the US). We have offered in correspondence (for example on July 24, 2025 – **Appendix 5**) to make Andrew and Tristan available for interview in Romania:

> *As our clients are keen to assist the police investigation, they are willing to be interviewed under caution notwithstanding that charges have already been authorised against them. Our clients remain under judicial control in Romania but we are confident that the Romanian authorities would consent to officers of Bedfordshire Police interviewing our clients in Bucharest. There are numerous precedents for police interviews being conducted abroad with the consent of the country in question.*

These offers have been categorically rejected by the Crown Prosecution Service. To say therefore that the Tates have "demonstrated a defiant unwillingness to participate in judicial proceedings in the United Kingdom" is entirely inaccurate.

16. The reality is that Andrew and Tristan have been deprived of the opportunity to meaningfully engage in U.K. proceedings as they have never been afforded sufficient information to do so. Should the CPS provide the names of the complainants, we would endeavour to provide evidence to assist the investigation (such as messages, photographs and witness statements) and make representations as to whether or not the evidential test is satisfied.

17. The Tates fully intend to participate with U.K. proceedings but, as ordered by the Court, only once Romanian proceedings have concluded.

**Ex. 8**, ¶ 15-17.

Third, the government provides no evidence regarding the Tates' wealth. Instead, the papers cite the Tates' travel schedule and the fact that Andrew posted a "video tour" of a mega-yacht on social media. In its comment that the U.K. seized two million pounds and several "supercars," the government writes that the funds and cars are "related to" Andrew, not that they *belonged* to Andrew, and there is no allegation that they were related to Tristan at all. As for the yacht, it does not belong

to either Andrew or Tristan. The video referenced by the government was a social media promotion. Even if the Tates did have "considerable financial resources," there is no evidence of an intent to flee. To be sure, the Tates never used any perceived wealth to flee judicial control in Romania.

The government's assertion that the Tates are trying to "avoid or frustrate" attempts to extradite them by traveling to countries without extradition treaties with the U.K. is equally unsupported. Five times in the last year the Tates traveled to the United States, as well as the U.A.E., Turkey, Croatia and Cyprus. All have valid extradition agreements with the U.K.

Finally, the quotations the government cites from the *New Yorker* Article should have no effect on this case. The author writes: "I have pieced together an account of Tate's activities from thousands of private messages, internal documents, sealed prosecutorial files, and court records—as well as scores of interviews with the Tates, their associates, and more than a dozen alleged victims." Heidi Blake, *Andrew Tate's Empire of Abuse*, New Yorker (June 8, 2026),https://www.newyorker.com/magazine/2026/06/15/andrew-tates-empire-of-abuse. The statements attributed to Andrew and Tristan are hearsay, with no identified sources.

The report that "Tristan panicked" and wrote to his advisers, "New charging decision = new warrant… Means we're not protected by romania at all and he can

be picked up at anytime from anyplace," and then, in a voice note, added, "We're just gonna have to fucking stay in Dubai and the United States and stop traveling and fucking get some extradition lawyers," is unreliable, and frankly, nonsensical. The U.A.E. and the United States are both parties to bilateral extradition treaties with the U.K., making them among the least effective sanctuaries if the brothers were genuinely intent on evading U.K. prosecution. *See* U.S.-U.K. Extradition Treaty, supra; U.K.-U.A.E. Extradition Treaty, *supra*.

Andrew's March 2026 tweet criticizing the British government hardly proves risk of flight. To the contrary, it supports the Tates' belief that these extradition proceedings were instituted in retaliation for the Tates' ongoing criticism of the British government.

In sum, the record does not demonstrate that Andrew or Tristan intend to flee.

At the extradition hearing in Romania, Andrew told the Court he wants to "remain in Romania, to prove that he has always told the truth and wishes for the trial in Romania to be concluded," and after which, Andrew "*will go to England on his own to resolve his issues there as well.*" **Ex. 1,** p. 3. Tristan made a similar statement. **Ex. 2**, pp. 4-5. They stayed true to their word while on judicial control. This fact, along with the other special circumstances above, proves, clearly and convincingly, that Andrew and Tristan will comply with any conditions set forth by this Court.

Regarding danger to the community, the government relies entirely on the decade-old charges against Andrew and Tristan in the U.K. and Romania. But the Romanian court was satisfied the Tates did not present any danger and permitted the Tates to remain at liberty under judicial supervision rather than detention. During the years that Andrew and Tristan have been on pretrial release, there were no allegations of criminal conduct while on release, they have not been charged with any current wrongdoing while on release, and they have no other criminal history in the United States, the United Kingdom, Romania, or any other country.

Consequently, the government is incorrect when it claims the serious nature of the offenses charged renders Andrew and Tristan a "danger to the community both here in the United States and abroad if [they] were released from custody." DE#4, p. 20. The underlying charges alone are not sufficient to sustain a finding of dangerousness. *See Rangel Prentt*, 2024 WL 2219823 at \*14 ("[O]ther than the underlying Colombian conviction, there is nothing demonstrating that Defendant remains a current danger to the community."). This is especially true here, where the Tates have not been *convicted* of the charges.

Any remaining concerns the Court may have regarding flight or danger can be fully mitigated through strict conditions of release.

### III.    PROPOSED CONDITIONS OF RELEASE

The Tates propose the following bail conditions and will be amenable to any modifications the Court deems appropriate:

a.  A bond in an amount to be determined by the court,

b.  Surrender of Andrew and Tristan's passports;

c.  GPS monitoring at any location approved by the Court;

d.  Authorization for Pretrial Service to enter the home at any time to ensure compliance with the bail conditions.

\* \* \*

## CONCLUSION

For the reasons set forth above, Andrew and Tristan Tate respectfully request

that the Court grant their request to be released on bail.

Respectfully submitted,


/s/ *Thomas Maniotis*
**THOMAS MANIOTIS**
Florida Bar No. 122414
EQUITY LEGAL, PLLC
5201 Blue Lagoon Drive, Floor 8
Miami, Florida 33126
(305) 407-1005
tamaniotis@equitylegalfirm.com
Counsel for Defendants


/s/ *Joseph D. McBride*
**JOSEPH D. MCBRIDE**
New York Bar No. 5445879
THE MCBRIDE LAW FIRM, PLLC
305 Broadway, Suite 700
New York, New York 10007
(917) 757-9537
jmcbride@mcbridelawnyc.com
Admitted Pro Hac Vice
Co-Counsel for Defendants


/s/ *Howard Srebnick*
**HOWARD SREBNICK** (FBN 919063)
**JACKIE PERCZEK** (FBN 042201)
**ALEXA KLEIN** (FBN 1002299)
**JAKE GOLDMAN** (FBN 1074657)
BLACK SREBNICK
201 South Biscayne Boulevard
Suite 1300
Miami, Florida 33131
(305) 371-6421

HSrebnick@RoyBlack.com
JPerczek@RoyBlack.com
AKlein@RoyBlack.com
JGoldman@RoyBlack.com


/s/ *Stephen James Binhak*
**STEPHEN JAMES BINHAK**
Florida Bar Number 736491
LAW OFFICES OF STEPHEN JAMES
BINHAK
One Southeast Third Avenue, Suite 1800
Miami, Florida 33131
(305) 361-5500
binhaks@binhaklaw.com