# DOSAR NR. 1713/2/2024 (845/2024)

*Criminal Sentence of 12.03.2024 – English translation*

*English text of this document, extracted from its Romanian–English parallel translation. Unofficial, for information only; not a certified or sworn translation.*

| ENGLISH TRANSLATION |
| :---: |
| **ROMANIA** |
| **BUCHAREST COURT OF APPEAL – FIRST CRIMINAL SECTION** |
| **File number: 1713/2/2024 (845/2024)** |
| **CRIMINAL SENTENCE NO. 37/F** |
| **Public hearing of 12.03.2024** |
| The Court, composed of: |
| **PRESIDENT – CORINA CIOBANU** |
| **COURT CLERK – MARIANA ROB** |
| The Public Ministry – Prosecutor's Office attached to the Bucharest Court of Appeal – was represented by **Prosecutor Sabău Amaryl**. |
| The case at hand concerns the enforcement of the arrest warrant issued on 19.01.2024 by a High Territorial Judge (Chief Magistrate) of the Westminster Magistrates' Court (United Kingdom of Great Britain and Northern Ireland), based on the arrest warrant dated 19 January 2023, issued by the Westminster Magistrates' Court, for the requested person, Tate Tristan. |
| At the roll call in the public hearing, the requested person, Tate Tristan, who is in custody, was present and assisted by his chosen legal representatives, Attorney Vidineac Eugen and Attorney Gliga Ioan Constantin, as per the legal representation authorization series BV no. 220568/2022. |
| Also present was the English language interpreter, Slăvuică Elena. |
| The summoning procedure was legally fulfilled. |
| The case report was presented by the court clerk, after which: |
| **The Court**, in accordance with the provisions of Article 104 of Law no. 302/2004, verified the identity of the requested person, Tate Tristan, and informed him of the reason for his appearance before the court at this hearing, specifically, the content of the arrest warrant issued by the British judicial authorities based on a national arrest warrant dated 19.01.2023. His extradition was requested for the purpose of conducting investigations into a series of expressly specified offenses. He stated that he had no objections regarding his identity. |
| Through the English language interpreter, the requested person states that they have been provided with the arrest warrant in English. |
| **The requested person's chosen defense attorney, Mr. Vidineac Eugen**, requests, in accordance with the provisions of Article 109 of Law No. 302/2004, which stipulates that the court must consider all circumstances |

and facts when deciding on the execution of the warrant, the admission of documentary evidence—specifically, a mediation request submitted by several alleged victims, similar to those mentioned in the European Arrest Warrant (EAW).

This request indicates that these individuals had previously filed criminal complaints in the United Kingdom, which were dismissed, as well as an official statement from the British authorities confirming that in 2017, the reported offenses were closed due to lack of evidence.

The defense compares the facts described in the European Arrest Warrant, the number of victims, and the public statements made by their legal representative, arguing that this is a case of identical individuals. Consequently, the court must assess the necessity of executing the European Arrest Warrant, not only from the perspective of legal appropriateness but also in light of the principle of legality, which the requested person invokes in their defense. This argument is further supported by the fact that the criminal investigation was reopened more than 10 years after the alleged offenses were committed. The related documentary evidence, provided in English, is also submitted to the Public Prosecutor's representative.

**The representative of the Public Prosecutor's Office**, taking the floor, states that they agree with the admission of the requested evidence, with the condition that the documents be translated into Romanian.

**The requested person's defense attorney, Mr. Vidineac Eugen,** informs the court that, before the conclusion of the proceedings, he will take the necessary steps to have the document translated into Romanian.

The court approves the evidence request and notes that it is being administered by the submission of the documents to the case file.

**The requested person's defense attorney, Mr. Gliga Ioan**, in further support of the evidence request, states that he has encountered difficulties in identifying the alleged victims to formulate defenses strictly related to them. However, he has managed to identify a common accusation for both requested persons, which pertains to a case before the Bucharest Tribunal. In this regard, DIICOT has decided to send the case to court for a human trafficking offense involving the victim ▮▮▮▮▮▮▮▮. The requested person Tate Tristan has acknowledged the acts described in relation to this victim in point 11 of the European Arrest Warrant, and regarding the requested person Tate Andrew, the same victim is mentioned in points 2-6 of the warrant. Furthermore, the defense attorney requests the submission of an extract from the indictment dated 15.06.2023 issued by DIICOT, which describes the criminal acts also mentioned in the European Arrest Warrant. However, based on the identity of time and the description of the facts, it can be concluded that these acts are already subject to judgment in the ongoing case at the Bucharest Tribunal.

Additionally, the defense requests the submission of a copy of the supervision program imposed as part of the judicial control measure in the case before the Bucharest Tribunal, which the requested person has been strictly adhering to, a measure that was imposed in August 2023.

The representative of the Public Prosecutor's Office, taking the floor again, states that they agree with the admission of the requested evidence.

**The Court** approves the requested evidence and notes that it is being administered through the submission of documents to the case file.

**The Court,** through the interpreter of the English language, informs the requested person that they have the option to consent to their surrender to the British judicial authorities for the necessary investigations regarding the offenses mentioned in the arrest warrant. In such a case, the consent is irrevocable, or alternatively, they may refuse surrender to the British authorities by invoking grounds for refusal.

The requested person, personally, through the interpreter of the English language, states that they do not consent to surrender to the British authorities, and the Court proceeds to prepare a declaration (page 46).

**The Court**, through the interpreter of the English language, informs the requested person that they have the option to invoke the specialty rule, which means that, if surrender is decided, they cannot be judged or convicted for any other offenses than those covered by the present arrest warrant.

When asked, the requested person, personally, through the interpreter of the English language, confirms that they do not waive the rights granted by the specialty rule.

There being no requests to formulate, exceptions to raise, or evidence to be administered, the Court grants the floor on the merits of the case.

**The representative of the Public Prosecutor's Office**, taking the floor, requests the admission of the referral made by the Prosecutor's Office attached to the Bucharest Court of Appeal, considering that both the substantive and procedural conditions are met, and there is no mandatory ground for refusal to execute the arrest warrant. In this case, a facultative ground for refusal applies, namely that the statute of limitations for some of the offenses, such as rape and bodily harm, may have occurred. However, they request that this facultative ground be set aside, given that no statute of limitations applies to the human trafficking offenses, and the period during which they were committed does not overlap with the period of criminal activity covered by the case before the Bucharest Tribunal, namely the period from July 2021 to 2022.

Therefore, based on the agreement between the European Union and the United Kingdom of Great Britain, referring to the applicable legal provisions under Law no. 302/2004, it is requested that the arrest warrant issued in the name of the requested person, Tate Tristan, be executed, and that their surrender be ordered, with respect to the specialty rule. It is also requested that it be acknowledged that the person does not consent to their surrender, and that an arrest warrant be issued for the purpose of surrender, which should be postponed until the final resolution of the case before the Bucharest Tribunal, or, if a prison sentence is imposed, until its execution, or until the date of conditional release.

It is further requested that the arrest warrant be enforced upon the cessation of the reason for the postponement of the surrender. It is requested that it be noted that the requested person has been detained since March 12, 2024.

**The defense attorney of the requested person, Vidineac Eugen,** requests that one of the facultative grounds provided by law to avoid executing the European arrest warrant be taken into account, considering that one of the facultative conditions has not been met, namely that the statute of limitations for certain criminal offenses, according to Romanian law, has intervened. Additionally, the European arrest warrant is vague and not sufficiently clear in terms of the accusations, meaning that the specialty principle cannot currently be respected. Even though the Public Prosecutor's representative concludes that the surrender should be postponed due to an ongoing case before the Romanian court, with the party under preventive arrest, this request has not been justified in any way, neither in terms of the legality nor the appropriateness of the preventive arrest measure. The court is obliged to assess the fate of the requested person, considering the complexity of multiple judicial procedures declared by two states, while respecting all fundamental rights and the conditions required by law when establishing any measure of deprivation of liberty.

In this case, referring to the indictment related to the trial in Romania, it can be noted that the requested person has been under preventive arrest for 3 months, under house arrest for 5 months, and since August 2023 has been under judicial control, during which sufficiently strict measures have been imposed.

Given that the limits of the accusations are not known, the legal nature of the actions, nor the identity of the victims, which would allow the requested person to formulate defenses, the question arises as to who benefits from the application of a measure of deprivation of liberty at this point. This measure is considered unjustified, outdated, ineffective, and even illegal, since the requested person is under judicial control and has not violated any obligation

imposed by either the preliminary chamber judge or the supervising authority. Applying the preventive arrest measure at this time for alleged acts committed in 2012, 2013, and 2015, on the territory of another state, against persons whose identity is not known, for actions that have been dismissed, as shown in the documents submitted at this session, and for which criminal prosecution is to be reopened, possibly due to the notoriety of the requested person, is not justified under any circumstances.

In another regard, the defense argues that the requested person has demonstrated full compliance with the obligations imposed by the Romanian judicial authorities, which is why this mandate has been effective, with delay, but still with the requested person in preventive arrest, which neither brings satisfaction to the victims nor effectiveness to the rule of law. In the event that the execution of the warrant and the transfer of the requested person to the UK are discussed, the UK will be able to apply any other measure it deems appropriate.

**The defense attorney of the requested person, Gliga Ioan,** requests, in accordance with the provisions of Article 102 (5)(b) of Law no. 302/2004, the rejection of the prosecutor's request, the immediate release of the requested person, and if necessary for the proper continuation of judicial procedures, the imposition of a preventive measure, with the consideration of applying the judicial control measure.

It is requested that it be noted there is only one point in which the defense aligns with the position of the Public Prosecutor, namely the need to clarify the legal situation in Romania, from which perspective the prosecutor has requested the postponement of the surrender. However, the point at which the positions diverge is with regard to the preventive measure that should be applied, as it is considered that the preventive arrest for a period of 15 days, as provided by Article 102(5)(a) of Law no. 302/2004, serves no purpose. This is because the procedures involving the requested person in Romania will certainly not conclude within 15 days, but possibly in 3 years. In this situation, within a short period, a discussion on the continuation of the preventive measure will be required, at which point nothing would have changed regarding the criminal case pending before the Bucharest Court, and therefore it is evident that a preventive measure, other than judicial control, is unnecessary. Since the judicial control measure is already in place, imposing another judicial control measure would be redundant.

Regarding the statement made by the representative of the Public Prosecutor, who indicated that the criminal activities attributed to the requested person do not overlap with the criminal period relevant to the case in Romania, with the period being between 2021-2022, the defense provides clarification. According to the extract submitted in the case file, it appears that the person is also indicted for crimes committed in 2016, exactly one of the reasons why the defense believes this case falls under the optional grounds for refusal of surrender, as provided by Article 99(2)(b) of Law no. 302/2004.

In addition to the offense that would fall under the scope of this optional ground for refusal, there are other offenses attributed to the requested person. However, in this case, before agreeing to the surrender of the individual to the British judicial authorities, the judicial procedures in Romania must first be completed, otherwise, the case before the Bucharest Court could not be concluded.

Finally, based on the above, the defense requests, under the provisions of Article 102(5)(b) of Law no. 302/2004, the refusal to execute the European arrest warrant and the immediate release of the requested person. If it is deemed that a preventive measure is necessary, the defense requests that judicial control be imposed as the appropriate measure.

**The requested person, Tate Tristan**, in his final statement, through the English-language interpreter, indicates that from the beginning of the process, he has made two requests to leave Romania: the first for his mother's birthday and the second due to the fact that his mother suffered a heart attack. The prosecutor rejected both requests, stating that if he were to leave for England, he would evade criminal responsibility in Romania. Even though he has not seen his mother to this day, and now there is a special opportunity to do so, even though his family and friends are there, and even though he could work to support his family, he wishes to remain in Romania to prove that the accusations against him are false and that he does not intend to flee. He does this for the sake of his reputation, his family, and his daughters. Although he desires to be in the United Kingdom, he requests to remain

==highlight==in Romania under the judicial control measure, as this is his opportunity to prove his innocence, even though it is possible that drastic measures will be taken against him—measures that do not exist in the UK.==

However, he places his full trust in the Romanian judicial system and is awaiting the start of the trial to clarify everything. Only after that will he go to see his mother.==

The court reserves its decision.

**THE COURT,**

Deliberating on the present request, based on the documents and proceedings of the case, the Court finds the following:

On March 12, 2024, the request No. 698/II-5/2024, dated March 12, 2024, submitted by the Prosecutor's Office attached to the Bucharest Court of Appeal, was registered before this Court under No. 1713/2/2024. This request concerns the execution of the arrest warrant issued on January 19, 2024, by a High Territorial Judge (Chief Magistrate) from the Westminster Magistrates' Court (in the United Kingdom of Great Britain and Northern Ireland), based on the arrest warrant issued on January 19, 2023, by the Westminster Magistrates' Court, in the name of the requested person TATE TRISTAN (a British and American citizen, ███████████████████████████████████████████████████████████████, issued on July 6, 2022, by the United Kingdom), internationally wanted for the crimes of human trafficking, as per Article 2 of the Modern Slavery Act of 2015, rape, as per Article 1 of the Sexual Offenses Act of 2003, and assault causing bodily harm, as per Article 47 of the Offenses Against the Person Act of 1861. The Court is tasked with deciding on the arrest of the requested person for the purpose of extradition, for a period of 30 days.

By retention order No. 36/12.03.2024, the Prosecutor's Office attached to the Bucharest Court of Appeal ordered the detention of the named TATE TRISTAN for 24 hours, starting from 04:40 on March 12, 2024, until 04:40 on March 13, 2024.

During the proceedings, the legal assistance for the requested person was provided by two appointed defense lawyers, and the Court ensured the presence of an English-language interpreter.

At the request of the defense lawyers of the requested person, approved by the Court, an extract from the indictment No. 1305/D/P/2022 dated June 15, 2023, prepared by the Prosecutor's Office attached to the High Court of Cassation and Justice – Directorate for the Investigation of Organized Crime and Terrorism – Central Structure – Organized Crime Combat Section, was added to the case file. The extract shows that the requested person TATE TRISTAN is an accused and has been indicted, with the case being registered before the Bucharest Tribunal – Criminal Section I, under No. 18906/3/2023. Also, a supervision report regarding the defendant TATE TRISTAN, prepared by the Ilfov County Police Inspectorate, Voluntari City Police, was added, which indicates that the requested person is currently under the preventive measure of judicial control, a measure ordered by Decision No. 428/CP of August 4, 2023, issued by the Bucharest Court of Appeal – Criminal Section I, in case No. 18906/3/2023/a1.2, as well as certain documents from the British judicial authorities allegedly related to the facts mentioned in the arrest warrant on which the extradition request is based.

When asked by the Court, the requested person, TATE TRISTAN, stated that she has no objections regarding her identity and that she does not agree to be extradited to the British judicial authorities. In this regard, the procedure continued with the hearing of the requested person, during which she declared that the reason she refuses to be handed over to the British authorities is that she does not consider herself guilty of committing the acts mentioned in the arrest warrant. She also mentioned that she has ongoing legal matters in Romania, being investigated in a case where she wishes to clarify aspects regarding her innocence. Furthermore, she stated that she wishes to invoke the principle of specialty, meaning that, if she is handed over to the British judicial authorities, she should be tried only for the acts that are the subject of the present request.

Upon reviewing the documents and proceedings of the case, the Court observes the following:

Regarding the requested person, TATE TRISTAN, on January 19, 2024, a High Territorial Judge (Chief Magistrate) from the Westminster Magistrates' Court (in the United Kingdom of Great Britain and Northern Ireland) issued an arrest warrant in case number TAT 00657, based on the arrest warrant issued on January 19, 2023, by the Westminster Magistrates' Court. This warrant requested the extradition of the requested person for the purpose of conducting criminal proceedings regarding the commission of human trafficking and rape, which are punishable under British law by life imprisonment, as well as assault causing bodily harm, which is punishable under British law by a maximum of 5 years in prison.

The arrest warrant records the commission of a total of 11 offenses between April 1, 2012, and October 1, 2016, as follows:

1. *Rape of a female individual, as provided by Article 1 of the Sexual Offenses Act 2003*, consisting of intentionally penetrating the anus of a woman with his penis between April 1, 2012, and December 26, 2013, without her consent, and without her reasonably believing that she had consented.

2. *Rape of a female individual, as provided by Article 1 of the Sexual Offenses Act 2003*, consisting of intentionally penetrating the anus of a woman with his penis on at least three occasions, on separate occasions other than the first accusation, between April 1, 2012, and December 26, 2013, without her consent, and without her reasonably believing that she had consented.

3. *Assault on an individual, causing bodily harm, as provided by Article 47 of the Offenses Against the Person Act 1861*, consisting of assaulting another person, causing them bodily harm, between April 1, 2012, and December 26, 2013.

4. *Assault on an individual, causing bodily harm, as provided by Article 47 of the Offenses Against the Person Act 1861*, consisting of assaulting another person, causing them bodily harm, on at least three occasions, on separate occasions other than the one specified in accusation 3, between April 1, 2012, and December 26, 2013.

5. *Assault on an individual, causing bodily harm, as provided by Article 47 of the Offenses Against the Person Act 1861*, consisting of assaulting another person, causing them bodily harm, on a separate occasion other than the ones specified in accusations 3 and 4, between April 1, 2012, and December 26, 2013.

6. *Assault on an individual, causing bodily harm, as provided by Article 47 of the Offenses Against the Person Act 1861*, consisting of assaulting another person, causing them bodily harm, on at least three occasions, on separate occasions other than those specified in accusations 3, 4, and 5, between April 1, 2012, and December 26, 2013.

7. *Assault on an individual, causing bodily harm, as provided by Article 47 of the Offenses Against the Person Act 1861*, consisting of assaulting another person, causing them bodily harm, between April 1, 2013, and December 26, 2013, on a separate occasion other than those specified in accusations 3, 4, 5, and 6.

8. *Assault on an individual, causing bodily harm, as provided by Article 47 of the Offenses Against the Person Act 1861*, consisting of assaulting another person, causing them bodily harm, on at least three occasions, on separate occasions other than those specified in accusations 3, 4, 5, 6, and 7, between April 1, 2013, and December 26, 2013.

9. *Rape of a female individual, as provided by Article 1 of the Sexual Offenses Act 2003*, consisting of intentionally penetrating the vagina of a woman with his penis on December 24, 2012, without her consent, and without her reasonably believing that she had consented.

10. ***Organizing or facilitating the travel of another person for the purpose of exploitation, as provided by Article 2 of the Modern Slavery Act 2015***, consisting of arranging or facilitating the travel of another person between April 3, 2016, and April 30, 2016, with the intention that the person would be exploited, or knowing or being reasonably expected to know that they would be sexually exploited by another person during or after the journey.

11. ***Organizing or facilitating the travel of another person for the purpose of exploitation, as provided by Article 2 of the Modern Slavery Act 2015***, consisting of arranging or facilitating the travel of another person between August 31, 2016, and October 1, 2016, with the intention that the person would be exploited, or knowing or being reasonably expected to know that they would be sexually exploited by another person during or after the journey.

**In detail, the British authorities have established the following factual circumstances concerning the individual TATE TRISTAN:**

„**The offenses refer to a female complainant.**

Between April 1, 2012, and December 26, 2013, she had a relationship with Tristan Tate (TT). On several occasions, TT convinced the complainant to allow him to strangle her until she lost consciousness, before and during vaginal sexual intercourse. The complainant suffered injuries as a result of both the strangulation and the blows inflicted by TT to help her regain consciousness. While unconscious due to the strangulation, TT penetrated her anus with his penis without her consent. Offenses 3 and 1 refer to a specific occasion when TT assaulted and then raped her anally in this manner.

Charges 4 and 2 are multiple accusations reflecting at least three other occasions on which he assaulted and raped her anally in this manner. Offense 5 refers to another specific incident, where TT strangled the complainant to unconsciousness but did not later rape her. Offense 6 reflects at least three other occasions when he assaulted her in this manner.

Offense 7 refers to an occasion when TT assaulted the complainant using a belt, leaving bruises. Offense 8 reflects at least three other occasions when he similarly assaulted her with a belt.

Offense 9 refers to December 24, 2012. The complainant went to TT's home, where he pushed her, causing her to stumble. He then mounted her from behind and penetrated her vagina with his penis. The complainant did not have the freedom to choose to consent to the sexual act, and he made no effort to establish whether she was consenting.

All the above offenses occurred in the United Kingdom.

Offenses 10 and 11 refer to the trafficking of the complainant for sexual exploitation. TT and his brother, AT, convinced her to work as a webcam model, providing sexual services on camera for paying clients of their business. Between April 3, 2016, and April 30, 2016, TT and AT arranged and facilitated the complainant's travel from the United Kingdom to Slovakia and her stay there, for her to work as a webcam model (video chat). They arranged her accommodation, which was deducted from her salary, and was to be a percentage of her total earnings. This is offense 10. She returned to the United Kingdom after an argument with TT.

Between August 31, 2016, and October 1, 2016, TT and AT continued to arrange for the complainant to travel from the United Kingdom to Romania, where she was to work as a webcam model under the same payment conditions as in the previous trip. On this occasion, they controlled her movements and required her to report her location to them. This is offense 11.

The complainant was not actually paid on either occasion for any of the services she provided."

According to Article 85 of Law no. 302/2004, the provisions of this title (regarding the European arrest warrant) also apply in cases where a convention containing provisions similar to Framework Decision 2002/584/JAI of the

Council of the European Union of June 13, 2002, concerning the European arrest warrant and surrender procedures between EU member states, is applicable between Romania and the requested state or the requesting state.

Furthermore, the provisions of Title VII of the Trade and Cooperation Agreement between the European Union and the European Atomic Energy Community, on the one hand, and the United Kingdom of Great Britain and Northern Ireland, on the other hand, are also applicable in this case.

By examining the referral made by the Prosecutor's Office attached to the Bucharest Court of Appeal in light of the relevant legal provisions, the Court notes that the arrest warrant issued by the British judicial authorities in the name of the requested person, TATE TRISTAN, fulfills the formal and substantive conditions provided by Article 87 of Law no. 302/2004, republished, and Article 606 of the Trade and Cooperation Agreement between the EU and the United Kingdom. The warrant is based on the national arrest warrant issued on January 19, 2023, by the Westminster Magistrates' Court.

The objections raised by the defense of the requested person regarding the lack of clarity in the description of the charges are unfounded, as the criminal activities for which the British judicial authorities request the surrender of TATE TRISTAN have been presented in the arrest warrant in a succinct, but explicit and comprehensive manner, with specific indications of the time and place in which the offenses were committed, as well as the manner in which they were carried out, providing sufficient information for their legal qualification under the incrimination provisions of the executing state's legislation.

Moreover, the Court finds that the offenses of human trafficking, rape, and assault causing bodily harm referred to in the arrest warrant issued by the British authorities fall into the category of offenses for which surrender is mandatory, without verifying the condition of dual criminality, as provided in Article 599, paragraph 5 of the Trade and Cooperation Agreement between the European Union and the United Kingdom, and Article 107, paragraph 1 of Law no. 302/2004. In fact, this condition of dual criminality is fully satisfied in this case, as all the offenses described in the arrest warrant for which surrender is requested also correspond to Romanian legislation. These offenses can be legally classified as human trafficking under Article 210 of the Penal Code, rape under Article 218 of the Penal Code, and bodily harm under Article 194 of the Penal Code.

Furthermore, based on the mentions in the arrest warrant, it is also deduced that the requirement established by the provisions of Article 98, paragraph 1, letter b of Law no. 302/2004 is met, since, under British legislation, the offenses of human trafficking and rape are punishable by life imprisonment, with the possibility of reviewing the sentence after serving 20 years of the sentence, as stipulated by the issuing state's legislation.

Examining the procedural position of the requested person, the Court observes that the refusal to consent to surrender is not based on any of the mandatory grounds for refusal of surrender provided by Article 99, paragraph 1, letters a-c of Law no. 302/2004, republished, or Article 600 of the Trade and Cooperation Agreement between the European Union and the United Kingdom. As for the optional grounds for non-execution of the arrest warrant invoked by the defense of the requested person, the Court also finds that none of these apply in this case, considering the following aspects:

Thus, regarding the reason for refusal of execution of the warrant provided by Article 99, paragraph 2, letter b of Law no. 302/2004, republished, and Article 601, paragraph 1, letter b of the Trade and Cooperation Agreement, concerning the situation where the person subject to the arrest warrant is undergoing criminal proceedings in Romania for the same act that prompted the arrest warrant, the Court finds that this hypothesis does not apply in the present case. This is because, in the case registered at the Bucharest Tribunal – Criminal Section I under file no. 18906/3/2023, currently in the preliminary chamber procedure, the defendant TATE TRISTAN was indicted by Prosecutor's Decision no. 1305/D/P/2022 of the Prosecutor's Office attached to the High Court of Cassation and Justice – Directorate for Investigating Organized Crime and Terrorism – Central Structure – Organized Crime Combat Section, on June 15, 2023, for committing the offenses of forming an organized criminal group under Article 367, paragraphs 1, 3, and 6 of the Penal Code (during 2021-2022), human trafficking in a continuous form under Article 210, paragraph 1, letter a of the Penal Code, in conjunction with Articles 182, letters a and c of the Penal Code, and applying Article 35, paragraph 1 of the Penal Code (three material acts concerning the victims:

██████████████████████████████████████████, between November 2021 and April 11, 2022), and incitement to assault or other violence under Article 47 of the Penal Code, in conjunction with Article 193, paragraph 1 of the Penal Code (victim: ████████████████████████████████), all with the application of Article 38, paragraph 1 of the Penal Code. Therefore, the offense described in point 11 of the arrest warrant (concerning the trafficking of a female person through her sexual exploitation in Romania, between August 31, 2016, and October 1, 2016) has no connection with the acts for which he is accused in the case pending before the Bucharest Tribunal – Criminal Section I.

Additionally, the Court finds that the optional ground for non-execution of the arrest warrant provided by Article 99, paragraph 2, letter g of Law no. 302/2004, republished, and Article 601, paragraph 1, letter d of the Trade and Cooperation Agreement does not apply, since, although it is true that the statute of limitations for criminal liability for the offenses of rape and bodily harm described in points 1-10 of the arrest warrant would have expired according to the legislation of the executing state (Article 154, paragraph 1, letter c of the Penal Code, referring to the decisions of the Constitutional Court no. 297/2018 and no. 358/2022), this ground for refusal of surrender is not applicable. The facts in question (committed by a person with British and American citizenship on the territory of the United Kingdom) do not fall under the jurisdiction of the Romanian judicial authorities (according to Articles 8 and 9 of the Penal Code, and Articles 41 and 42 of the Criminal Procedure Code).

Regarding the fact that, according to the document attached at page 45 of the case file, the UK judicial authorities issued a statement in 2017 indicating that the acts referred to in the arrest warrant for which execution is requested in the present case were initially dismissed, the Court finds that this document does not contain any concrete information allowing it to be definitively determined that the respective communication refers to the very acts that prompted the issuance of the arrest warrant dated January 19, 2024. Moreover, even if such a decision had been made, the documents and works of the file show that the facts under consideration, for which the British authorities are currently requesting the surrender of the requested person, are subject to an ongoing judicial procedure. In this procedure, a national arrest warrant has already been issued in the name of the requested person (issued on January 19, 2023, by the Westminster Magistrates' Court).

Consequently, under Article 109, paragraph 1, in conjunction with Article 104, paragraph 7, and Article 110, paragraph 2, first sentence of Law no. 302/2004, republished, the Court will accept the request made by the Prosecutor's Office attached to the Bucharest Court of Appeal and will order the execution of the arrest warrant issued on January 19, 2024, by a Senior Territorial Judge (Chief Magistrate) from the Westminster Magistrates' Court (in the United Kingdom of Great Britain and Northern Ireland), based on the arrest warrant dated January 19, 2023, issued by the Westminster Magistrates' Court, in the name of the requested person, TATE TRISTAN.

However, considering that the requested person, TATE TRISTAN, is currently under investigation in the case concerning criminal file no. 18906/3/2023 before the Bucharest Tribunal – Criminal Section I, the Court finds that the provisions of Article 114, paragraph 1, in conjunction with Article 58, paragraph 1 of Law no. 302/2004, republished, are applicable. These provisions stipulate that when a requested person is being investigated by Romanian judicial authorities, their surrender is postponed until the final resolution of the case. If the requested person is convicted to a custodial sentence, the surrender is delayed until they are released, either due to parole or after serving their sentence.

As a result, under Article 114, paragraph 1, in conjunction with Article 58, paragraph 1 of Law no. 302/2004, republished, the Court will order the postponement of the surrender of the requested person until the final resolution of the case concerning criminal file no. 18906/3/2023 before the Bucharest Tribunal – Criminal Section I. In the event of a conviction to a custodial sentence in that case, the surrender will be delayed until the person is released following conditional release or after serving their sentence.

The Court will note that the requested person understands to invoke the benefit of the specialty rule provided for in Article 117 of Law no. 302/2004, republished.

It will order the detention of the requested person for the purpose of surrendering them to the British judicial authorities, for a period of 30 days, starting from the date the reasons justifying the postponement of the surrender cease to apply.

It will note that the requested person was detained for a period of 24 hours, starting from March 12, 2024, at 04:40, based on Detention Order no. 36 of March 12, 2024, issued by the Prosecutor's Office attached to the Bucharest Court of Appeal.

It will order the immediate release of the requested person, TATE TRISTAN, from the detention order no. 36 of March 12, 2024, issued by the Prosecutor's Office attached to the Bucharest Court of Appeal, with this enforceable order to be communicated to the administration of the detention facility.

Under Article 32, paragraph 3, letter a of Law no. 76/2023, the Court will request the SIRENE National Bureau to undertake the necessary steps to add a validity indicator to the alert introduced in SIS by the issuing state.

Under Article 275, paragraph 3 of the Criminal Procedure Code, the judicial costs will remain the responsibility of the state, including the fee due to the English language interpreter for 3 (three) hours of work performed, which will be covered from the amounts advanced from the Ministry of Justice's fund, in accordance with Articles 272, paragraph 1 and 2, Article 273, paragraph 1, 4, and 5, and Article 275, paragraph 6 of the Criminal Procedure Code.

**FOR THESE REASONS,**

**IN THE NAME OF THE LAW,**

**THE COURT DECIDES:**

Pursuant to Article 109, paragraph 1, in conjunction with Article 104, paragraph 7, and Article 110, paragraph 2, first sentence, of Law no. 302/2004, republished, the Court admits the referral made by the Prosecutor's Office attached to the Court of Appeal of Bucharest.

It orders the enforcement of the arrest warrant issued on January 19, 2024, by a senior territorial judge (Chief Magistrate) of the Westminster Magistrates' Court (United Kingdom of Great Britain and Northern Ireland), based on the arrest warrant issued on January 19, 2023, by the Westminster Magistrates' Court, for the requested person TATE TRISTAN (a British and American citizen, ███████████████████████████████ ████████████████████████████████ ████████████████████, issued on July 6, 2022, by the United Kingdom).

Pursuant to Article 114, paragraph 1, in conjunction with Article 58, paragraph 1, of Law no. 302/2004, republished, it orders the postponement of the surrender of the requested person until the final resolution of the case in file no. 18906/3/2023 pending before the Bucharest Court – First Criminal Section, and in the event of a conviction to a custodial sentence, until their release upon conditional release or until the sentence is served.

It finds that the requested person intends to benefit from the principle of specialty as provided by Article 117 of Law no. 302/2004, republished.

It orders the detention of the requested person for the purpose of extradition to the British judicial authorities for a period of 30 days, starting from the date the reasons justifying the postponement of the surrender cease.

It finds that the requested person has been detained for 24 hours, starting from March 12, 2024, at 04:40, under Detention Order no. 36 of March 12, 2024, issued by the Prosecutor's Office attached to the Court of Appeal of Bucharest.

It orders the immediate release of the requested person, TATE TRISTAN, from the effects of Detention Order no. 36 of March 12, 2024, issued by the Prosecutor's Office attached to the Court of Appeal of Bucharest, and this enforceable decision will be communicated to the administration of the detention facility.

Pursuant to Article 32, paragraph 3, letter a of Law no. 76/2023, it requests the SIRENE National Bureau to take the necessary steps to add a validity indicator to the SIS notification made by the issuing state.

Pursuant to Article 275, paragraph 3 of the Criminal Procedure Code, the legal costs will be borne by the state.

Pursuant to Article 272, paragraphs 1 and 2, Article 273, paragraphs 1, 4, and 5, and Article 275, paragraph 6 of the Criminal Procedure Code, the interpreter's fee for 3 (three) hours of work will be covered from the amounts advanced by the Ministry of Justice fund and will be borne by the state.

The decision may be appealed within 5 days from the date of pronouncement. Pronounced in a public hearing, today, March 12, 2024.

**PRESIDENT,**

Corina Ciobanu

**COURT CLERK,**

Mariana Rob