## DECLARATION OF ANDREW FORD

I, Andrew Ford, declare as follows:

I am over 18 and competent to make this declaration. I have personal knowledge of the facts stated herein, and if called as a witness, I could testify truthfully to these facts.

1. I make this statement in connection with the extradition proceedings currently being held before the United States District Court of the Southern District of Florida, concerning the request for the extradition of Emory Andrew (Andrew) and Tristan Tate by United Kingdom.

2. I am a Director of Holborn Adam Solicitors. I am a Solicitor in England and Wales. My Solicitors Regulation Authority number is 565315.

3. I have represented Andrew and Tristan Tate in various matters in England and Wales since 2022. I am very familiar with the matters concerning proceedings within that jurisdiction.

4. Specifically, I represent Andrew and Tristan Tate in relation to proceedings emanating from two Trade and Cooperation Agreement (TaCA) warrants (**Appendix 1 and 2**).[1] One warrant is for Andrew Tate, and the other warrant is for Tristan Tate.

5. These TaCA warrants were issued by District Judge Goldspring on January 19, 2024.

6. Andrew and Tristan were both arrested in Romania in relation to the TaCA warrants on March 11, 2024. Romanian proceedings were already well established by this date.

7. Following a hearing, the Bucharest Court of Appeal ordered that extradition to the U.K. would happen, but only after Romanian proceedings had concluded, because these proceedings were commenced prior to the inception of the U.K. proceedings.

*The Crown Prosecution Service is Aware of the Romanian Order Staying Extradition*

8. In all of the communications between my firm, Holborn Adams, on behalf of the Tates, and the Crown Prosecution Service, I have been operating on the

---

[1] A TaCA warrant is an international arrest warrant used for streamlined extradition between the United Kingdom and European Union member states under the EU-UK Trade and Cooperation Agreement.

Docusign Envelope ID: E4D6927A-290E-8A71-820C-889613759007B

belief that the Tates' extradition to the U.K. would happen once Romanian proceedings had concluded. Any suggestion that the Tates should have voluntarily returned to the U.K. after the warrant was issued is at odds with the Order by the Bucharest Court of Appeal staying extradition.

9. Authorities in the U.K. have acknowledged and respected the Romanian Order since it was entered in March 2024. ███████████████████████████████████████████████████████████████████████████

*Refusal by Crown Prosecution Service to Provide Disclosure*

10. Since the warrants were issued, the Police and the Crown Prosecution Service have not been prepared to provide any further information regarding the allegations other than the scant information provided within the TaCA warrants.

11. Since March 14, 2024, I have written to the Crown Prosecution Service and the Police on several occasions to request basic information, most importantly the names of the complainants. We sought the names of the complainants in order to assist the investigation against Andrew and Tristan, specifically by providing further information regarding their relationship with the Tates.

12. The allegations relate to apparent incidents which date back more than a decade, and they were not made contemporaneously. As Andrew travelled to the U.K. in 2022 without issue, I believe the allegations were made after that time.

13. In England, it is a defence to Rape where one has a *reasonable belief in consent*. Thus, counsel needs to know the complainants' identities in order to investigate and gather evidence to support the potential defences that the sexual contact was consensual; there was reasonable belief in consent; or that no sexual contact took place at all.

14. The Tates sought judicial review of the Crown Prosecution Service's refusal to provide the names of the complainants. I have annexed our Statement of Grounds from this case which sets matters out in detail (**Appendix 4**). The Judicial Review was heard at the High Court in London on June 23, 2026 before Justice Chamberlain. The application was refused but this decision is now subject to appeal.

Initial
AF

*Alleged "Defiant Unwillingness to Participate"*

15. Andrew and Tristan have never been interviewed in relation to the allegations underpinning the TaCA warrants (and now the UK's request for extradition from the US). We have offered in correspondence (for example on July 24, 2025 – **Appendix 5**) to make Andrew and Tristan available for interview in Romania:



These offers have been categorically rejected by the Crown Prosecution Service. To say therefore that the Tates have "demonstrated a defiant unwillingness to participate in judicial proceedings in the United Kingdom" is entirely inaccurate.

16. The reality is that Andrew and Tristan have been deprived of the opportunity to meaningfully engage in U.K. proceedings as they have never been afforded sufficient information to do so. Should the CPS provide the names of the complainants, we would endeavour to provide evidence to assist the investigation (such as messages, photographs and witness statements) and make representations as to whether or not the evidential test is satisfied.

17. The Tates fully intend to participate with U.K. proceedings but, as ordered by the Court, only once Romanian proceedings have concluded.

*Bail Pending Extradition in the U.K.*

18. Section 198 of Extradition Act 2003 amended the Bail Act of 1976 to bring the position for extradition regarding the presumption to bail in line with the position for domestic cases. The position in England and Wales regarding bail pending extradition is now that there is a presumption to bail in the U.K. in extradition cases where the defendant in not convicted (as is the case in relation to Andrew and Tristan Tate).

19. Section 4 of the Bail Act of 1976 provides:

General right to bail of accused persons and others.

Initial AT

Docusign Envelope ID: E4D6927A-290E-8A71-820C-89961375907B

(1) A person to whom this section applies shall be granted bail except as provided in Schedule 1 to this Act.

(2) This section applies to a person who is accused of an offence when—

> (a) he appears or is brought before a magistrates' court or the Crown Court in the course of or in connection with proceedings for the offence, or

> (b) he applies to a court for bail or for a variation of the conditions of bail in connection with the proceedings.

This subsection does not apply as respects proceedings on or after a person's conviction of the offence.

(2A) This section also applies to a person whose extradition is sought in respect of an offence, when—

> (a) he appears or is brought before a court in the course of or in connection with extradition proceedings in respect of the offence, or

> (b) he applies to a court for bail or for a variation of the conditions of bail in connection with the proceedings.

> (2B) But subsection (2A) above does not apply if the person is alleged to have been convicted of the offence.

20. The Extradition Act 2003 also provides statutory commentary for section 198 within the notes of the statute. This is also set out below:

Section 198: Bail: England and Wales

> 562. This section amends the Bail Act 1976 so that extradition proceedings under this Act are governed by the bail provisions that apply in other criminal justice proceedings (subsections (1) to (3)).

> 563. *The amendments to section 4 of the Bail Act contained in subsections (4) and (5) extend the presumption in favour of bail to proceedings in extradition cases where a person is accused of an offence. Currently the presumption in favour of bail does not apply to extradition cases and these amendments remove this anomaly, to bring extradition proceedings into line with other criminal proceedings. In conviction cases the presumption in favour of bail does not apply.*

Initial

AF

Docusign Envelope ID: E4D6927A-290E-8A71-820C-89961375907B

> 564. The amendments in subsection (6) relate to the situation where a person has been granted bail in the course of extradition proceedings. A court is given power to withhold bail or vary or impose conditions of bail, on the application by the person representing the requesting state in extradition proceedings.

> 565. Subsections (7) to (11) apply when a person has been granted bail in the course of extradition proceedings. Their effect is that the person is subject to the same liability to arrest as if he was granted bail and is under a duty to surrender into custody in the course of a criminal case. Therefore, where the person fails to surrender as required, a magistrates' court has the power to issue a warrant for his arrest. In addition, where there is reason to believe that the person is likely to break his bail conditions or fail to surrender, the person may be arrested without warrant by a constable. A constable also has this power if, where applicable, a person's surety gives notice in writing that the person is unlikely to surrender and so the surety requests to be relieved of his associated obligations. If a person is arrested in this manner without a warrant he must be brought before a justice of the peace within 24 hours (this is calculated to except Sundays and certain public holidays). The justice of the peace will decide whether the person is then to be granted bail again or committed to custody.

> 566. The amendments in subsections (12) to (14) are to Part 1 of Schedule 1 of the Bail Act. Their effect is that this Part of the Schedule, which governs the decision-making process for granting bail in criminal law cases involving imprisonable offences, also applies in extradition cases.

Thus, if the Tates were arrested in the U.K. for extradition to the United States, they would enjoy a presumption in favour of bail.

21. Rape is a bailable offence in England. If they were charged domestically, the brothers would benefit to a right to and a presumption to bail in domestic proceedings unless there are substantial grounds to believe the defendant might flee, commit further offenses, or interfere with witnesses.

22. The Court in Andrew and Tristan Tate's case would no doubt consider, amongst other points, the arguments below;

   a. Their protracted compliance with Romanian bail conditions. This is at significant expense and inconvenience to them in doing so as they have

Initial AF

Docusign Envelope ID: E4D6927A-290E-8A71-820C-89961375907B

travelled from other countries to appear in Romanian in accordance with their conditions.

b. The fact that they are publicly recognisable.

c. Compliance with UK court Orders (such as recent costs orders and confidential ring orders in relation to individuals who bring civil claims against Andrew).

d. Lack of previous convictions in any jurisdiction.

e. Lack of breach of bail conditions in any jurisdiction.

f. The fact that Andrew and Tristan have been to countries with no extradition treaty with the UK but not sought to stay there.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 7, 2026

Signed by:

EBE3DF505163470...

Andrew Ford

Docusign Envelope ID: E4D6927A-290E-8A71-820C-89961375907B

## List of Appendices

1. TaCA warrant regarding Emory Andrew Tate.

2. TaCA warrant regarding Tristan Tate.

3. Email from Catrin Attwell of the CPS dated 19th March 2024.

4. Statement of Grounds from Judicial Review proceedings.

5. Letter from Holborn Adams to Crown Prosecution Service dated July 24, 2025.

# APPENDIX 1

[TO BE FILED SEPARATELY UNDER SEAL]



1

65

[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]

3

67

[TO BE FILED SEPARATELY UNDER SEAL]

[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]

[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]

70

[TO BE FILED SEPARATELY UNDER SEAL]

7

71

[TO BE FILED SEPARATELY UNDER SEAL]

7



[TO BE FILED SEPARATELY UNDER SEAL]

8

72

[TO BE FILED SEPARATELY UNDER SEAL]

72

OFFICIAL-SENSITIVE

[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]

9

[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]

74

[TO BE FILED SEPARATELY UNDER SEAL]



11

75

[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]

# APPENDIX 2

[TO BE FILED SEPARATELY UNDER SEAL]

[TO BE FILED SEPARATELY UNDER SEAL]

[TO BE FILED SEPARATELY UNDER SEAL]

2

[TO BE FILED SEPARATELY UNDER SEAL]

2

78

[TO BE FILED SEPARATELY UNDER SEAL]

3

79

[TO BE FILED SEPARATELY UNDER SEAL]

3

[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]

[TO BE FILED SEPARATELY UNDER SEAL]

[TO BE FILED SEPARATELY UNDER SEAL]



82

[TO BE FILED SEPARATELY UNDER SEAL]

7

83

[TO BE FILED SEPARATELY UNDER SEAL]

[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]

84

[TO BE FILED SEPARATELY UNDER SEAL]

9

[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]

10

[TO BE FILED SEPARATELY UNDER SEAL]

10

86

[TO BE FILED SEPARATELY UNDER SEAL]



11

87

[TO BE FILED SEPARATELY UNDER SEAL]

11

87

[TO BE FILED SEPARATELY UNDER SEAL]



[TO BE FILED SEPARATELY UNDER SEAL]

12

# APPENDIX 3

# APPENDIX 4

**IN THE HIGH COURT OF JUSTICE**      **AC-2025-LON-XXXX**
**KING'S BENCH DIVISION**
**ADMINISTRATIVE COURT**

**BETWEEN:**

**ANDREW TATE**

**TRISTAN TATE**

**Claimants**

**and**

**THE DIRECTOR OF PUBLIC PROSECUTIONS**

**Defendant**

---

**STATEMENT OF GROUNDS**
**TO MOVE FOR JUDICIAL REVIEW**

---

**Introduction**

1.  By this application, the Claimants seek permission to proceed with a claim in judicial review of the decision of the Director of Public Prosecutions ("DPP") to withhold from them the identities of individuals that have made criminal complaints against them. The decision in question was first made on or about 19th March 2024 and is subject to constant review. The Defendant's most recent review, rejecting the Claimants' request for the names of the complainants, was conducted on 11th August 2025.

2.  The Claimants seek an order that the Defendant disclose to their legal representatives the names of the complainants. A draft order is appended to this statement of grounds.

**Ground of Judicial Review**

3.  The Claimants advance two grounds of challenge in this claim:

    (i)  The Defendant's failure to provide the relevant disclosure is Wednesbury Unreasonable; and

    (ii)  The Defendant's failure to provide the relevant disclosure amounts to a breach of Article 6 of the ECHR.

1

**Factual Background**

4. The Claimants are dual citizens of the United States of America ("USA") and the United Kingdon ("UK"). They have been habitually resident in Romania since 2017.

5. The Claimants were arrested by Romanian police in Bucharest in December 2022. In June 2023, Romanian prosecutors charged the Claimants with offences of rape and human trafficking allegedly committed in that jurisdiction. The criminal charges in Romania are contested by the Claimants and they are due to stand trial in Romania on a date to be confirmed.

6. An arrest warrant for each of the Claimants was issued by Westminster Magistrates' Court on 19th January 2024. The warrants were issued under the Trade and Cooperation Agreement ("TaCA"), allowing for streamlined extradition proceedings between the UK and member states of the European Union ("EU").

7. The warrant issued for Andrew Tate alleged ten offences, namely:
    (i)     Three offences of rape, contrary to section 1 of the Sexual Offences Act 2003;
    (ii)    Four offences of assault occasioning actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861;
    (iii)   Two offences of human trafficking, contrary to section 2 of the Modern Slavery Act 2015; and
    (iv)    One offence of controlling prostitution for gain, contrary to section 53 of the Sexual Offences Act 2003.

8. The warrant issued for Tristan Tate alleged eleven offences, namely:
    (i)     Three offences of rape, contrary to section 1 of the Sexual Offences Act 2003;
    (ii)    Six offences of assault occasioning actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861; and
    (iii)   Two offences of human trafficking, contrary to section 2 of the Modern Slavery Act 2015.

9. None of the charges on the face of the warrants named a complainant. By way of example, the rape charges were particularised in the following manner:

2

22

> *Between 01/01/2015 and 01/03/2015 intentionally penetrated the vagina of a woman with your penis, when she did not consent and you did not reasonably believe she was consenting.[1]*

10. In the charges that alleged an offence other than rape, the complainants were simply referred to as "another" in the particulars.  Hence, taking one of the assault charges as an example:

> *Between 01/01/2015 and 01/03/2015 assaulted another thereby occasioning her, actual bodily harm.[2]*

11. On 12th March 2024 the Court of Appeal in Bucharest granted the UK's extradition request.  The Claimants are therefore due to be extradited from Romania to the UK once the criminal proceedings they face before the courts in Romania have concluded.

12. On 14th March 2024 the Claimants' solicitor, Mr Andrew Ford, contacted Bedfordshire Police via email to request a document setting out basic case information, including the following:

> *1. Who the complainants are?*
> *2. What they allege?*
> *3. When they made their complaints?*
> *4. Whether they had made any previous complaints which had been NFA'd?*

13. A response from the OIC, Sam Khanna, was received on 19th March 2024 which stated that:

> *Regarding disclosure, having just met with CPS colleagues, I am aware that they will be writing to you.*

14. There followed an email from the CPS reviewing lawyer, Ms Catrin Attwell, also on 19th March 2024.  Ms Attwell confirmed that the TaCA warrants had been issued solely on the basis of the material contained within them, and that no other evidence had been placed before Westminster Magistrates' Court.  Ms Attwell asserted that the warrants contained

---

[1] These are the particulars of the third charge in the warrant issued against Andrew Tate.

[2] These are the particulars of the fifth charge in the warrant issued against Andrew Tate.

3

23

sufficient information for the Claimants to challenge the extradition process and went on to state that:

> With regards to your request for disclosure of the following: complainants' identity, when they reported the complaint and previous complaints, I do not intend, at this stage, to disclose this information.

The rationale for this decision was that the Claimants had not been charged (although a charging decision had been made on the Full Code Test and warrants had been issued) and were not subject to bail conditions.

15. The Claimants' solicitors then wrote to the Ms Attwell, on 21st March 2024, noting that:

> Previous correspondence that we have received regarding disclosure has perhaps erroneously focused on full disclosure of evidence.
> We make clear that we are not seeking full disclosure of the evidence. Our request is for the type of information which would be provided at the pre-interview disclosure. This request enables a suspect to understand the nature of case against them.

The letter went on to state:

> You have raised the issue of non-disclosure of the identities of the complainants, and their safeguarding. We understand this concern. There is no desire from our side for the public ventilation of their identities. We provide assurances that we have advised our clients in relation to offences of witness intimidation, the ramifications of publicly naming complainants/witnesses, and the potential harm this would cause to any defence proffered.

16. Further correspondence between the parties, on other topics, also referenced the Claimants' request for disclosure of the complainants' identities. The CPS position was to reiterate the mantra in the email of 19th March 2024. For example, in her letter dated 30th May 2024, Ms Attwell dealt with the request for disclosure by stating:

> As stated in my email dated 19.03.2024, the full code test has been applied. Once extradited to the UK, your clients will appear at Westminster Magistrates court in relation to the charges.
> The concerns raised in your letter regarding the application of the full code test are addressed in my email dated 19.03.2024.

17. On 8th October 2024 the Claimants' solicitors again wrote to the Crown seeking the disclosure of basic information equivalent to pre-interview disclosure. The letter included the following statement:

4

24

*An undertaking from our clients not to disclose the complainants' identity provides sufficient protection to the complainants whilst also balancing the need for ensuring a fair process.*

18. On 22ⁿᵈ October 2024 the Crown responded with a letter that refused to provide any additional disclosure and rejected the suggestion of an undertaking:

*There is reference to a "Confidence Order" and "Confidentiality Order" in your correspondence, which are in force as part of the civil proceedings. However, you will be aware that civil proceedings are separate to any criminal proceedings. The offer of an "undertaking" from your clients not to disclose the complainants' identities would not offer sufficient protection to them because any such agreement would be unenforceable.*

19. In order to address the (erroneous) suggestion that undertakings given by the Claimants could not be enforced, a formal offer of undertakings was made under cover of a letter dated 23ʳᵈ December 2024. In that correspondence, the Claimants each offered undertakings, each backed by a security of £10,000, not to reveal the names of the complainants if they were disclosed to them. The undertakings provided that:

*I shall not publish, or otherwise reveal to any person, any matter relating to any of the complaints that is likely to lead members of the public to identify any complainant as a person against whom an offence is alleged to have been committed.*

*Further, I undertake that I shall not incite, encourage, counsel or procure any other person to publish any matter relating to any of the complaints that is likely to lead members of the public to identify any complainant as a person against whom an offence is alleged to have been committed.*

20. On 8ᵗʰ January 2025 a response to the offer of undertakings was received from the CPS. The offer was rejected and the following reasons were cited:

*Your clients are not subject to bail within this jurisdiction and therefore there are no legal mechanisms in place in relation to the administration and, if applicable, forfeiture of the monies. Furthermore, the proposed undertaking and security do not mitigate the risk of harm to the victims and therefore it would not be appropriate to enter into such an arrangement.*

21. On 18ᵗʰ February 2025 the Claimants sent a letter before claim in judicial review.

22. On 27ᵗʰ February 2025 the Claimants travelled from Romania to the USA. A travel ban that had been imposed by the authorities in Romania, and prevented the Claimants from leaving that jurisdiction, was lifted prior to them travelling to the USA.

5

25

23. On 7th March 2025, a response to the letter before claim was received from the DPP.

24. On 21st March 2025 the Claimants left the USA and returned to Romania, in compliance with the terms of their judicial control.  Both Claimants registered with officers of the Romanian serious crime agency, DIICOT, in Bucharest.

25. On 1st April 2025 the Claimants travelled from Romania to Dubai.

26. On 24th July 2025 the Claimants again offered undertakings, each with an increased value of £20,000.  The Claimants also stated that they were willing to assist the investigation by agreeing to be interviewed under caution, notwithstanding that a charging decision had already been made.  Investigating officers were invited to conduct the interviews under caution in Bucharest with the permission of the Romanian authorities.

27. On 11th August 2025, a response to the offer of undertakings was provided by the CPS. The offer was rejected and the following reasons were cited:

> *Whilst you have offered undertakings that your clients will not disclose the complainants' identities (and would pay £20,000 if they did so), we do not consider that there is any enforceable legal basis for such undertakings, either in this country or more particularly as your clients are outside the jurisdiction. Furthermore, the prosecution has set out in detail our position on this issue in our response dated 7 March 2025 to your proposed claim for judicial review and do not propose to repeat that.*

The Claimants' offer to provide the police with interviews under caution was also rejected, but no reasons for that decision were cited.

28. The Claimants are currently under Romanian judicial control, meaning they must regularly meet with prosecutors and are obliged to return to Romania as and when required by the Romanian authorities.

**Submissions**

29. It is clear that a suspect in a criminal investigation has a right to provide information to the police and the CPS that might affect the decision about whether charges should be brought.  The police have a duty to pursue all reasonable lines of inquiry in the course of a criminal investigation, whether they point to, or away, from a suspect's guilt.  If criminal

6

charges are instigated, the defendant may also offer material to the Crown that may have a bearing on whether the charges should be pursued. The requirement for the police and CPS to consider material put forward by a suspect/defendant is rooted in the right to a fair trial. In *R v Stratford Justices, ex parte Imbert*, The Times, 25 February 1999, Buxton LJ stated:

> *I of course accept that article 6, although it speaks of the right to a fair trial, is concerned also with the fairness of pre-trial proceedings, including not only disclosure but also investigation and the obtaining of evidence.*

30. The right of a suspect/defendant to provide information, and have it considered by those responsible for determining whether charges should be brought or continued, is reflected in Paragraph 3.4 of the Code for Crown Prosecutors, which states:

> *Although prosecutors primarily consider the evidence and information supplied by the police and other investigators, the suspect or those acting on their behalf may also submit evidence or information to the prosecutor, before or after charge, to help inform the prosecutor's decision. In appropriate cases, the prosecutor may invite the suspect or their representative to do so.*

31. It is axiomatic that, in order for a suspect/defendant to able to provide relevant information, he must be made aware of the basic details of the case against him. Accordingly, although the statutory provisions concerning disclosure do not apply before a defendant is brought before a court, the common law requires that adequate disclosure is made. The *Attorney General's Guidelines on Disclosure*, state, at paragraph 78, that the common law rules apply "from charge". Annex B to those guidelines, also provides for "pre-charge engagement".

32. Annex B highlights that, in order for pre-charge engagement to be effective and fair, the police and prosecution will, of necessity, have to provide disclosure [at paragraph 22]:

> *Since pre-charge engagement takes place prior to the institution of any proceedings, the statutory disclosure rules will not be engaged. However, disclosure of unused material must be considered as part of the pre-charge engagement process, to ensure that the discussions are fair and that the suspect is not misled as to the strength of the prosecution case.*

33. The Defendant does not appear to dispute that the Claimants have a right to provide information at the current time that might affect the decision about whether to maintain

7

27

the charges against them.  The CPS has invited the Claimants to provide any such information (in accordance with paragraph 3.4 of the Code for Crown Prosecutors, quoted above).  For example, in the letter dated 22nd October 2024, the CPS issued the following invitation:

> *If you or your clients have any additional material that you believe would have a bearing on the case and support your clients' position, please forward this material to the police for consideration. You will have a copy of the TaCA warrant that provides details of the offending, location of the offending and a summary of the allegations, which is sufficient to enable you to do this.*

This invitation was reiterated in the letter dated 8th January 2025.

34. The obvious difficulty is that the Claimants cannot realistically be expected to provide information that has a bearing on the case if they do not know the identity of their accusers. This renders the invitation to engage with the investigation effectively hollow.

35. The assertion by the Defendant that the details provided in the TaCA warrants are sufficient to enable the Claimants to provide any relevant information to the Crown is self-evidently wrong, and disingenuous.  The warrants have been deliberately drafted in a vague manner in order to conceal the identities of the complainants.  The suggestion that the warrants give sufficient details of the location of the alleged offences is also plainly incorrect.  For example, charges 3-6 alleged against Andrew Tate (two offences of rape and two of assault occasioning actual bodily harm) were all allegedly committed against the second complainant "…at her home address in the UK".  Without knowing the identity of the second complainant, the information provided about the location of the offences is next to meaningless.  Further, that timing of the alleged offences appears to have been left deliberately vague.  Although the summary within the warrant suggests that each of these four offences took place on a single day, the charges are particularised with a date range between 1st January and 1st March 2015.

36. The information provided in the warrants is insufficient to permit the Claimants to understand the case against them or to determine whether they are in possession of material that might affect the Crown's decision about whether to proceed with the charges. The dates and locations given are too vague for the Claimants to be able to put forward a positive case (by way of alibi, for example).  Further, the Crown's failure to provide the names of the complainants means that the Claimants cannot know if they are in possession

8

of information that might undermine the credibility of the complainants or the accounts they have provided to the police.  In effect, the deliberate decision of the Defendant to withhold basic details of the criminal case against the Claimants denies them the right to provide relevant material to the Crown and have the charges against them reviewed in light of that evidence.

37. Despite the suggestions in the letters from the CPS dated 22nd October 2024 and 8th January 2025 that the information contained within the TaCA warrants is sufficient to permit the Claimants to put forward relevant material, the Defendant has tacitly acknowledged this not to be the case.  In the DPP's letter dated 7th March 2025, at paragraph 20, it is stated that:

> *…the DPP has ensured that all reasonable lines of inquiry (including in so far as electronic communications and devices are concerned) takes into account the fact that there will be a period of time when the Claimants will not be aware of the names of the complainants.*

38. It is not apparent in practical terms what this means but is clearly predicated on the idea that the Claimants will not be able to determine complainants' identities from the contents of the TaCA warrants.  Whatever steps the Defendant has taken to mitigate the fact that the Claimants are unable to provide relevant material to the Crown for consideration, they are inevitably second-best.  The investigation, and decisions concerning the charges, would obviously be better aided by the Claimants being able to provide information and suggest further lines of inquiry.

39. The Defendant's decision not to provide adequate details of its case against the Claimants is in breach of the Crown's common law disclosure duties and breaches its own policy in the Code for Crown Prosecutors.  The decision runs counter to the Claimants' right to a fair trial under Article 6 of the ECHR.

40. It is important to note that the Defendant's decision not to provide basic disclosure at this stage has the potential to cause material prejudice to the Claimants and the conduct of their defence in the forthcoming criminal proceedings in England and Wales.  The offences alleged against the Claimants are already of some age (ranging between 3rd July 2014 and 1st October 2016 in the case of Andrew Tate, and between 1st April 2012 and 1st October 2016 in the case of Tristan Tate).  It is currently unclear how long it will be before the criminal proceedings in Romania are concluded (a process that is outside the Claimants'

9

control) but it is likely to be many months. Without knowing the identities of the complainants, the Claimants are unable to apply their minds to the allegations and provide accounts to their solicitors. The delay in their being able to so do inevitably means their memories will continue to fade before their instructions can be taken.

41. Further, the Claimants are unable to search for, locate and retain potentially important evidence (particularly electronic evidence) without knowing the names of the complainants. There is a risk that relevant material not currently in the possession of the Claimants may be lost prior to their extradition to the UK. The Defendant's unreasonable decision to withhold the names of the complainants means that the Claimants are unable to indicate, either to their legal representatives or the police, what lines of enquiry might be relevant.

42. The Defendant accepts that the identities of the complainants will inevitably have to be revealed to the Claimants before their first court appearance in England and Wales. Indeed, it is unlikely a court would consider the charges as drafted in the TaCA warrant to be sufficient for any action to be taken to in respect of them. In the DPP's letter of 7th March 2025, at paragraph 20, it is stated:

> *The decision that has been made is that the Claimants will be informed* [of the complainants' names] *once they have been extradited to the United Kingdom and before their first appearance at Court.*

43. Each of the complainants already enjoys the protection afforded them by the Sexual Offences (Amendment) Act 1992. The issue of the TaCA warrants must have been preceded by the laying of an information against the Claimants, and accordingly they are "accused of an offence" within the meaning of section 1(2) of the 1992 Act (as is made clear by section 6(3)(a)). Each of the complainants is said to be the victim of an offence to which the Act applies, by virtue of section 2. They are all, therefore, protected by section 1(2), which provides that:

> *Where a person is accused of an offence to which this Act applies, no matter likely to lead members of the public to identify a person as the person against whom the offence is alleged to have been committed ("the complainant") shall during the complainant's lifetime be included in any publication.*

44. A breach of the prohibition in section 1(2) is a criminal offence by virtue of section 5(1), which provides as follows:

> *If any matter is included in a publication in contravention of section 1, the following persons shall be guilty of an offence and liable on summary conviction to a fine not exceeding level 5 on the standard scale—*
>
> *(a) where the publication is a newspaper or periodical, any proprietor, any editor and any publisher of the newspaper or periodical;*
>
> *(b) where the publication is a relevant programme—*
>
> *(i) any body corporate or Scottish partnership engaged in providing the programme service in which the programme is included; and*
>
> *(ii) any person having functions in relation to the programme corresponding to those of an editor of a newspaper;*
>
> *(c) in the case of any other publication, any person publishing it.*

45. The Act utilises a very broad definition of "publication", as is made clear by section 6(1):

> *"publication" includes any speech, writing, relevant programme or other communication in whatever form, which is addressed to the public at large or any section of the public (and for this purpose every relevant programme shall be taken to be so addressed), but does not include an indictment or other document prepared for use in particular legal proceedings.*

Clearly, this definition is sufficiently wide to include social media posts, which is the medium of principal concern to the Defendant.

46. Accordingly, anyone who was to publish any details that might lead to the identification of the complainants would commit an offence contrary to section 5 of the 1992 Act and be liable upon conviction to an unlimited fine.

47. As is clear from section 8(6), however, the 1992 Act does not have extraterritorial extent. At least arguably, therefore, it would not prevent the Claimants from publishing the complainants' names while they are outside the jurisdiction.

48. The Claimants have therefore each offered the Crown an undertaking that, if the complainants' names are disclosed to them, they will not reveal anything about the complainants' identities to any other person and will not publish any material that could lead to their identification. The undertakings are each backed by a sum of £20,000 that

11

31

will be forfeit in the event of breach.  This places the Claimants in substantially the same position as they would be in were they within the jurisdiction of England and Wales.  It effectively provides the complainants with the same protection as does the Sexual Offences (Miscellaneous Provisions) Act 1992.  If the Claimants were to publish details that might lead to the identification of the complainants, they would incur a financial penalty, which is the only sentence provided for by section 5(1) of the 1992 Act.

49. The Crown has rejected the undertakings that have been offered but without explaining why they offer insufficient protection to the complainants.  The letter from the CPS dated 8th January 2025, in response to the original offer of undertakings, stated that:

> *Your clients are not subject to bail within this jurisdiction and therefore there are no legal mechanisms in place in relation to the administration and, if applicable, forfeiture of the monies.*

As it is clearly wrong to suggest that there is no mechanism to allow for forfeiture of the monies in the event that the undertakings are breached, it is unsurprising that this line of argument was not repeated in the Defendant's letter of 7th March 2025.[3]

50. Instead, the letter of 7th March states (at paragraph 29):

> *The fact that the Claimants have offered a sum of money as an undertaking does not address the risks that there are here and which are real.*

This appears to be a rejection of an undertaking at all, as opposed to a suggestion that the amount that stands to be forfeit is insufficient.  The Claimants' increased offer of £20,000 each was similarly rejected on 11th August 2025 without it being claimed the sum was inadequate.  However, the Defendant fails to explain why the undertakings offered do not address the risks that are said to exist.  It is submitted that it is unreasonable for the Defendant to expect the complainants to receive greater protection than that afforded to them under the provisions of the Sexual Offences (Miscellaneous Provisions) Act 1992.

51. It is also submitted that the Defendant has placed too great an emphasis on the extensive reach of the Claimants' social media activities and accordingly arrived at an inflated assessment of the risk posed to the complainants.  The Defendant's analysis appears to ignore several relevant factors, namely:

---

[3] Oddly, the claim that undertakings are not enforceable was resurrected in the Defendant's letter of 11th August 2025, which betrays a degree of muddled thinking at the CPS.

(i)     The fact that both Claimants are of good character;

(ii)    The fact that the Claimants (who are both currently engaged in civil proceedings in England and Wales where they are accused of similar behaviour to that alleged by the Crown) have not published anything that might identify the claimants in that case.

(iii)   The fact that the Claimants have complied with every requirement of their judicial control in Romania.

(iv)    The fact that, while there is nothing to date that has prevented them publicly speculating about the identity of their accusers in the criminal proceedings, neither Complainant has done so.

Taken together, these factors demonstrate that the Claimants are unlikely to reveal details that might serve to identify the complainants.

52. In addition, the Claimants appreciate that, if they were to publish anything that might lead to the identities of the complainants becoming known, that would inevitably compromise any application they may make for bail once they have been returned to the jurisdiction.

53. It is submitted that, without more, it should be apparent that the risk of the Claimants publicly naming the complainants is low.  However, the Claimants have gone further and offered, in good faith, enforceable undertakings not to reveal the complainants' identities. Those undertakings, backed up by a substantial sum in each case, provide the complainants with comparable protection to that offered by the provisions of the Sexual Offences (Miscellaneous Provisions) Act 1992.

54. As Lord Hope said in a somewhat different context in *R v Brown* [1998] A.C. 367:

> *The rules of disclosure which have been developed by the common law owe their origin to the elementary right of every defendant to a fair trial. If a defendant is to have a fair trial he must have adequate notice of the case which is to be made against him. Fairness also requires that the rules of natural justice must be observed…*
>
> *I would be inclined to attach less weight to the practical problems than that which was given to them by the Court of Appeal.  If fairness demands disclosure, then a way of ensuring that disclosure will be made must be found.*

It is submitted that the use of undertakings such as those already offered is a "way of ensuring disclosure" that both offers protection to the complainants and permits fair disclosure to be made.

13

33

**Conclusion**

55. Despite the Claimants trying to proactively engage with the Crown, and proposing several ways in which to move forward, to enable a balance between protecting the complainants and the Claimants' right to a fair trial, the Defendant has failed to afford the Claimants the same level of engagement, instead dismissing proposals without any real basis or disclosure.

56. As such, the Claimants submit the Defendant's conduct is Wednesbury unreasonable and amounts to a breach of Article 6 ECHR.

57. The Claimants invite the court to make an order that the Defendant disclose to the Claimants' legal representatives the names of the complainants in the criminal case brought against them.

SALLIE BENNETT-JENKINS K.C.

2 Hare Court

ROBERT FITT

33 Bedford Row

20th August 2025

14

# APPENDIX 5



☎ 020 7205 2303
@ law@holbornadams.com
www.holbornadams.com
🏠

**[TO BE FILED SEPARATELY UNDER SEAL]**

Address: Holborn Adams, 125 Old Broad Street, Broadgate, London, EC2N 1AR

Holborn Adams and Holborn Adams Solicitors are trading styles of Holborn Adams Limited. Company Registration Number 09606050.
Registered Office 125 Old Broad Street, Broadgate, London, England, EC2N 1AR. Holborn Adams Limited is authorised and regulated by the Solicitors Regulation Authority.   SRA Identification Number 636618.
Please note that client appointments must be made in advance.

131






[TO BE FILED SEPARATELY UNDER SEAL]

Address: Holborn Adams, 125 Old Broad Street, Broadgate, London, EC2N 1AR

Holborn Adams and Holborn Adams Solicitors are trading styles of Holborn Adams Limited. Company Registration Number 09606050.
Registered Office 125 Old Broad Street, Broadgate, London, England, EC2N 1AR. Holborn Adams Limited is authorised and regulated by the Solicitors Regulation Authority.   SRA Identification Number 636618.
Please note that client appointments must be made in advance.

132



☎ 020 7205 2303
@ law@holbornadams.com
www.holbornadams.com

**[TO BE FILED SEPARATELY UNDER SEAL]**



Address: Holborn Adams, 125 Old Broad Street, Broadgate, London, EC2N 1AR

Holborn Adams and Holborn Adams Solicitors are trading styles of Holborn Adams Limited. Company Registration Number 09606050.
Registered Office 125 Old Broad Street, Broadgate, London, England, EC2N 1AR. Holborn Adams Limited is authorised and regulated by the Solicitors Regulation Authority.   SRA Identification Number 636618.
Please note that client appointments must be made in advance.