# NORTH MIAMI POLICE DEPARTMENT

*STANDARD OPERATING PROCEDURES*

## RESPONSE TO RESISTANCE 300.16

EFFECTIVE DATE: 04-28-23 APPROVED: ______________ Chief of Police

SUPERSEDES: 01-04-23 CFA: 4.01, 4.02, 4.03, 4.04, 4.05 4.06, 4.07, 4.08, 4.10, 10.10

CONTENTS:

I. Purpose
II. Policy
III. Scope
IV. Definitions
V. Types of Resistance
VI. Response to Resistance
VII. Lethal Force
VIII. Less-Lethal Force
IX. Less-Lethal Weapons
X. Physical Restraint Devices
XI. Reporting Measures
XII. Training
Appendix A: Decision-Making Model
Appendix B: Force Guidelines

## I. PURPOSE

To establish guidelines governing the justifiable use of force in accordance with Florida State Statute (FSS) 776.05 and its limitations, and to clearly describe prohibited activities and the Department's philosophy of progressive policing practices emphasizing integrity and respect for the sanctity of life.

## II. POLICY

Officers will use the Critical Decision-Making Model (CDM) (see Appendix A) to assist them in determining the appropriate action and response for resolving incidents. The four elements of the CDM core are:

- Police Ethics
- Agency Values
- Concept of Proportionality
- Respect for the Sanctity of all Human Life

Officers must use de-escalation tactics, when it is safe for them to do so under the totality of circumstances.

When properly qualified, sworn personnel will carry Department approved firearms while on duty and when working extra-duty police work. Officers may carry their approved firearm while off from work.

Authorized members, when properly qualified, will carry Department authorized less-lethal weapons while on duty and when working extra-duty police work, but not while off from work.

All personnel are required to comply with Department procedures and must have completed the necessary Department training for each weapon carried, as well as the completion of the Florida Basic Recruit Training Program, or its equivalent, prior to assignment in any capacity in which a sworn member is allowed to carry a firearm or is in any position to make an arrest.

**CFA 4.03, 4.05, 4.06**

## III. SCOPE

This policy applies to all sworn members of the Department, and any other personnel authorized to carry a less-lethal weapon.

## IV. DEFINITIONS

A. Lethal Force: Any force likely to cause death or great bodily harm.

B. Last Resort: Based on the specific circumstances, the type of threat, and the amount of time to react, the officer has considered all practical means available to avoid using lethal force.

C. Reasonable Belief: A state of mind supported by circumstances strong enough to warrant a cautious and prudent person to make a similar judgment. Facts and circumstances within the officer's knowledge, and of which s/he has reasonable information, are sufficient in themselves to justify a person to act in a similar manner under similar circumstances. The elements of reasonable belief include the officer's own experience and training, as well as the facts of the situation known or perceived by the officer at that time.

D. Serious Physical Injury: A bodily injury that creates substantial risk of death; serious injury, permanent disfigurement; or can result in long-term loss or impairment of the functioning of any bodily member or organ.

E. Less-lethal weapons: Weapons that are primarily used to control a subject, such as the Conducted Energy Weapon (CEW), Expandable Baton, Aerosol Deterrent Spray (ADS), Bean Bag Shotgun, or other weapons of opportunity available to an officer in an emergency situation.

F. Proportionality: Involves directing officers to do the following:

1. Use only the level of force necessary to mitigate the threat and safely achieve lawful objectives.

2. Consider, if appropriate, alternate response to resistance options that are less likely to result in injury, but will allow officers to achieve lawful objectives.

3. Consider the appropriateness of officers' actions. The concept of proportionality does not mean that officers, at the moment they have determined that a particular use of force is necessary and appropriate to mitigate a threat, should stop and consider how their actions will be appropriate; instead, as they approach an incident, officers should keep the concept of proportionality a consideration in their minds as they are assessing the situation and deciding how to respond. Proportionality also considers the nature and severity of the underlying events.

G. De-Escalation Techniques: Taking action or communicating verbally or non-verbally during a potential encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in the force necessary. Options include using distance and cover, tactical repositioning, slowing down situations that do not pose an immediate threat, calling for a supervisor and other resources to be brought to the scene, and similar actions and tactics.

H. Empty-handed Defensive Tactics: Any strike or combination of strikes where the head, shoulder, elbow, fist, fingers, knees or feet are utilized on a subject to stop aggression towards the officer, another officer or a citizen, or to gain control of a subject or effect an arrest. Any leverage-based tactics to gain control of a subject such as an arm bar or shoulder lock; or a takedown or a sweep are also empty-handed tactics.

I. Less-lethal Force: Force other than that which is considered lethal force. Less-lethal force is distinguishable from lethal force in that it is not intended or reasonably likely to result in death or great bodily harm in most cases.

J. Chokeholds: The intentional and prolonged application of force to the throat, windpipe, or airway of another person that prevents the intake of air. The term does not include any hold involving contact with another person's neck that is not intended to prevent the intake of air.

K. Vascular Neck Restraints: A technique, which involves applying pressure to the neck, that can be used to incapacitate individuals by restricting the flow of blood to their brain.

L. Totality of Circumstances: The facts and circumstances known to the officer at the time, or reasonably perceived by the officer, that serve as the basis for the officer's decision to use force.

The Totality of Circumstances includes consideration of the subject's form of resistance, all reasonably perceived factors that may have an effect on the situation, and the response options available to the officer. The following should be taken into consideration when evaluating the totality of circumstances, but is not limited to:

1. Severity of the crime.
2. If the subject is an immediate threat.
3. The subject's access to weapons.
4. The subject's combative skills.
5. The subject's size, age, weight, physical condition.
6. The officer's size, age, weight, physical condition.

M. Objective Reasonableness: The reasonableness of a specific use of force and the level of force used is based upon the officer's evaluation of the situation in light of the totality of the circumstances (i.e. the severity of the crime, the level of threat or resistance demonstrated by the subject, or the danger the subject presents to the officer or others) known to the officer at the time of the use of force. The reasonableness of the force used must be judged from the perspective of what a reasonably prudent officer would use under the same or similar situations.

N. Duty to Intervene: The requirement of all officers to attempt to prevent or stop the use of excessive force by another officer when it is objectively reasonable to do so.

O. Excessive Use of Force: Use of force that exceeds the degree of force permitted by law, policy, or the observing officer's employing agency.

P. Critical Decision-Making Model (CDM): A five-step critical thinking process, built around the core values of the Department and the policing profession. The CDM will guide the officer through a process of collecting information; assessing the situation, threats, and risks; considering police powers and agency policy; identify options and determining the best course of action; and acting, reviewing and reassessing the situation.

Q. Ripp Hobble: A restraint device used to prevent a combative arrestee or person in crisis from kicking at officers and/or other objects. When used in tandem with handcuffs, it places the arrestee or person in crisis in a total appendage restraint position (T.A.R.P.).

R. BolaWrap: A remote restraint device used for immobilizing and controlling resistive/non-compliant individuals, including those known or suspected of having mental health issues. The purpose of the BolaWrap is to facilitate a safe and effective response in order to minimize injury to all involved parties.

S. Other language clarification:

- Should: Indicates a general or expected action, absent a rational basis for failing to conform.

- Shall or Will: Indicates a mandatory action.

## V. TYPES OF RESISTANCE

When refusing to comply with lawful orders, individuals may respond to law enforcement efforts by resisting in the following fashion:

A. Passive resistance: A subject's verbal and/or physical refusal to comply with an officer's lawful direction causing the officer to use physical techniques to establish control.

Examples of passive resistance include the following:

1. The subject refuses to move at the officer's lawful direction.

2. The subject refuses to take his hands out of his pockets or from behind his back, at the officer's lawful direction.

B. Active resistance: A subject's use of physically evasive movements directed toward the officer such as bracing, tensing, pushing, or pulling to prevent the officer from establishing control over the subject.

Examples of active resistance include the following:

1. Subject physically anchors him/herself to a person or object to prevent them from being removed, or;

2. The subject braces or pulls away from the officer when the officer grips the subject's arm; or

3. The subject attempts to run when the officer touches or attempts to grab the subject's arm or shoulder.

C. Aggressive resistance: A subject's attacking movements toward an officer that may cause injury, but are not likely to cause death or great bodily harm to the officer(s) or others.

Examples of aggressive resistance include the following:

1. The subject balls up his/her fists and approaches the officer in a threatening manner; or

2. The subject pushes the officer back as the officer tries to take the subject into custody.

D. Lethal-force resistance: A subject's hostile, attacking movements with or without a weapon that create a reasonable perception by the officer that the subject intends to cause, and has the capability of causing, death or great bodily harm to the officer or others.

Some examples of lethal-force resistance include the following:

1. A subject refuses to drop a knife when ordered to by the officer and moves toward the officer; or

2. A subject shoots or points a gun at an officer or other person.

E. All acts of resistance to lawful orders will be clearly documented in an Offense Report.

## VI. RESPONSE TO RESISTANCE

Officers are confronted with situations where control must be exercised to effect an arrest or ensure public safety. When confronted with various kinds of passive resistant, non-cooperative, hostile, aggressive, and dangerous subjects, officers shall use only the force necessary to effect lawful objectives. The degree of control

used depends on all factors, including what the officer perceives as reasonable and necessary under the circumstances and the ability, opportunity and intent of the subject as reasonably perceived by the officer(s) at the time.

Control may be achieved through presence, dialogue, verbal direction, physical force, intermediate weapons, incapacitation and lethal force. An officer may use that force which s/he reasonably believes necessary to defend him/herself or others from bodily harm, or effect lawful objectives, in accordance with FSS 776.05.

A. DE-ESCALATION: In many critical incidents, de-escalation is the preferred, tactically sound approach.

Officers will use de-escalation techniques to prevent or reduce the need for force when it is safe and feasible to do so based on the totality of the circumstances. This includes continually assessing the situation and modifying the response to resistance as circumstances change and in ways that are consistent with officer safety. **CFA 4.01B**

Examples of de-escalation techniques include but are not limited to:

1. Exercising dialogue, persuasion and advice, and providing a warning prior to the use of force, when it is safe.

    a. When safe to do so, and dialogue has been established, officers at the scene should coordinate, if feasible, to have only one officer address the person in crisis while listening intently and asking question to ascertain the nature of the problem, such as difficulties with health conditions, relationships, work, financial, or other problem that may give the officer an opportunity to help the individual in crisis consider solutions.

2. Attempting to calm an agitated subject and promote rational decision making.

3. Considering whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on other factors.

4. Determining whether the officer may be able to stabilize the situation through the use of time, distance, or positioning to isolate and contain the subject.

5. The use of distance and cover or concealment, tactical repositioning, "slowing down" situations that do not pose an immediate threat, calling for a supervisor and other resources, including CIT trained officers. In certain critical incidents, officers

may consider "buying time" to assess the situation and their options, bring additional resources to the scene, and develop a plan for resolving the incident without the use of force or only the force necessary to mitigate the threat.

6. Stopping the application of any physical control tactic or use of any weapon if the subject ceases to resist or is incapacitated and is no longer a threat to him/herself, officers or other persons.

B. PROPORTIONALITY: Officers shall balance the totality of the circumstances, known to or perceived by the officer at the time, with the severity of the offense committed and the subject's level of resistance. Proportional force does not require officers to use the same type or amount of force as the subject. The more immediate the threat and the more likely that the threat will result in serious physical injury or death, the greater the level or force that may be proportional, objectively reasonable, and necessary to counter it.

C. RENDERING AID: After any use of force and as soon as reasonably possible, officers will assess subjects for injuries and provide the appropriate medical aid. Officers must ensure the situation is safe before providing aid to subjects. Officers must immediately request medical assistance if subjects show signs of injury. Officers must also listen for any complaint of injury during and following any use of force. Officers must be especially cognizant that an individual may be able to speak, yet breathing difficulties can still exist that may lead to severe injury or death to that person. **CFA 4.08**

D. PREVENTION OF IN-CUSTODY DEATH: Subjects in custody will not be kept on their stomach any longer than necessary to prevent the possibility of positional asphyxiation or "Sudden In-Custody Death." The person in custody will be seated on their buttocks **as soon as safely possible** and have their back against a solid object to facilitate breathing. The person in custody will be supervised by an officer.

E. DUTY TO INTERVENE: Officers shall intervene when they know, or should know, another officer is using unreasonable force of any kind, prior to, during, or after taking a person into custody (if applicable) or during any law enforcement efforts.

1. Officers have a duty to intervene if a particular officer's involvement is causing a situation to escalate (even verbally), whether it occurs during a criminal or civil matter call for service. Whenever safely possible, officers must pause to use proper listening and communication skills to reach a safe resolution to disputes.

2. Officers have a duty to intervene if another officer is erring on the application of any law.

F. SUPERVISOR RESPONSIBILITY: Unless there are extenuating circumstances, a supervisor will immediately respond to any scene where:

1. A weapon (including a firearm, edge weapon, rocks, or other improvised weapon) is reported;

2. Where a dispatcher or other member of the Department believes there is potential for significant use of force;

3. Where a person experiencing a mental health crisis is reported; and death or serious bodily harm may be imminent.

4. In the event of apparent serious injury, supervisors will immediately make notification to the respective Section Major.

5. The supervisor will remain on scene until a subject(s), or the person in crisis, has been taken into custody, or is relieved by another supervisor.

6. The duty of a supervisor in these types of calls for service is to ensure that, whenever appropriate, de-escalation tactics are utilized so that the appropriate level of force is applied to accomplish the necessary law enforcement objectives.

## VII. LETHAL FORCE

A. Lethal Force shall be used, as a last resort, only when:

1. There is an imminent danger of death or serious physical injury to the officer or another person, or;

2. To prevent the escape of a fleeing subject if there is **probable cause** to believe:

   a. The subject has committed a felony involving the infliction or threatened infliction of serious bodily injury or death, and;

   b. The escape of the subject would pose an imminent danger of death or serious bodily injury to the officer(s) or to another person(s).

3. An officer may use lethal force to protect himself/herself from the

use or threatened use of ADS/CEW when the officer reasonably believes that lethal force will be used against him/her if the officer becomes incapacitated. This will be based on if an officer's exposure to oleoresin capsicum (OC Spray)/ADS, or the deployment of a CEW device, and a well-founded fear in the officer, that he/she will be left unable to defend themselves or others once these weapons are utilized against them.

B. Restrictions on the use of Lethal Force:

1. Discharging a Firearm at a Vehicle:

a. A police officer should make every effort not to place him/herself in a position of danger when attempting to approach or pursue a motor vehicle, and should make every effort to avoid a situation in which the use of a motor vehicle would pose a threat of death or serious physical injury to the officer.

b. Shooting at or from a moving vehicle is prohibited except:

1.) When someone inside the vehicle is using or threatening lethal force by means other than the vehicle itself; or

2.) As a last resort, to prevent the imminent death or serious physical injury to other persons when the officer has probable cause to believe that the driver is or will be utilizing the vehicle as a weapon to inflict mass casualties.

c. Even when circumstances may justify the shooting at or from a moving vehicle, officers will not shoot if there is an unreasonable probability of striking the intended target or when there is substantial risk to the safety of innocent bystanders or officers.

2. Individuals Who Pose a Danger Only to Themselves: Officers must carefully consider the use of less-lethal options against individuals who pose a danger only to themselves and not other members of the public or to officers. Officers should exercise considerable restraint to wait as long as necessary so that the situation can be resolved peacefully. Officers are never authorized to use lethal force against individuals who pose a danger only to themselves.

3. Warning Shots: Warning shots are **prohibited** as they pose a danger to officers and citizens alike. **CFA 4.04**

4. Neck Restraints: The Lateral Vascular Neck Restraint (LVNR), or any other neck restraint (such as a chokehold) by any means (knee,

arm, etc.), is not authorized for use as a less-lethal force option, and shall not be used by any member as a control technique. This does not include the use of lethal force in situations where the use of said force is justified to prevent the death or great body harm to the officer(s) or other person(s). **CFA 4.01A, 4.10**

5. Officers are not authorized to fire their firearms in order to subdue an escaping subject who presents no imminent threat of death or serious injury.

6. Officers should issue verbal warnings before shooting where appropriate; that is, where there is no imminent threat of death or serious physical injury to the officer(s) or another person(s), and said warning does not endanger with death or great body harm the officer or another person. **CFA 4.01D**

7. Lethal force may never be used for the protection of property.

## VIII. LESS-LETHAL FORCE

Less-lethal Force is force that is not known or expected to create substantial risk of death or serious bodily harm. Less-lethal force may be used to gain compliance when de-escalation efforts have failed or are not possible and while effecting an arrest, preventing escape from lawful custody, and in defense of self or others from injury or assault.

A. Examples of resistance where a less-lethal response may be used include:

1. A subject taking an offensive or a physically resistant action, such as a subject standing at the ready and menacing with an object, device, or material capable of inflicting injury.

2. A person using bodily force such as punching, striking, scratching, grabbing/holding.

3. A subject using active resistance to being taken into custody or presenting an imminent biohazard threat such as spitting or throwing a biohazard at the officer, or attempting to do so.

4. A subject evading custody.

5. A subject attempting to harm himself (ingesting narcotics, suicide attempt).

6. A subject making explicit verbal threats to injure the officer or others, and the officer reasonably believes the person will carry out the threat.

7. The officer objectively and reasonably perceives an actual or imminent threat to self, others or evidence.

B. Weaponless Strategies: Officers may use weaponless strategies to gain physical control of a person. These may include:

1. Open hand control.

2. Use of an officer's body part(s) to strike a person.

3. Use of joint manipulation and/or pressure point techniques.

4. Wrestling with a person, whether standing or during a take-down.

5. Actively holding/pinning a person against the ground or other fixed object.

6. Any other less-lethal physical action required to control a resistant, combative or violent person.

## IX. LESS-LETHAL WEAPONS

Weapon(s) that are not fundamentally designed to cause death or serious bodily harm. The following are the only Department-authorized less-lethal weapons to be assigned to officers, and/or supervisors, or other authorized civilian personnel as designated by the Chief of Police:

- Conducted Energy Weapons
- Expandable Baton
- Aerosol Deterrent Spray
- Bean-Bag Shotguns

Personnel assigned any of the above-listed less-lethal weapons are strictly prohibited from carrying them while off-duty for personal use. **CFA 4.06B**

Less-lethal weapons are not to be used as an alternative to de-escalation. Instead, less-lethal tools and equipment are intended to provide officers with options when they encounter individuals who are aggressive and unarmed, or armed with a weapon other than a firearm, and who present a threat to officers or others.

A documented inspection of all less-lethal weapons will be conducted to ensure expiration dates are not exceeded, as well as weapon functionality. Inspections will be conducted annually, at a minimum. **CFA 4.06E**

## A. CONDUCTED ENERGY WEAPON (CEW)

The CEW, upon deploying, transmits electrical pulses into the body of the subject, creating electro-muscular disruption. The result is a temporary loss of the subject's neuromuscular control and any ability to perform coordinated action.

The CEW may be deployed when a subject exhibits aggressive resistance in a manner that, in the officer's judgment, is likely to result in injuries to themselves or others, or when the subject's resistance would require officers to use a greater level of force in order to gain compliance.

Fleeing should not be the sole justification for using a CEW against a subject. Personnel should consider the severity of the offense, the subject's threat level to others, and the risk of serious injury to the subject before deciding to use a CEW on a fleeing subject.

1. Usage guidelines:

   The CEW is to be used as an additional law enforcement tool. It is not intended to replace firearms or other methods of self-defense. A subject's actions, including body language and verbal statements**,** will be taken into consideration before deploying the CEW.

   a. The CEW will be deployed in accordance with the Force Guideline (Appendix B) as established by the Florida Department of Law Enforcement. Personnel are justified in using physical force for their protection; for protection of another from an imminent physical threat and/or assault; as well as for the protection of an individual who is making an imminent threat to do bodily harm to oneself and has the apparent ability to carry out the threat.

   b. Officers will be issued two Close Quarter (CQ) Cartridges and two Stand Off (SO) Cartridges. Officers shall have the Close Quarters (CQ) Cartridges loaded for use in their CEW, and shall have the Stand Off (SO) Cartridges on their person in the assigned holster. Officers shall not have two different style cartridges loaded in their CEW at the same time.

   c. Cartridge Characteristics:

1.) Close Quarters (CQ) Cartridge is solid black in color. It has 25 feet of high-visibility wire. The optimal distance for deployment is 4-10 feet.

2.) Stand Off (SO) Cartridge is gray in color, with a black tip. It has 25 feet of high-visibility wire. The optimal distance for deployment is 11-22 feet.

d. The CEW should be deployed for one standard cycle (5 seconds). Officers will then evaluate the situation to determine if subsequent cycles are necessary. Personnel should consider that exposure to the CEW for longer than 15 seconds (whether due to multiple applications or continuous cycle) may increase the risk of death or serious injury. Any subsequent applications must be **independently justifiable**, and the risks should be weighed against other options.

e. Officers are not to intentionally deploy more than one CEW at a time against a subject.

f. Officers are to provide subjects with a warning prior to activating a CEW, unless doing so would put any person at risk. The warning can be in the form of verbalization, display, laser painting, deterrent mode (arcing), or a combination of these tactics.

g. When possible, officers must announce to other personnel on scene that a CEW is going to be activated against a subject.

h. In the event the CEW deployment is ineffective, officers should re-assess the situation and the current status of the threat, and take appropriate, proportional actions. In some cases, that may mean tactically repositioning, getting together as a team, using de-escalation tactics and assessing different options.

2. Usage Criteria:

The CEW will **NEVER**:

a. Be intentionally aimed at the face or eyes of a subject unless as a last resort to prevent the death or great bodily harm of an officer or another person. The CEW should be aimed at lower center mass, unless circumstances dictate otherwise, and will not be intentionally targeted to other sensitive areas (i.e. head,

neck, genitalia). Officers should not target the chest area, specifically, the area near the heart with CEW, given that there is a chance a CEW could induce extra heart beats.

b. Knowingly be used near flammable gases or liquids, including alcohol-based Oleoresin Capsicum (OC) deterrent spray. NMPD is currently utilizing water based Sabre Red Crossfire Spray.

c. Be used where the potential exists for a subject to suffer extensive harm or injury (such as a fall from a roof or other hazardous situations that could cause severe injury).

d. Knowingly be used against pregnant women, elderly persons, young children and visibly frail persons.

e. Be used unreasonably, based upon all circumstances, including the subject's age and physical condition.

f. Be used on handcuffed subjects, unless doing so is necessary to prevent them from causing serious bodily harm to themselves or others, such as by strong kicks to an officer or other persons and lesser attempts of control have been ineffective.

g. Be used against subjects in physical control of a vehicle in motion, or with the immediate ability to set it in motion (i.e., automobiles, trucks, motorcycles, ATVs, bicycles, scooters).

3. Drive-stun method: Officers can use a CEW in a drive-stun mode as pain compliance techniques, only when the subject's resistance would require officers to use a greater level of force in order to gain compliance.

4. Aggressive animals: Officers may use any objectively reasonable force for self-defense, or the protection of others, when encountering an aggressive animal. Officers should consider tactical options and less-lethal weapons when encountering aggressive animals. The use of intermediate less-lethal weapons should be considered as the primary option, if available, when containment or redirection is not practical. Officers should attempt to discern fearful behavior from threatening behavior and, when possible, take steps to defuse or mitigate animal encounters.

5. After-Use Care for Subjects:

Once the subject is handcuffed and in custody, the CEW-trained

personnel will, if applicable:

a. Remove the probes using safety gloves. CEW probes having made contact with a person's body should be treated as a biohazardous material and handled as such. If necessary, the area may be treated with alcohol and an adhesive strip bandage applied.

b. Provide all subjects who have been exposed to CEW drive-stun, or probes, a medical evaluation by emergency medical responders in the field or at a medical facility. Any subject who has been exposed to a prolonged application (i.e., more than 15 seconds) must be transported to a medical facility for evaluation. Medical personnel conducting the evaluation should be made aware that the subject has experienced CEW activation, so they can better evaluate the need for further medical treatment.

c. Not remove the probes should the CEW probe strike a person in the eye, face, or groin area, or a female in the breast. Persons having been struck in the eye, face, breast, or groin will be transported to an appropriate medical facility. Treatment will be noted on the Control of Persons Report. **CFA 4.08**

d. When dealing with a combative subject who has been struck with CEW probes, it is recommended that the probes not be removed until the subject has reached their destination (medical facility or jail). The connected probes are still effective if the officer needs to control the combative in-custody subject.

6. Weapon Care: Personnel authorized to carry the CEW will be responsible for its care and maintenance.

a. The CEW must be stored in the holster when not in use. The CEW will be handled using the same precautions and security used for firearms. Under no circumstances will a CEW be left unattended in any vehicle, except during prisoner processing, in which case the CEW may be secured in the vehicle trunk or locked compartment.

b. No alterations, changes, modifications or substitutions shall be made to the CEW. No officer will be permitted to carry any cartridges that have not been authorized by the Department. All repairs will be coordinated by the Master CEW Instructor.

c. It is the responsibility of the user to report any malfunction or

operation failure to their supervisor immediately.

d. Officers will carry two (2) cartridges on their person.

7. Spark test: To ensure functionality and minimize the possibility of a weapon failure during field deployment, it is necessary for officers carrying the CEW to conduct a spark test.

a. Patrol officers are required to spark test their CEW during roll call. Shift supervisors will be responsible for officers conducting the spark test in accordance with the authorized training received.

b. Other officers in specialized units will be required to spark test at the beginning of their shift. The spark test technique will be consistent with the training received and it shall be the responsibility of the supervisor to make sure the CEWs are spark tested on a daily basis.

c. Spark test duration will be for one (1) full five (5) second cycle.

8. Downloading: The CEW stores deployment data that can be downloaded and documented. All CEWs are subject to inspection and downloading of stored data; however, any time a CEW is deployed, the information will be downloaded via a switch of the battery as soon as practical. Supervisors will be responsible for ensuring that the officer downloads the information following an incident.

9. Tactical Deployments: Tactical deployments are deployments with the probes or in a drive-stun method, but does not include Deterrent Mode.

10. Maintenance: Should the CEW not pass the spark test, or, for any malfunctions, the officer must notify their supervisor immediately.

**B. AEROSOL DETERRENT SPRAY (ADS)**

ADS is a chemical compound that irritates the eyes to cause tears, pain, and temporary blindness. ADS is considered a response to resistance tool and shall be deployed in a manner consistent with the Force Guideline. ADS is a response to resistance option following verbal compliance tactics and is a weapon that is not fundamentally designed to cause death or great bodily harm.

The Department will issue ADS, a water-based Oleoresin Capsicum, to

provide officers with an optional response to resistance tool for gaining compliance of resistant or aggressive individuals for arrest and other enforcement situations.

Sworn officers and non-sworn personnel, that have been authorized and trained in the ADS, shall use ADS only when necessary for personal defense, and in defense of other persons.

Whenever practical and reasonable, officers must issue the verbal warning "CLEAR" prior to using ADS against a subject.

Once a subject is incapacitated or compliant, use of ADS is no longer justified.

1. Usage Guidelines:

   Officers may use ADS when warranted, but only in accordance with the guidelines and procedures set forth herein. ADS may be used when:

   a. Verbal dialogue has failed to bring about the subject's compliance, and,

   b. The subject has demonstrated their intention to resist the officer's efforts to make the arrest.

   c. Confronting aggressive approaching animals.

2. Usage Criteria:

   It is optional for officers to carry ADS as an additional response to resistance tool, while on duty. However, those wishing to carry ADS must complete an approved course of instruction prior to carrying ADS. This includes each officer being sprayed with ADS. Only Department issued ADS will be utilized. Other usage criteria includes:

   a. Whenever possible, officers should be upwind from the subject before using ADS and should avoid entering the spray area.

   b. An officer should maintain a safe distance from the subject of between three (3) and fifteen (15) feet.

   c. A single spray burst of between one (1) and three (3) seconds should be directed at the subject's eyes, with three (3) feet being the minimal recommended deployment distance.

d. Use of ADS should be avoided, if possible, under conditions where it may affect innocent bystanders.

e. CEWs shall NOT be used if ADS is deployed, unless exigent circumstances exist to protect officers or other persons from imminent injury that would warrant the added less-lethal response to resistance action.

3. Effects of ADS:

a. Within several seconds of being sprayed by ADS, a subject will normally display symptoms of temporary blindness, have difficulty breathing, burning sensation in the throat, nausea, lung pain and/or impaired thought processes.

b. The effects of ADS vary among individuals. Therefore, all subjects shall be handcuffed as soon as practical after being sprayed. Officers should use loud, repetitive, verbal commands towards the subject. Officers should also be prepared to employ other means to control the subject, if necessary, consistent with agency policy.

c. Immediately after spraying a subject, officers shall begin decontamination and request Fire Rescue to address any injuries. Officers should be alert to any indications that the individual needs emergency medical care. This includes, but is not necessarily limited to, breathing difficulties, gagging, profuse sweating and loss of consciousness. Upon observing these or other medical problems, the officer shall immediately expedite emergency medical aid and ensure that breathing is facilitated. The on-duty supervisor will respond to the scene, and document use of ADS. **CFA 4.08**

d. Subjects that have been sprayed shall be monitored continuously for indications of medical problems and shall not be left alone while in police custody. If possible, subjects shall be immediately decontaminated on the scene or be transported as soon as practical to the station for decontamination.

e. Air will normally begin reducing the effects of ADS within 20-30 minutes of exposure. However, once the subject has been restrained, officers shall assist him/her by rinsing and drying the exposed area.

4. After-Use Care for Subjects:

After the subject has been physically restrained, the first step in decontamination is to remove them from the contaminated area. The officer can then question and observe the subject for any medical concerns. Once the subject is in a safe environment, decontamination can begin as follows: **CFA 4.08**

a. Reassure the subject that the effects are temporary and that you will assist in providing relief.

b. The person in custody will not be kept on his/her stomach any longer than necessary to prevent positional asphyxiation or Sudden In-Custody Death. The person in custody will be seated on their buttocks with their back against a solid object **as soon as safely possible** to facilitate breathing. The person in custody will be supervised by an officer.

c. If appropriate, remove any contaminated clothing and seal in a plastic bag.

d. Any clean cloth can be soaked in cool clean water and used to wipe any visible product from the subject's skin. DO NOT RUB THE EYES.

e. Provide copious amounts of cool clean water for the eyes and skin. If available utilize a hose with cool clean water ensuring there is not too much pressure. A hose held upright until 1 ½ inches of water deploys will create the proper water pressure for decontamination. The hose should be held over the bridge of the nose aiming horizontally over one eye towards the outside of the face so as not to re-contaminate the other eye.

f. If no water source is available, eye strobing will help to speed up the recovery period by creating natural tears. Affected persons should be instructed to close their eyes tightly and then open widely, but not use their hands to assist with opening and closing of the eyes. Only the eye muscles should be engaged to complete this process. The individual should repeat this step numerous times to create a natural flow of tears to reduce dryness and irritation.

g. Assistance shall be offered to any individuals accidentally exposed to ADS who feel the effects of the agent.

5. Maintenance:

a. All ADS devices shall be maintained in an operational and charged state by assigned personnel. Replacements for damaged, expired, inoperable or empty devices are the responsibility of officers to whom they are issued, and the employee's supervisor, upon staff inspection, done every four (4) months.

**C. BEAN BAG SHOTGUN AND AMMUNITION**

The Bean Bag Shotgun fires a bean bag round, which consists of a small fabric pillow with a lead round inside. It is designed to deliver an impact that will cause minimum long-term trauma with no penetration, to briefly render a subject immobile. The Department has provided all of the Uniform Patrol Section Commanders and Sergeants with these specialized shotguns that are to be used specifically as a less-lethal force alternative.

1. Usage guidelines:

The use of a Bean Bag Shotgun will be considered a less-lethal response to resistance on the Force Guideline. It may be used to control a person who poses a threat or danger of serious harm to officers or the public, including himself or herself. This includes non-compliant, armed subjects. The goal is to remove the threat with a minimal potential for death or serious injury to all involved.

a. Prior to loading, the supervisor shall visually and physically inspect the chamber and magazine of the shotgun to ensure all ammunition is removed.

b. The supervisor will then load the Bean Bag Shotgun with the 12-gauge Bean Bag round, while visually and physically ensuring that each round is, in fact, a Bean Bag round. When feasible, a cover officer will assist the supervisor to verify that the appropriate rounds are loaded.

c. The Bean Bag Shotgun will only be pointed at the subject's legs, thighs, and buttocks. Intentional aiming at the head, chest or throat area aim shall be prohibited, except where a lethal response to resistance is warranted.

d. Bean Bag Shotguns have easily identifiable bright orange stocks and fore grips and shall only be used to fire less-lethal Bean Bag rounds of ammunition.

2. Usage Criteria:

Incidents where officers confront a dangerous person and all of the following are present:

a. The person has the apparent ability to cause serious bodily harm.

b. Refuses to comply with lawful orders.

c. Cannot be safely approached by officers using alternative means, such as their Expandable Baton, CEW, or ADS.

d. Sufficient distance or cover must be considered. Officers should not place themselves or others in unnecessary or unreasonable danger in deploying the Bean Bag Shotgun. The optimal energy range is 20 to 50 feet. Distances closer than 20 feet present additional danger to officers and may cause serious bodily harm or death. Distances further than 60 feet may result in diminished accuracy and effectiveness.

e. Back-up officers must be prepared to use other force, including lethal force, if necessary, during a dynamic incident where the subject can instantly attack with aggravated or lethal force aggression.

f. Other officers should be prepared to immediately subdue a subject who is temporarily incapacitated and briefly unable to resist.

3. After-use care for Subjects:

After striking a subject with a Bean Bag Shotgun round, Miami-Dade Fire Rescue will be requested by the on-scene supervisor or officer on scene. Fire Rescue will then check and treat the subject for any injuries.

4. Maintenance:

a. The Range Master will be consulted for any malfunctioning issues related to the Bean Bag Shotgun.

b. If repairs are unable to be made, the Bean Bag Shotgun will be turned in to the Range Master and a temporary spare will be issued.

**D. EXPANDABLE BATON:**

The Expandable Baton is a versatile weapon and tool, and should only be used when objectively reasonable, necessary, and proportional. As a weapon, the baton is an instrument for striking and control techniques. As a tool, to create distance in the open position. When an officer makes contact with subjects or complainants who are agitated and/ or emotional and repeatedly move into the officer's "reactionary gap", the officer can create a barrier between them where the baton can be used.

1. The Expandable Baton can be used against:

   a. Aggressive resistance that may include the subject's attempt to attack or actually attack an officer or another person.

   b. Lethal-force resistance where a subject's actions creating an objective reasonable perception on the part of the officer that the officer or another person is subject to great bodily harm or death as a result of the circumstances and/or nature of an attack.

2. Usage guidelines (and other uses):

   a. To displace persons as an officer moves through large crowds in crowd-control situations.

   b. In the open position, provides a fixed and sturdy object that can be used to move unruly people out of the path of the officer.

   c. As a striking weapon on aggressive subjects and animals.

   d. To gain access into a conveyance or structure, if exigent circumstances exists.

3. Usage Criteria:

   a. The baton shall not be used against a subject who is restrained and under control, or who is complying with police direction.

   b. A strike to the head with an Expandable Baton is prohibited. The head, neck, spine, groin, or kidneys shall not be targeted, unless as a last resort and justifiable lethal response to protect the officer or others from imminent death or great body harm.

- Strikes to these areas have a higher probability of creating soft or connective tissue damage or bone fractures than do primary target areas.

c. The preferred/primary target areas should be the subject's arms, legs, and torso.

1). Strikes to these locations normally create severe muscle cramping, which inhibits a subject's ability to continue assaultive action.

2). The arms, legs, and torso should be considered primary targets because of the low potential for subject injury.

3). The radial nerve and the median nerve in the arms are secondary target areas of the body.

4). These locations are intended as targets used to block or deflect strikes directed toward the officer.

4. After-use Care for Subjects:
Officers are required to request medical assistance for the subject after the use of an Expandable Baton. **CFA 4.08**

5. Maintenance:
Any Expandable Baton that is found not to function properly will be turned in to the Quartermaster for replacement.

**E. IMPROVISED WEAPONS OF OPPORTUNITY**:

Improvised weapons of opportunity (i.e., flashlights, radios, etc.) may only be used in the event an officer has exhausted all Department-authorized less-lethal weapons, or as a reactionary response to aggressive resistance when Department-authorized less-lethal weapons are not readily accessible.

1. Usage Guidelines: Officers should avoid targeting the head, neck, spine, groin, or kidneys with any improvised weapon of opportunity, unless as a last resort and justified lethal response.

2. Usage Criteria: Officers will follow the Expandable Baton usage criteria in the event an officer uses any improvised weapon of opportunity against a subject.

**2.** After-use care for Subjects: Officers are required to request medical

assistance for the subject after the use of an improvised weapon of opportunity. **CFA 4.08**

## X. PHYSICAL RESTRAINT OPTIONS

### A. HANDCUFFS:

Usage guidelines and criteria:

1. The arrestee, or person in crisis, will be handcuffed with both hands behind their back.

2. All officers will utilize stainless steel handcuffs with a double locking mechanism. The handcuffs can either be hinged or chained. The double-lock prevents the handcuffs from tightening once the lock is engaged and makes it more difficult for the lock to be picked.

3. After handcuffs are secured onto the wrists of an arrestee, or person in crisis, they will be immediately double-locked to prevent the unintended tightening of the handcuffs and possible injury.

4. Miami-Dade Fire Rescue will be requested to respond and evaluate any persons visibly injured, or claiming to be injured, by the handcuffs prior to transport.

5. In cases of injury, or claims of injury, supervisors will complete a Supervisors' Control of Persons Inventory Report, as noted on Section XI of this policy.

### B. RIPP HOBBLE:

Usage guidelines and criteria:

1. If an officer makes the decision to arrest a person, or comes into contact with an individual who is suspected of experiencing a mental health crisis, and in both cases there is a likelihood of the arrestee/detainee becoming violent requiring the application of a Ripp Hobble, the officer will do the following:

   a. Notify their supervisor so they may respond to the scene. A supervisor must respond.
   b. Apply the Ripp Hobble to the ankles of the individual. If he/she is kicking, the officer can connect the Ripp Hobble snap to the handcuffs at its **full extension**.

c. The person in custody will not be kept on his/her stomach any longer than necessary to prevent positional asphyxiation or Sudden In-Custody Death. The person in custody will be seated on their buttocks with their back against a solid object **as soon as safely possible** to facilitate breathing. The person in custody will be supervised by an officer.

d. Miami-Dade Fire Rescue must respond to evaluate the individual in custody prior to transporting him/her anywhere.

e. If transporting the individual via patrol vehicle, one officer will operate the vehicle while a second officer will sit in the passenger seat and monitor the individual in custody.

f. When the Ripp Hobble is utilized, the officer's offense or incident report shall document the reason for its use, the steps listed above, the supervisor notified, and the Miami-Dade Fire-Rescue's alarm number.

**C. BOLAWRAP:**

The BolaWrap 150 is a hand-held remote restraint device that discharges a 7.6 foot (Kevlar) cord (with a 230 lbs. test strength) to entangle an individual at a range of 10-25 feet. The BolaWrap is equipped with anchor hooks at each end of the cord and requires at least three (3) to four (4) feet of clearance around the targeted area for its application.

The BolaWrap device has limitations and restrictions requiring consideration before its use. It is an additional law enforcement tool, and it is not intended to replace firearms or less-lethal methods of self-defense. The device should only be used when its operator can safely approach the subject within the operational range of the device.

1. Usage guidelines and criteria:

   a) The BolaWrap may be used in an attempt to physically control an intended arrestee/detainee when the totality of circumstances perceived by the supervisor at the time indicate that such application is reasonably necessary to control an individual when:

      1). The subject has demonstrated, by words or actions, an intention to be violent, or to physically resist, and reasonably appears to present the potential to harm officers, him/herself, or others.

      2). Is exhibiting physically evasive movements to defeat an officer's attempt at control by way of bracing, tensing, running away, verbally or physically signaling an intention to avoid or prevent being taken into, or remain in custody.

b) Only a Department-approved/issued BolaWrap device will be utilized by personnel trained in its deployment and use.

c) The BolaWrap device is not a substitute for any other justifiable and reasonable use of force necessary to accomplish the Department's law enforcement duties.

d) Supervisors who have been issued the BolaWrap device will have them readily available during their tour of duty.

e) Under no circumstances will a supervisor deploy a firearm and the BolaWrap simultaneously.

f) Each deployment of the BolaWrap shall comply with Departmental policies, including this Response to Resistance policy.

g) The BolaWrap is not intended to be a transport restraint device, and shall not be used as a substitute for a Ripp Hobble application. Once the subject has been detained, the cord should be cut with an approved device, removed, and collected as evidence.

2. Deployment:

Although the BolaWrap device is generally effective in controlling individuals that for a brief moment may be in a still position, officers should be aware that the device may not achieve the intended results (i.e., the individual suddenly switches positions, or removes the cords) and must be prepared to respond with alternate options.

a. Prior to deployment, a verbal warning stating "**BOLA, BOLA, BOLA**" shall precede a BolaWrap application, unless circumstances dictate that a verbal warning would endanger the safety of officers, other persons, or when it is otherwise not practicable due to the totality of the circumstances. The purpose of the warning is to:

1). Alert other officers at the scene that the BolaWrap will be deployed so they do not confuse the sound of the BolaWrap deployment with the sound of gunfire.

**Note:** Officers at the scene must be cognizant of alerting any late-arriving officers at a call who may not be able to hear the BOLA warning, but may hear the sound of the device as they approach. Similarly, officers must be cognizant of other assisting agencies who may not carry the device and lack understanding of the

warning and ensuing sound.

2). Provide the individual with a reasonable opportunity to voluntarily comply.
3). The fact that a verbal or other warning was given, or under exigent circumstances the reason it was not given, shall be documented by the supervisor deploying the BolaWrap in the applicable written report.

b. The deploying supervisor must, whenever possible, assemble a sufficient number of officers to assist with taking the non-compliant suspect into custody with a "Wrap and Rush" approach, as the officers may only have a few seconds to secure the person after deployment. However, officers will remain cognizant of the possibility of the subject producing a weapon as they approach and will consider other options for cover based on the circumstances.

c. When necessary, responding officers who take the role of cover officer by providing lethal cover, will do so with their firearm in a low ready position. The officer providing lethal cover will not point his/her firearm at the non-compliant suspect while the BolaWrap deploying supervisor is targeting the suspect for deployment of the BolaWrap 150.

d. Under exigent circumstances, nothing in this policy prohibits a supervisor from deploying the BolaWrap at a subject without requesting or having the presence of additional officers.

e. Mere flight from a pursuing officer, without other known circumstances or factors, is not an acceptable reason for the use of the BolaWrap to apprehend an individual.

f. Simultaneous applications of the BolaWrap on a single individual by more than one device is permitted, when necessary, and in authorized target areas.

g. Targeting considerations:

1). Reasonable efforts will be made to target lower extremities (thigh to ankle) or lower arms (elbow to wrist) if in a downward position.
2). The head, neck, chest and groin shall be avoided.
3). If the dynamics of a situation, and a subject's sudden movements, causes the BolaWrap to strike an unintended area (head, neck, chest or groin area), officers will remove (if

necessary, summon medical assistance) the BolaWrap as soon as safely possible and will monitor the subject until examined by Miami-Dade Fire Rescue.

h. Restrictions:

The BolaWrap's laser shall not be intentionally directed into the eyes of another, as it may permanently impair his/her vision.

Use of the BolaWrap on the individuals listed below is prohibited, unless an officer reasonably believes, based on the totality of the circumstances, that other options would be ineffective and failure to use the device would present a greater danger to the officer, the subject, or other persons:

1). Individuals who are known to be pregnant.
2). Elderly individuals or obvious juveniles.
3). Individuals who are handcuffed, or otherwise restrained.
4). Individuals detained in a police vehicle.
5). Individuals having physical control of a vehicle in motion, or with the immediate ability to set it in motion (i.e., automobiles, trucks, motorcycles, ATVs, bicycles, scooters).
6). Individuals in danger of falling or becoming entangled in machinery or heavy equipment, which could result in death or serious bodily injury.
7). Individuals near any body of water that may present a drowning risk.
8). Individuals whose position or activity may result in collateral injury (e.g., falls from height, operating vehicles).

i. Actions following deployments:

1). The deploying supervisor, or assigned officer, shall request assistance from Miami-Dade Fire Rescue if the use of the BolaWrap results in injury.
2). If the anchor hooks penetrate only a subject's clothing, then the supervisor, or assigned officer, may remove the hooks. The supervisor or officer may cut the BolaWrap cord with Department-approved shears. Pocket knives are prohibited from being used to cut the cord.
3). The BolaWrap cord shall be cut prior to any transport to any location.
4). The expended cassette, anchor hooks and cord shall be collected and submitted properly packaged into evidence pursuant to

Property and Evidence policy guidelines, 300.10.

5). If the anchor hooks penetrate skin, the hooks will be removed using safety gloves. Anchor hooks having made contact with a person's body will be treated as a biohazardous and handled as such.

6). Do not remove the anchor hooks should they strike a person in the eye, face, or groin area, or a female in the breast. Persons having been struck in these areas will be transported to an appropriate medical facility as soon as possible, and treatment will be noted on the Supervisor's Control of Persons Inventory Report.

j. Supervisors' Responsibilities:

1). When possible, supervisors will respond to calls when they reasonably believe there is a likelihood the BolaWrap may be useful.

2). The deploying supervisor shall complete the applicable written report, which shall include documentation of the BolaWrap's serial number, cassette's serial number, reason for its use, as well as the description of any injuries sustained, or claimed.

3). In addition, BolaWrap deployments will be documented on a Supervisor's Control of Persons Inventory Report following the procedures noted on Section XI of this policy; however, at no time will the supervisor deploying the device conduct his or her own review of the facts. Instead, the supervisor's commander will complete the Control of Persons Inventory Report.

k. Maintenance:

1). Supervisors assigned the BolaWrap shall be responsible for ensuring that it is properly maintained and in good working order by inspecting the same prior to their tour of duty.

2). BolaWrap devices will also be inspected during regular shift inspections, to include the cassette for an expiration date. Per the vendor, that is, from the time of shipping, two (2) years carrying out in the field; three (3) years in proper storage; and unlimited life for training purposes.

3). The only serviceable items by the Department on the BolaWrap are the cassettes and battery pack.

## XI. REPORTING MEASURES

A. Supervisors Responsibilities:

1. Supervisors Control of Persons Inventory Report: The Department will document all uses of force that involve: 1) empty-handed defensive tactics; less-lethal weapons; or improvised weapons of opportunity, and 2) any instance where injury is observed on or alleged by a subject that is a result of the aforementioned uses of force. Documentation will be made as described below:

   a. The Supervisor's Control of Persons Inventory Report shall be completed by the on-duty supervisor in the following situations: **CFA 4.07**

      1). A charge of Resisting Arrest with Violence is filed.

      2). A North Miami officer uses kicks, punches, or strikes against a person.

      3). A canine bite against a person occurs.

      4). Use of a less-lethal weapon against a person occurs.

      5). Use of an improvised weapon of opportunity against a person occurs.

      6). Use of the BolaWrap on a person.

      7). There are injuries, or allegations of injury to subject, as a result of police action.

         a). Photographs will be taken of subject's injuries or allegations of injury and be submitted with the report, even if no injury is seen. The photographs will then be turned in with the Supervisor's Control of Persons Inventory Report.

         b). Request medical assistance (i.e. Rescue) if needed, or as required by this policy. **CFA 4.08**

      8). If a subject sustains any injury NOT as a result of physical contact being made between an officer and the subject, the incident must be thoroughly documented in the original offense report. The injury MUST be photographed and evaluated by a supervisor, and the name of the supervisor taking the photographs must be documented in the report.

      9). Supervisors will download **any** photographs taken

before the end of their tour of duty and shall transfer the images to Veripic, or any other established computer software designated for this purpose.

b. The Supervisor's Control of Persons Inventory will NOT be utilized:

1). During incidents where only the officer is injured. Officer injuries will be documented on the field report and the City's Supervisor Report form.

2). When a death occurs, or a firearm is discharged.

3). To document the display or drawing of firearms by officers (i.e., search of a building, responding to in-progress calls, etc.). However, in the event it is necessary to point a firearm or a CEW at a person, whether an arrest is made or not, it will be documented on an Offense/Incident report.

4). When a chemical agent is used by SWAT during a barricaded subject, hostage situation, or field force deployment. Documentation of use will be listed in the After-Action Report.

5). After the use of a less-lethal weapon against an animal. However, it will be documented on an Offense/Incident report. The officer who used the weapon must notify his/her supervisor immediately.

c. The Supervisor's Control of Persons Inventory shall be reviewed by the respective Section Major. **CFA 4.11**

1). All reports shall be forwarded, via the chain of command, to the Section Major within three (3) days.

2). Upon review, the Section Major shall determine if the particular response to resistance was justified and whether the action was in compliance with Departmental procedures and training. If warranted, the Section Major will make recommendations on corrective or adverse actions, to include non-disciplinary actions, such as training or tactical improvements.

3). A copy of the Supervisor's Control of Persons Inventory

shall be forwarded to the Chief of Police via the chain of command, as the final level of authority in the review process. **CFA 4.07**

B. Officer Responsibilities:

1. All involved officers, during a use of force incident involving empty-handed defensive tactics, less-lethal weapons, improvised weapons of opportunity or lethal force, will complete a written report as soon as practicable.

2. Officers will document on the applicable written report when they have pointed a firearm or a CEW at an individual as a threat of force. If applicable, this includes back-up officers on the same call, who will document such pointing of their firearm or CEW at a person on a supplemental report.

3. Police shooting incidents will be documented as prescribed in the Police Shooting Incidents policy, 300.19.

## XII. TRAINING

Department members will receive copies and be instructed in this Response to Resistance policy before they are authorized to carry lethal and less-lethal weapons, as well as physical restraint devices. In addition, officers, and applicable non-sworn personnel, will receive annual training/review of this policy (available in PowerDMS) during in-service training in accordance with CJSTC Rules. **CFA 10.10B CFA 4.02**

Prior to being authorized to carry, members will demonstrate proficiency with each lethal and less-lethal weapon, as well as restraint devices per training guidelines, and shall be further trained as listed below.

**CEW**: Sworn members authorized to carry will receive initial and annual training thereafter. **CFA 10.10C**

**ADS**: Sworn and non-sworn personnel authorized to carry will receive initial and biennial training thereafter. **CFA 10.10D**

**Bean Bag Shotguns**: Commanders and Sergeants authorized to carry will receive initial and biennial training thereafter. **CFA 10.10D**

**Handcuffs:** Sworn members will receive initial and as-needed training thereafter.

**Rip Hobble:** Sworn members will receive initial and as-needed training

thereafter.

**Expandable Baton**: Sworn and non-sworn personnel authorized to carry will receive initial and biennial training thereafter. **CFA 10.10D**

**BolaWrap:** Sworn members authorized to carry will receive initial and annual training thereafter.

Appendix A

# North Miami Police Department

*"Making a Positive Impact"*

## Decision-Making Model



Appendix B

## Force Guidelines

The Force Guidelines recognizes that officers make use of force decisions based on the totality of circumstances at the time of the incident. Circumstances are fluid and dynamic. Formulating a valid response

| Subject Resistance | Situational Factors |
|---|---|
| • Is the subject verbally or physically resisting my lawful authority?<br>• Is the subject making attacking movements that are not likely to cause death or great bodily harm?<br>• Is the subject making attacking movements that are likely to cause death or great bodily harm? | • What subject factors influence this situation? Weapon? Physical size? Demeanor? Others?<br>• What officer factors influence this situation? Training? Experience? Physical size? Others?<br>• What environmental factors influence this situation? Weather? Location? Presence of others? |
| **Justification** | **Officer's Response** |
| • Were my actions reasonable based on the subject's resistance and the totality of the circumstances?<br>• Am I able to articulate the reasons for my actions?<br>• Was I in compliance with constitutional and state laws, agency policy, and training? | • Can I physically control the subject?<br>• Could I use a nonlethal weapon not meant to cause death or great bodily harm?<br>• Is deadly force the appropriate option to prevent death or great bodily harm to myself or others? |

Force guidelines: the decision making process *Figure 4-2*

requires continual assessment as the situation changes.

CMS Criminal Justice Defensive Tactics