**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NOS.** 26-mj-03259-LOUIS
26-mj-03260-LOUIS

**IN THE MATTER OF THE EXTRADITION OF TRISTAN TATE,**
______________________________________/

**IN THE MATTER OF THE EXTRADITION OF EMORY ANDREW TATE,**
______________________________________/

## RESPONSE TO FUGITIVES' FILING OF DECLARATION OF EUGEN C. VIDINEAC

At their detention hearing on August 27, 2026, Andrew Tate and Tristan Tate (collectively "the Tates") claimed for the first time that their inability to participate in their Romanian criminal proceedings constitutes a special circumstance that warrants release from custody pending these extradition proceedings. On September 1, 2026, the Tates submitted a declaration (the "Vidineac Declaration") authored by their Romanian criminal defense counsel, Eugen C. Vidineac ("Vidineac"), addressing the status of the Romanian proceedings and the alleged "prejudice the brothers suffer as a result of their continued detention." ECF No. 54 at 1.[1] The United States does not require additional time to consider this Declaration and hereby responds in kind.

## THE VIDINEAC DECLARATION INACCURATELY PRESUMES THAT THE BUREAU OF PRISONS IS UNABLE TO MITIGATE THE TATES' CONCERNS

Vidineac avers that continued incarceration hampers the Tates' efforts to participate in defending their Romanian criminal cases because: (a) the Federal Detention Center Miami ("FDC

[1] For ease of reference, citations to the docket refer only to the docket for Tristan Tate, No. 26-mj-03259. Both dockets contain the same documents referenced in this filing, but they appear at different ECF numbers.

Miami" or the "Institution") does not provide the technological programs or access needed for videoconferencing, ECF No. 54 at 9-10, ¶ 28; (b) the time difference with Romania hampers meetings and court hearings, *Id.* at 10, ¶¶ 29, 30; and (c) the discovery is so large that telephone conferences cannot suffice. *Id.* at 10, ¶¶ 31, 32.[2] As explained below, none of these grounds support a finding of special circumstances to justify release.

First, FDC Miami has informed the undersigned that they have the technological ability to provide videoconferencing to both the Romanian court(s) and Vidineac. The Institution has the capability to provide videoconferencing through WebEx and, if needed, ZoomGov.[3] Indeed, they have provided videoconferencing to other incarcerated fugitives with pending foreign court proceedings or U.S. immigration proceedings around the country. Moreover, the Institution has indicated it has no issues with providing videoconferencing for attorney meetings, upon request.[4] Therefore, to indicate that FDC Miami does not have the ability to provide videoconferencing to the Tates is not accurate and cannot support a finding of special circumstances.

Likewise, the Vidineac Declaration is mistaken that the time difference with Romania makes videoconferencing coordination with FDC Miami "prohibitive." *Id.* at 10, ¶ 29. These

---

[2] Vidineac also mentions that he has his own law practice which "precludes travel." ECF No. 54 at 9, ¶ 27. However, he does not say that the United States government, the Romanian government, or BOP are impeding him from visiting the Tates, nor does he allege that some other circumstance outside of his control is precluding his ability to visit the Tates. Rather, he seemingly admits that this is a choice he has made. As Vidineac has not been prohibited from traveling, his choice to refrain from travel cannot be a contributory factor for a special circumstance here.

[3] Vidineac seemingly argues that the coordination needed to schedule video meetings would be difficult. This misses the mark. <u>The issue is not if it is difficult but whether it is possible</u>. And while coordination is needed to schedule the use of videoconferencing, time-saving options—such as scheduling regular meetings—are available. Moreover, advance notice of court hearings could also be provided in order to have everything in place for the Tates beforehand.

[4] According to FDC Miami, neither BOP attorneys nor the officer at FDC Miami who handles videoconferencing requests has received such a request by, or for, the Tates.

concerns are speculative. Vidineac fails to allege that FDC Miami cannot accommodate the time difference but merely supposes it could be an issue. Additionally, he fails to tell this Court if requests can be made of the Romanian court for hearing times during Eastern Standard Time zone business hours or if U.S. counsel can assist him with scheduling meetings with BOP. The reality is the Institution has indicated it is willing to work with the Tates to accommodate the hours needed for hearings and meetings with advance notice. Therefore, if as Vidineac alleges, a Romanian hearing or attorney preparation meetings could last hours, the Tates could simply request a large amount of time for videoconferencing with FDC Miami. Moreover, arranging regularly scheduled meetings is feasible. Therefore, this concern is of no moment.

Finally, Vidineac argues that the discovery in the Romanian cases is so voluminous that the technological and temporal requirements needed to review it with the Tates cannot be accomplished with telephone conferences. Perhaps, but this is a false premise that presupposes FDC Miami cannot provide the technology he says he needs. In fact, FDC Miami has the ability to accommodate the kind of videoconferencing that allows for screensharing and the private communications Vidineac says are needed. Moreover, FDC Miami has a room available with a computer to review both discovery on hard drives and audio/visual discovery compatible with VLC Media Player and Libre software. The Institution can make this computer available to the Tates for the purpose of reviewing discovery materials outside attorney meeting times, upon request.[5] Thus, as FDC Miami has options to allow the Tates to review discovery—both on their own and with counsel—this argument also fails to support a special circumstance here.

[5] Additionally, FDC Miami has allowed the Tates' attorneys to bring and use their own computers during their meetings with the Tates.

**THE TATES' ASSERTIONS PRESENTED AT THE DETENTION HEARING COLLAPSE UNDER THEIR OWN EVIDENCE**

During the August 27, 2026, detention hearing, Andrew Tate claimed that, if he and his brother Tristan remain detained during their extradition proceedings, they would be convicted in absentia and sentenced to life imprisonment. However, like other allegations made by the Tates in this case, Andrew Tate's claim is not supported by the record. Indeed, the declaration from his and Tristan's own attorney undermines the Tates' new special-circumstances argument.

Significantly, the Vidineac Declaration does not claim that the Tates are potentially subject to in absentia proceedings that could result in a conviction and sentence of life imprisonment. *See generally* ECF No. 54. This may be because the Romanian code provision governing in absentia proceedings, Article 364, appears to restrict such proceedings to cases in which defendants themselves request such proceedings in writing or to circumstances where defendants provide no justification for their absence from Romania.[6]

---

[6] Article 364 of the Romanian Code of Criminal Procedure provides as follows:
(1) The case shall be adjudicated with the defendant present. It is mandatory to bring the detained defendant at the trial.
(2) The court proceedings may take place with the defendant absent, if the latter is missing, flees justice or changed their address without informing thereupon the judicial bodies and, following the controls carried out, their new address remains unknown.
(3) The court proceedings may also take place with the defendant absent if, even though lawfully served the summons, the defendant provides no justification for their absence during the adjudication of the case.
(4) Throughout the court proceedings, the defendant, including the case when deprived of liberty, may apply, in writing, to be tried in absentia, as represented by the retained or the publicly appointed counsel.
(5) When the court deems it mandatory for the defendant to be present, it may order the former's presence including with a bench warrant.
(6) The defendant may submit motions, raise objections and make final arguments.
*See* Venice Commission of the Council of Europe, *Romania – Law on Criminal Procedure as of 7 February 2014*, PDF file, *available at* https://www.coe.int/en/web/venice-commission/-/cdl-ref-2018-043-e (last visited Sept. 2, 2026).

In any event, even if in absentia proceedings against the Tates were possible over the Tates' objection, the Vidineac Declaration acknowledges that two of the three Romanian criminal matters pending against the Tates, which are now consolidated, *currently have no indictment or active proceedings*.[7] The case has not entered the mandatory preliminary-chamber stage, is "currently at the criminal investigation stage," and "[a]ll evidentiary proceedings have been completed." Vidineac's assertion that an indictment is "imminent" is unsupported speculation and cannot justify release. Regardless, there is certainly no imminent hearing that could result in an in absentia conviction or a sentence of life imprisonment, as claimed.

Perhaps recognizing the lack of urgency in the more serious matter, Vidineac points to a third, never-before-mentioned Romanian criminal case against Tristan Tate: Case 1927/93/2026a1 charging incitement to battery or other acts of violence, in which a hearing is scheduled for September 10, 2026. *See* ECF No. 54 at 6, ¶ 14.[8] The charge in this case carries a maximum two-year penalty, potentially only a fine. *See id.* at 20. Participation in proceedings related to this charge alone, which only applies to Tristan Tate, should not constitute a special circumstance warranting release in an extradition proceeding that involves far more serious offenses in the U.K.[9]

Moreover, the Vidineac Declaration has not alleged that the defense is unable to request, based on the Tates' ongoing incarceration in the United States, additional time or a postponement of any forthcoming hearings or other deadlines, including the upcoming September 10, 2026,

[7] *See* ECF 54 at 4, ¶ 8 ("It is now for the prosecutor to redraft the indictment… discontinue charges, or take any other appropriate procedural measures. In our situation, the prosecutor decided to continue the investigation and joined case file 1305/D/P/2022 to case file 2557/D/P/2023 on 3 July 2026.").

[8] Vidineac previously submitted two affidavits to this Court (*see* ECF Nos. 30-3, 30-4).

[9] If anything, this previously unidentified charge further undermines Tristan Tate's assertion that he poses no danger to the community.

hearing in Tristan Tate's third case (1927/93/2026a1). Vidineac himself acknowledges that adjournment is possible, indicating that the defense may be able to request it, and the Romanian court may grant such relief. *Id.* at 11, ¶ 35. Further, one of the Schedules attached to the Vidineac Declaration states that foreign custody, while not automatic, can trigger tolling and serve as a basis for interruption or suspension of the applicable statute of limitations. *Id*. at 21-23, Schedule II, Column 6 ("Interruption, suspension, and foreign custody").

Finally, regardless of the status or severity of the charges in any unrelated criminal proceedings in Romania, or the fugitives' ability to seek and obtain postponements, the fugitives' request must be rejected as a policy matter. Under the Tates' theory that they must be released to participate in legal proceedings pending elsewhere, defendants with *more* pending, criminal exposure would be more entitled to release from custody than those who do not have additional charges pending. Rewarding defendants who are facing charges in more jurisdictions is illogical and would create undesirable results that should not overcome the strong presumption of detention in extradition cases.

**CONCLUSION**

For the foregoing reasons, and for the reasons previously submitted, the United States, on behalf of the government of the United Kingdom, requests that both Andrew and Tristan Tate be detained pending resolution of their extradition proceedings.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: */s/ Alejandra L. López*________
Alejandra L. López
Assistant United States Attorney

Fla. Bar No. 37132
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9241
Email: Alejandra.Lopez@usdoj.gov

By: */s/ Abbie D. Waxman*
Abbie D. Waxman
Assistant United States Attorney
Fla. Bar No. 109315
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9240
Email: Abbie.Waxman@usdoj.gov

A. TYSEN DUVA
ASSOCIATE ATTORNEY GENERAL
CRIMINAL DIVISION

By: */s/ Kerry A. Monaco*
Kerry A. Monaco
Associate Director
Office of International Affairs
Criminal Division
U.S. Department of Justice
Court ID: A5503560
1301 New York Avenue, NW
Washington, DC 20530
Telephone: (202) 616-4798
Email: Kerry.Monaco2@usdoj.gov

By: */s/ Rachel M. Yasser*
Rachel M. Yasser
Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice
Court ID: A5503561
1301 New York Avenue, NW
Washington, DC 20530
Email: Rachel.Yasser2@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on September 2, 2026, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF, which caused the same to be served on Howard Srebnick, Esquire, Jackie Perczek, Esquire, Thomas Maniotis, Esquire and Joseph McBride, Esquire, counsel for the Defendant.

*/s/ Alejandra L. López*________
Alejandra L. López
Assistant United States Attorney