**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 26-mj-03260-LFL

IN THE MATTER OF THE EXTRADITION OF
EMORY ANDREW TATE
_______________________________________/

**EMORY ANDREW TATE'S MEMORANDUM OF LAW**
**IN OPPOSITION TO EXTRADITION**

EMORY ANDREW TATE, through undersigned counsel, respectfully asks this Court to deny the government's request to certify his extradition to the United Kingdom, and states as follows:

## Introduction

The United Kingdom seeks the extradition of Andrew Tate to be prosecuted for 42 offenses stemming from conduct that allegedly occurred in the United Kingdom between 2011 and 2017, and the United States seeks certification on 39 of those counts.

Yet neither the United Kingdom nor the United States identifies a single person who has accused Andrew Tate of a crime. The government has not submitted a sworn statement from any complainant, and the only account of what any complainant said that is before this Court is a "summary of the evidence" prepared by a Bedfordshire detective. *See* ECF#68-1. Nor does the government dispute that each complainant first made her allegations several years after the conduct she alleges, sometimes only after police sought her out, and only after Andrew and his brother, Tristan, became

internationally famous internet personalities. Several of the accusers admit that they repeatedly consented to intercourse with Andrew. On the word of these anonymous accusers, the government asks this Court to certify the extradition of an American citizen on 23 charges, some carrying life sentences.

The remaining 16 charges relate to images allegedly found on three devices the U.K. attributes to Andrew. According to the U.K., 168 of the images depict the same person, a woman who was allegedly 17 years old when the images were made; the devices were seized during Andrew's arrest on July 18, 2015. ECF#68-1, ¶¶ 194–201. However, the alleged minor has not been identified to the defense or this Court, and there is nothing in the record establishing her date of birth.

The government seeks certification on the following criminal offenses:

- Five (5) counts of human trafficking in violation of Sections 2(1) and 5(1) of the Modern Slavery Act 2015;
- Ten (10) counts of rape in violation of Section 1 of the Sexual Offences Act 2003;
- Seven (7) counts of assault occasioning actual bodily harm in violation of Section 47 of the Offences Against the Person Act 1861;
- One (1) count of controlling prostitution for gain in violation of Section 53 of the Sexual Offences Act 2003;
- Five (5) counts of distributing an indecent photograph of a child in violation of Section 1(1)(b) of the Protection of Children Act 1978;
- Seven (7) counts of making an indecent photograph of a child in violation of Section 1(1)(a) of the Protection of Children Act 1978; and

- Four (4) counts of possession of extreme pornographic images in violation of Sections 63(1), 63(7)(d), and 67(3) of the Criminal Justice and Immigration Act 2008.

ECF#74, p. 3; ECF#68-1, pp. 155-56.

The offenses are set forth in two separate warrants in the U.K.'s request. The first, issued on January 19, 2024, by Senior District Judge Paul Goldspring, Chief Magistrate, of the Westminster Magistrates' Court, includes ten (10) counts. ECF#74, p. 4; ECF#68-1, pp. 34–36. Judge Goldspring issued a second warrant on August 5, 2026, adding 32 offenses, on 29 of which the government seeks certification. ECF#74, p. 4; ECF#68-1, pp. 37–46.

Counts 1–2 relate to Complainant 1 ("C1") and include human trafficking charges related to C1's involvement in the Tates' webcam business in 2016. ECF#74, pp. 6–10. Counts 3–6 relate to Complainant 2 ("C2") and include rape and assault charges from alleged conduct in 2015. ECF#74, pp. 10–14. Counts 7–10 relate to Complainant 3 ("C3") and include rape and assault charges from alleged conduct in 2014 and 2015, as well as a controlling prostitution charge. ECF#74, pp. 14–18. Counts 11–18 relate to Complainant 7 ("C7") and include rape and assault charges, as well as a human trafficking charge related to the webcam business. ECF#74, pp. 18–22. Counts 19–21 relate to Complainant 5 ("C5") and include charges for rape and human trafficking. ECF#74, pp. 22–27. Counts 22 and 23 relate to Complainant 6 ("C6") and include charges for rape and human trafficking. ECF#74, pp. 27–29. The remaining counts (24, 25, 27–29, 31–37, and 39–42) relate to pornographic images discovered on

three devices seized by U.K. authorities from Andrew Tate's home and person in 2015. ECF#74, pp. 30–37.

All six accusers remain anonymous: the U.K. has not disclosed the identity of C1, C2, C3, C5, C6, or C7 to the defense, the U.S. government, or this Court, and none have submitted a sworn statement. Neither the Due Process Clause nor the Extradition Treaty Between the United States and the United Kingdom (the "Treaty") permits the United States to surrender an American citizen on nothing more than anonymous allegations. Several of the accusers admit that the intercourse was consensual. On this record, the government has failed to establish probable cause to believe that Andrew committed the charged offenses.

Several counts also fail dual criminality. The government contends that Counts 1 and 2 would be criminal in the United States under 18 U.S.C. §§ 2422 (coercion and enticement) and 2421 (transportation). ECF#74-2, p. 1. But both statutes require prostitution or other criminal sexual activity, and webcam work is neither. The same flaw defeats Count 10, which the government analogizes to Florida's prostitution statutes even though C3 says she refused to have sex for money and only did webcam work. ECF#68-1, ¶¶ 95–99. And several of the rape and assault counts rest on two English rules with no American counterpart: (1) a presumption that violence negates consent to intercourse, and (2) a bar on consenting to bodily harm during intercourse. Finally, the extreme pornography charges are not dually criminal because "the First and

Fourteenth Amendments prohibit making mere private possession of obscene material a crime." *Stanley v. Georgia*, 394 U.S. 557, 568 (1969).

As shown below, the government has not carried, and cannot carry, its burden to establish that Andrew Tate is extraditable for four reasons: (1) no sworn complaint supports Counts 1, 2, and 10, or the 29 counts added by the August 5, 2026 warrant, as 18 U.S.C. § 3184 requires; (2) extraditing him on anonymous allegations would violate due process; (3) the request does not establish probable cause to believe that Andrew committed the charged offenses; and (4) Counts 1, 2, 7, 8, 9, 10, 19, 22, and 39–42 fail dual criminality. The extradition hearing is not a rubber stamp; the Court must rigorously analyze the facts and law. On this record, the Court should decline to certify Andrew Tate's extradition to the U.K.

## Argument

### I. The Court Plays an Integral Role in Protecting the Integrity of Extradition Proceedings.

The courts play an essential role in the extradition determination. Ronald J. Hedges, International Extradition: A Guide for Judges 2 (Fed. Judicial Ctr. 2014) ("[T]he courts play an essential role in reviewing evidentiary and procedural issues."); *see also* Restatement (Third) of Foreign Relations Law § 326, cmt. b (1987) ("The courts . . . have the final say as to the meaning of an international agreement insofar as it is law of the United States applicable to cases and controversies before the courts."); *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning.").

In extradition proceedings, the court is not "permitted to simply hand over a United States citizen on the word of a prosecutor, coupled with conclusory allegations and unsubstantiated, unreliable evidence. . . . [T]he Court is not merely a rubber stamp for a foreign government's decision that probable cause exists, such that an American citizen should be held to answer criminal charges in that country. In our system of justice, each case must be decided based on the particular evidence presented therein." *United States v. Mazur*, 2007 WL 2122401, at *27 (N.D. Ill. July 20, 2007) (denying extradition).

That is because the rights at stake are the constitutional protections the United States guarantees its citizens, protections the courts, not the Executive, must enforce. *See United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999). Under 18 U.S.C. § 3184, the Court must determine whether the evidence is "sufficient to sustain the charge." *Id.* Thus, the Court must make individual determinations as to whether the government provided sufficient evidence to extradite Andrew on these charges. In making this determination, the Court must look to the allegations set forth in the United Kingdom's request (ECF#68-1), not to the government's summary of the evidence.

## II. The Court May Not Certify Counts 1, 2, 10, 11–25, 27–29, 31–37, and 39–42 Because They Are Not Charged in the Sworn Complaint.

The Court should deny certification of Counts 1, 2, 10, 11–25, 27–29, 31–37, and 39–42 because no complaint made under oath charges Andrew with those offenses. Under 18 U.S.C. § 3184, the Court may act only "upon complaint made under oath,

charging" the person sought "with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty." *Id*. The statute then directs the Court to determine whether the evidence is "sufficient to sustain the charge." *Id.* "The charge" is the charge made in the sworn complaint. The complaint defines what the Court may hear, what it may consider, and what it may certify to the Secretary of State. The Court has no authority under the statute to certify offenses that are not charged in the sworn complaint.

The government filed its Complaint for Provisional Arrest with a View Towards Extradition against Andrew on July 18, 2026. ECF#3. The complaint was sworn by AUSA Waxman. The complaint charges two offenses: rape, in violation of section 1 of the Sexual Offences Act 2003, and assault occasioning actual bodily harm, in violation of section 47 of the Offences Against the Person Act 1861. ECF#3, ¶ 5. The counts concern two complainants, C2 and C3. The complaint relies on a warrant issued by Judge Goldspring in the U.K. on January 19, 2024. *Id.* ¶ 6. The factual allegations in the complaint describe only alleged rapes and assaults said to have occurred in Bedford, England, between January and March 2015 (C2) and rapes and assaults said to have taken place in Luton, England, on or around July 3 or 4, 2014, and a separate occasion between August 31 and December 31, 2015 (C3).[1] *Id.* ¶ 7.

[1] The complaint actually reads "August 31 , 2025, and December 31, 2025" but the warrant reads "31 August 2015 and 31 December 2015."

The complaint does not charge human trafficking or controlling prostitution, does not cite the Modern Slavery Act 2015, and does not mention C1. The complaint therefore corresponds, at most, to Counts 3 through 9 in the extradition request. The complaint does not charge Counts 1 and 2, which allege the human trafficking of C1 under the Modern Slavery Act, ECF#74 at pp. 6–10, Count 10, which alleges controlling prostitution for gain, *id.* at p. 16, or Counts 11–25, 27–29, 31–37, and 39–42 which allege offenses against other complainants and the images charges, *id.* at pp. 18–37. Indeed, the complaint could not have charged Counts 11–25, 27–29, 31–37, and 39–42 because those counts appear only in a second warrant issued by Judge Goldspring in the U.K. on August 5, 2026, more than two weeks after the complaint was sworn by AUSA Waxman on July 18, 2026. ECF#68-1 at pp. 37–45; ECF#3 at p. 6.

Since the issuance of the August 5, 2026 warrant in the U.K., the government has not amended the complaint. In a footnote in the complaint, the government reserved the right to proceed "on additional charges" once the U.K.'s formal request is "presented to the Court," ECF#3 at p. 3 n.1, but the government has not proceeded on those charges in the manner § 3184 requires: by a complaint made under oath. Instead, the government seeks certification on charges that appear only in the U.K.'s formal request, which was docketed as an unsworn "Notice of Filing," ECF#68, and in the government's unsworn memorandum of law, ECF#74. Filing notices and memoranda of law are not a substitute for an amended complaint, made under oath, charging offenses that were not alleged under oath in the original complaint. The August 5, 2026

U.K. warrant may be part of the evidentiary materials, but it does not amend the complaint or satisfy the oath requirement of § 3184.[2]

Under the rule of specialty, Andrew may be tried in the United Kingdom only for the offenses for which extradition is granted. Treaty, art. 18(1). The Secretary of State's surrender decision rests on what this Court certifies. If the Court certifies offenses that no sworn complaint has charged, it would authorize Andrew's surrender for crimes that were never properly before the Court under § 3184.

Because the Court may certify only offenses charged in a complaint made under oath, the Court should deny certification of Counts 1, 2, 10, 11–25, 27–29, 31–37, and 39–42.

## III. Certifying Andrew's Extradition on the Basis of Anonymous, Unsworn Allegations Would Violate Due Process.

Although relaxed procedural and evidentiary rules govern extradition hearings, "[t]he United States' actions in reviewing a request for extradition are, of course, subject to the constraints of the Constitution. The constitutional rights of individuals, including the right to due process, are superior to the government's treaty obligations." *Martin v.*

---

[2] 18 U.S.C. § 3190 permits properly authenticated foreign warrants to be admitted as evidence at an extradition hearing, but those warrants do not replace the sworn complaint required by § 3184. Nor does the declaration of State Department Attorney Adviser Tom Heinemann, included with the U.K.'s formal request, serve as the sworn complaint. ECF#68-1 at pp. 1–4. That declaration attests only to the existence of the Treaty and to the formal requirements of the extradition process; it does not charge Andrew with any crime.

*Warden, Atlanta Pen.*, 993 F.2d 824, 829 (11th Cir. 1993) (citing *Geisser v. United States*, 513 F.2d 862, 869 n.11 (5th Cir. 1975)).

The Treaty requires a showing of "[s]uch information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is requested." Treaty, art. 8(3)(c); *see, e.g., Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006); *Sindona v. Grant*, 619 F.2d 167, 175 (2d Cir. 1980); *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433 (S.D. Fla. 1993), *aff'd*, 28 F.3d 116 (11th Cir. 1994). To certify the evidence to the Secretary of State, the Court must conclude that probable cause exists to believe that the crimes charged by the United Kingdom were committed and that the person before the Court committed them.

The standard for a finding of probable cause is defined by federal law. *Fernandez-Morris*, 99 F. Supp. 2d at 1365. Probable cause means that there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the guilt of the accused. *Id.*; *see also In re Extradition of Ernst*, 1998 WL 395267, at *9 (S.D.N.Y. 1998) ("[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.") (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)).

Conclusory statements do not satisfy the probable cause standard. *Fernandez-Morris*, 99 F. Supp. 2d at 1365. The question is not whether the evidence would justify a conviction, but whether it is sufficient to hold the accused. *Id.* (citing *Collins v. Loisel*,

259 U.S. 309, 316 (1922)). The evidence must be sufficient to "block out those elements essential to a conviction." *Collins*, 259 U.S. at 317.

As the Supreme Court has said in the analogous context of arrest warrants, the judicial officer "should not accept without question the complainant's mere conclusions that the person whose arrest is sought has committed a crime." *Fernandez-Morris*, 99 F. Supp. 2d at 1366 (citing *Giordenello v. United States*, 357 U.S. 480, 486 (1958)). This independent review allows a magistrate judge to perform a "'neutral and detached' function and not serve merely as a rubber stamp" for the foreign government. *Id.* (citing *Aguilar v. Texas*, 378 U.S. 108, 111 (1964)). Indeed,

> [Magistrate judges] must, under Article III of the Constitution, exercise their independent judgment in a case or controversy to determine the propriety of an individual's extradition. The executive may not foreclose the courts from exercising their responsibility to protect the integrity of the judicial process. A court must ensure that it is not used for purposes which do not comport with our Constitution or principles of fundamental fairness.

*Id.* (quoting *Ahmad v. Wigen*, 726 F. Supp. 389, 412 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990)).

To be sure, a relator's right to present evidence at an extradition hearing is limited: he may offer only evidence that explains, rather than contradicts, the requesting country's proof. *Id.* (citing *Hooker v. Klein*, 573 F.2d 1360, 1368–69 (9th Cir. 1978); *Cheng Na-Yuet v. Hueston*, 734 F. Supp. 988, 995 (S.D. Fla. 1990), *aff'd*, 932 F.2d 977 (11th Cir. 1991)). The scope of such explanatory proof lies largely within the Court's

discretion. *Id*. (citing *Hooker*, 573 F.2d at 1369). But probable cause remains a statutory requirement, 18 U.S.C. § 3184; without it, the requesting state's allegations are mere suspicions and the request must be denied. *Fernandez-Morris*, 99 F. Supp. 2d at 1366.

Evidence that "explains away or completely obliterates probable cause" is admissible at the final extradition hearing. *In re Extradition of Martinelli Berrocal*, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017). For example, in *Matter of Extradition of Ameen*, Ameen was accused of murder in Iraq but sought to prove to the extradition court that he was in Turkey when the murder took place. 2021 WL 1564520, at *8 (E.D. Cal. Apr. 21, 2021). The court permitted Ameen to provide substantial evidence to prove his alibi, including declarations, sign-in sheets from a Turkish immigration office, a polygraph test Ameen passed in which he stated he was not in Iraq on the day of the murder, and Ameen's cell phone records showing his phone was in Turkey on the day of the murder.

Here, the U.K.'s request includes only the warrants signed by Judge Goldspring, statement of facts by Detective Constable Lee-Anne Marshall, a copy of Andrew's photograph, and a statement of English law by solicitor Narinder Dhillon. ECF#68-1, p. 46. It contains no sworn statement from any complainant. The complainants' names appear nowhere in the record: the U.K. transmitted only "a true and redacted copy" of the arrest warrant, and every complainant's name is blacked out in the warrants before this Court. *Id*. at 34–45. Neither the U.S. government nor the Court knows who the complainants are. Additionally, the U.K. has failed to identify to the defense or this

Court the woman depicted in the images seized from the devices who was allegedly 17 at the time the images were taken.[3]

Additionally, the United Kingdom is in possession of the complainants' own recorded accounts and chose not to submit them. Each complainant gave a video-recorded interview to police. ECF#68-1, ¶¶ 31, 55, 82, 105, 139, 162. The United Kingdom describes those recordings as part of its evidence, admissible at trial as each complainant's evidence-in-chief, *id.* at 183–84, but neither the U.K. nor the U.S. government has put a single recording before this Court. Instead, the Court is asked to find probable cause on a detective's summary of evidence the United Kingdom holds but declined to produce.

Because the U.K. refuses to disclose the accusers' names, Andrew lacks meaningful notice of the accusations and cannot defend against them. He cannot even attempt to explain the complainants' statements, the one avenue extradition law leaves open to him. In the same vein, the U.K. has only provided general, and sometimes year-long, windows of time as to when the crimes allegedly occurred, making it impossible for Andrew to defend. Several of the accusers claim to have been in a romantic relationship with Andrew; if he knew who they were, and when the alleged offense

---

[3] The government offered an unredacted copy of the request subject to a protective order. *See* ECF#74, pp. 2–3 n.3. That copy would not have identified any complainant, and the government has stated that it does not have any of the accusers' names and does not know their identities.

specifically occurred, he could offer evidence that explains their allegations. *See, e.g., Ameen*, 2021 WL 1564520, at *8. Without their identities or the dates of the alleged offenses, his hands are tied. More importantly, this Court cannot assess "the reliability of the source," which the probable cause standard requires. *Ernst*, 1998 WL 395267, at *9.

Moreover, under the rule of specialty, Andrew may be prosecuted only for the offenses on which extradition is granted. Treaty, art. 18. If the Court certifies extradition on anonymous accusations, neither Andrew nor this Court will have any way to confirm, after the surrender, that Andrew is being prosecuted for those offenses and no others. If Complainant 1 is Jane Doe, nothing in this record would reveal whether the U.K. instead tried him on the allegations of Mary Roe.

Courts have denied requests for extradition based on deficiencies in affidavits or documents provided by the requesting country. *See e.g., Matter of Extradition of Singh*, 124 F.R.D. 571, 577 (D.N.J. 1987) ("when a court in an extradition proceeding is presented with evidence through affidavits, the court may conclude, on review of the affidavits submitted, that there are insufficient indicia of reliability or credibility to establish probable cause."); *In re Extradition of Joseph Ben-Dak*, 2008 WL 1307816, at *16 (S.D.N.Y. Apr. 11, 2008) (denying extradition where the affidavits' description of the scheme was "vague" and "disjointed" and provided no competent evidence of what the scheme actually was). The "materials submitted must set forth facts from which both the reliability of the source and probable cause can be inferred." *Ernst*, 1998

WL 395267, at *9 (denying certification, without prejudice to supplementation of the record, where a Zurich court decision failed to establish probable cause). For example, in *Ameen*, the court rejected witnesses' accounts that placed Ameen in Iraq during the murder, stating: "Implicit in the purpose of these probable cause proceedings is the court's ability to reject witness testimony for want of reliability. The court does not determine guilt or innocence, true, but it must assure itself that the standards for probable cause under United States law are satisfied." 2021 WL 1564520, at *12. The court found that the witness's statements were "vague and ultimately unreliable," based in part on the fact that the witness did "not offer a date, even an approximate one, on which Person 7 claims to have seen Ameen in [Iraq]." *Id.* at *14. The court found a second witness's account unreliable in part because the allegations were "derived from summations of an FBI agent's interview notes rather than Person 1's own words," stating "[t]he distinction is subtle, but meaningful. A summation captures the fundamentals of a witness's claims, but it can omit nuance or important details that the interviewing agent(s) might, at the time, have thought inconsequential." *Id.* at *15.

Here, the Court has even less: no affidavit from any complainant, only a detective's secondhand summary of what unnamed women told police years later, with very broad temporal limits. Although the government cites several cases in arguing that the anonymous victim statements are "sufficient to establish probable cause for the charged offenses," the cited cases involved sources known to the government.

In *United States v. Martinelli*, the court rejected Martinelli's argument that affidavits failed to set forth probable cause "because they are 'silent as to the basis of knowledge of any of the individuals or entities or their veracity or reliability;'" because the people and entities listed "were neither anonymous nor confidential…the affiant officer actually contacted several of them." 454 F.3d 1300, 1307 (11th Cir. 2006). And there was "a high level of corroboration." *Id.* Here, neither the government nor the Court (nor the Tates) knows the identities of the complainants.

In *United States v. Golden*, the Eleventh Circuit affirmed a finding of probable cause based on an 11-year-old's witness statement, where the statement was "detailed, prompt, and certain facts were corroborated by the victim's father." 545 F. App'x 920, 921 (11th Cir. 2013). *Golden*, too, involved a known complainant. And Fla. Stat. § 794.022(1) is inapplicable here because it is an evidentiary rule regarding a victim's testimony at trial and the need for corroboration. It has no bearing on the reliability of a detective's third-person summary of an anonymous statement.

Finally, the government claims that the anonymous accounts, "given independently over a span of years," reinforce one another. ECF#74, pp. 50-51. But the record reflects that several of the complainants only came forward after seeing the Tates were arrested in Romania, and three of the complainants (C5, C6, and C7) never came forward but instead were contacted by police. *Id.*, pp. 6; 14; 18; 23; 27. This undermines the government's position that the accounts are consistent or independent: Accounts

given only after widespread publicity of similar allegations, or only after police sought the complainant out, are neither independent nor mutually corroborating.

Extraditing Andrew on these anonymous allegations would violate due process, and the Court should not certify extradition on this record. At a minimum, the Court should direct the United States to request the complainants' identities and their recorded interviews from the United Kingdom under Article 10 of the Treaty and to provide them to the Court and to counsel.

## IV. The Request Does Not Establish Probable Cause on Any of the Counts.

The United Kingdom seeks Andrew's extradition on five trafficking counts, ten rape counts, seven assault counts, one count of controlling prostitution for gain, and sixteen images counts. At the outset, Andrew asserts his innocence and categorically denies each and every allegation in the request and its supporting materials. Because extradition law does not permit him to defend on the merits here, his response is limited to the extradition questions before this Court; if a particular allegation is not addressed, this results from those limits alone and is not an admission, concession, or acquiescence of any kind. Andrew expressly reserves all rights, defenses, and objections, including the right to contest every allegation in any subsequent proceeding.

### A. Counts 1 and 2 (C1)

Counts 1 and 2 charge that Andrew "arrange[d] or facilitate[d] the travel" of C1 "with a view to" her exploitation. ECF#68-1, p. 166. The government alleges that Andrew and Tristan brought C1 from England to Romania twice in 2016 to work as a

webcam model. But nothing in Detective Marshall's statement establishes that C1 was forced to perform on webcam or to remain in Romania. The allegations do not establish probable cause.

Count 1 alleges that Andrew arranged C1's travel to Kosice, Slovakia and collected her from the airport, and the following day drove C1 to an apartment in Brasov, Romania where she remained for four or five days. According to C1, she performed on camera, but when she told the Tates she "no longer wished to work online and wanted to return home," she was "driven to the airport" and returned to the United Kingdom. Although C1 claims that Tristan, not Andrew, "brandished a machete," Tristan also told her that she was free to leave as she could "walk down the hill and obtain a taxi herself." Andrew made no attempt to stop her. ECF#68-1, ¶¶ 32–42. By her own account, C1 stayed in Romania four to five days, disliked the work, asked to leave, and went home. This is not human trafficking.

Count 2 alleges that, two months after her April 2016 trip, C1 emailed Tristan asking for webcam work because she needed money. ECF#68-1, ¶ 43. Tristan turned her down because no space was available. *Id*. In September 2016, Andrew offered her webcam work in Romania, and she accepted. *Id*. Andrew again flew her to Romania. *Id*.

Again, upon arrival, she began working as a webcam model. *Id*., ¶ 44. C1 claims she "felt under pressure to engage in increasingly sexual activity on the webcam because she believed she owed Andrew Tate for the opportunity he had given her." *Id*.

But her own sense of obligation is not force, fraud, or coercion by Andrew. C1 sought out the work, and traveled of her own volition only a few months after her first trip. C1 also described her relationship with Andrew as "good," and called him "the nicer brother." *Id.*, ¶ 32. After six or seven days, she left of her own free will: Tristan drove her to a hotel near the airport and brought her belongings, and she booked her own flight home after declining Andrew's offer to keep working. *Id.*, ¶¶ 49–50.

Nothing in the record alleges force or threat by Andrew. The United Kingdom itself says she was recruited with "assurances that she could leave if she wished," ECF#68-1, ¶ 42; ECF#74-2, p. 1, and the email it cites said, "Try the job for 3 days. Then fly home if you don't like it." ECF#68-1, ¶ 51. She left both times. Accordingly, there is no probable cause to support the charges that Andrew "arranged and facilitated C1's travel to Romania with a view to her exploitation through commercial sexual webcam work." See ECF#74-2, p. 1.

**B. Counts 3–6 (C2)**

Several of the complainants' accounts of their sexual encounters with Andrew show that they were consensual, or that Andrew reasonably believed that the complainants consented. Under the U.K. law submitted by British authorities,

> (1) a person commits rape if
>
> (a) he intentionally penetrates the vagina, anus or mouth of another person with his penis, and
>
> (b) the other person does not consent to the penetration, and

> (c) he does not reasonably believe that the other person consents.
>
> (2) Whether a belief is reasonable is to be determined having regard to all the circumstances, including any steps the person has taken to ascertain whether the other person consents.

ECF#68-1, pp. 156-57. Thus, if Andrew reasonably believed that his partner consented to sexual intercourse, there is no probable cause to believe he committed rape.

C2 contacted police in August 2022 about conduct Andrew allegedly committed in 2015. C2 claimed that in "approximately" January 2015, Andrew raped and choked her on two separate occasions on the same night. *See* ECF#74, pp. 12-13. Without C2's identity, the Court cannot assess the reliability of her account, and Andrew is unable to offer evidence that explains her account.

**C. Counts 7-10 (C3)**

C3 contacted police in 2023 "after seeing that [Andrew] was arrested in Romania for similar offences to those she alleges to have experienced." ECF#74, p. 14. She alleges that Andrew assaulted her twice and raped her once, and controlled her webcam work in the U.K., which the U.K. calls prostitution. *Id.* at 15.

Count 7 is for an alleged assault that occurred during consensual intercourse between C3 and Andrew in July 2014 when C3 was "surprised at how rough" Andrew was. ECF#68-1, ¶ 87. C3 "thinks" "that he choked her" and "thinks" "that he also slapped or spanked her on her buttocks." *Id.* If C3 cannot say whether Andrew choked her, her account cannot establish probable cause that he did. The government's chart

nonetheless says he "strangled C3 . . . to the point of leaving marks on her neck." ECF#74-2, p. 1. C3 claims she sustained injuries visible on her neck, but no photograph, medical record, or witness corroborates them. *Id.* ¶ 87.

Counts 8 and 9 relate to an incident "in autumn or winter 2015" where C3 and Andrew began having consensual intercourse and Andrew choked C3 during the intercourse. *Id.*, ¶¶ 88–91. C3 is "nearly sure" but "cannot be sure" that she told Andrew to stop. *Id.*, ¶ 89. According to C3, she "initially consented to vaginal sexual intercourse, but she did not consent to choking." *Id.*, ¶ 91. Nothing in C3's account reflects that Andrew did not reasonably believe this encounter was consensual. That C3 now views the encounter differently does not make it a rape or an assault.

The government relies on an undated exchange in which C3 answered a reference to choking with "I'm scared. And excited." ECF#74, p. 18. This text suggests that the sexual activity was consensual, and supports Andrew's position that he reasonably believed C3 consented to their sexual activities. There is no probable cause on either Count 8 or Count 9.

Count 10 alleges that Andrew "intentionally controlled the activities of [C3] in relation to her prostitution." ECF#68-1, p. 88. But C3 only alleges that she worked as a webcammer; this is not prostitution.[4] Count 10 alleges that when Andrew suggested that C3 have sex with a stranger for £3,000, C3 refused outright. *Id.*, ¶ 99. Nothing in

---

[4] To the extent that webcam work is considered prostitution in the U.K., this count fails because it is not dually criminal, *see infra*.

C3's account reflects that she engaged in prostitution, and this count should not be certified.

**D. Counts 11-18 (C7)**

C7 made allegations against Andrew only after police contacted her in March 2025. ECF#68-1, ¶ 105. C7 dated Andrew for a year and ended their relationship when she learned he had been seeing someone else. *Id.*, ¶ 113.

Counts 11 and 13 relate to an incident that allegedly took place between "1 November 2011 and 31 October 2012" (the span of a year) where Andrew "choked [C7] unconscious and continued having sexual intercourse with her whilst she was unconscious." *Id.*, ¶¶ 116, 118. Nothing in the allegation suggests that C7 did not consent; to the contrary, she described their "sexual relationship as 'rapey sex.'" ECF#68-1, ¶ 111. She stayed in the relationship a year, left it only over another woman, *id.*, ¶ 113, and made no report until police contacted her thirteen years later. *Id.*, ¶ 105.

The request calls Count 11 "a specific incident," then describes what Andrew "would" do during sex generally, without a date or any detail that separates it from the occasions charged in Count 12. ECF#68-1, ¶ 116. The memorandum offers the incident only "[f]or example." ECF#74, p. 19. The only corroboration is two undated photographs C7 supplied, one of C7 in bed with Andrew and one of a hand on her throat that "C7 stated was the hand of A. TATE." *Id.* Neither is tied to any count or to any act. There is therefore no probable cause to support charges for rape and assault and neither count should be certified.

Counts 12 and 14 relate to Andrew allegedly "vaginally raping [C7] on multiple occasions at his apartment in Luton" and "during intercourse he would choke her and she would become unconscious." ECF#68-1, ¶ 117. C7 does not date or separately describe these occasions beyond saying that "this happened four or five times from November 2011." *Id*. Counts 12 and 14 charge "not less than three occasions" over twelve months, with no date or description of any one. ECF#68-1, pp. 50–51. The Court has no particular act to test, and specialty could never be enforced on these vague allegations. *See* Part III, *supra*. This is insufficient to establish probable cause.

Counts 15, 16, and 17 relate to an incident in 2017. Although C7 had left Andrew, moved away and got married, in 2017 she agreed to meet Andrew at a hotel room. C7 claims that when they got to the hotel room they rented together, Andrew threw her on the bed and had vaginal sex with her while choking her. ECF#68-1, ¶ 121. C7 claims "[t]here was no discussion and no foreplay" before he began having sex with her. Immediately after, Andrew "forced C7 to perform oral sex on him." *Id.*, ¶ 122. The warrant lists two counts of rape and one count of assault for this incident. Again, nothing in C7's account suggests that she did not consent to intercourse or that Andrew did not reasonably believe she consented. To the contrary, they agreed to meet and rent a hotel room together.

Moreover, the government says invoices "confirm that A. TATE stayed at hotels and ate at restaurants near C7's hometown in April 2017." ECF#74, p. 20. Even if the invoices confirm Andrew's presence as alleged, they have no bearing on whether the

hotel sex was consensual. The one email the government says referred to rape was deleted by C7 and has not been produced, so neither the Court nor Andrew can read what it said. ECF#68-1, ¶ 114. Despite C7's claim that Andrew raped her during this encounter, two months later, C7 moved to Romania to live with Andrew. *Id.*, ¶¶ 125-26. Nothing in the request reconciles that decision with the account C7 gave police in 2025. There is no probable cause to support these three charges, and the Court should not certify Counts 15, 16, or 17.

Count 18 is for the alleged human trafficking of C7. C7 claims that she agreed to go to Romania and that Andrew booked her flight in June 2017. ECF#68-1, ¶ 126. Andrew told C7 she did not have to webcam, "but she could if she wanted to earn money." *Id.*, ¶ 125. C7 left Romania on her own after three months. *Id.*, ¶ 132. C7 admits that she did not think she was trafficked until she "reflected" "following Andrew Tate's growth to fame." *Id.*, ¶ 133. This does not suffice as probable cause to believe that Andrew trafficked C7.

The government's chart says Andrew "relentlessly recruited C7 to engage in sex work online." ECF#74-2, p. 3. Within the charged period, the only recruitment correspondence the government quotes told C7 that "she did not need to do webcam work in Romania if she did not want to." ECF#74, p. 21. Nothing in the record supports that Andrew acted "relentlessly."

The acts C7 describes performing on camera involved no other person. *Id.*, p. 22. Those acts fall outside Fla. Stat. § 796.07(1), and the government identifies no other

offense for which anyone could be charged under 18 U.S.C. § 2421 or § 2422. The violence the government attributes to Andrew in Romania is undated, and the government cites no message, record, or witness that corroborates it; it rests entirely on the detective's summary of C7's account. *Id.* The government also describes a sword incident, but it places that incident in the 2011–2012 relationship, years before the charged period, and does not connect it to webcam work. *Id.*, p. 18.

The Court should decline to certify Count 18.

**E. Counts 19-21 (C5)**

After police contacted her in February 2025, C5 reported two incidents of rape that allegedly occurred "over the course of approximately one year" between April 2015 and March 2016. ECF#74, p. 23. According to C5, they had consensual sex, but Andrew became very rough and slapped her. She also alleges he choked her. ECF#68-1, ¶ 144. According to C5, she "thought that they were just going to have normal sex. She did not consent to the force used by Andrew Tate during intercourse." *Id.*, ¶ 145. That is the basis for Count 19, but because C5 admits the intercourse was consensual, there is no probable cause.

Count 20 relates to an incident between April 2015 and March 2016 where C5 and Andrew got a hotel room and started having consensual intercourse. C5 claims that she told Andrew to stop during intercourse and tried to push him off but he did not stop. The government charges a twelve-month window. A twelve-month window forecloses the explanatory evidence the government agrees Andrew may offer. *See* Part III, *supra*.

Nothing the government offers corroborates the encounter itself. Without C5's identity or a date, the Court cannot assess the reliability of either account.

Count 21 relates to human trafficking. The government claims that Andrew arranged C5's travel to Romania with the intention that she would be sexually exploited. C5 agreed to go to Romania with Andrew to spend time with him on holiday. ECF#68-1, ¶ 151. According to C5, when she told Andrew she wanted to leave, "[s]he was driven to the airport by a man who did not speak English." *Id.*, ¶ 158. Then, "[s]he got on a plane and went home." *Id.* She went to Romania willingly and went home on her own. The memorandum gives no date for this trip and cites no travel record. ECF#74, p. 25. For C1, C6, and C7, the government offers flight or bank records; for C5 it offers no travel record of any kind. *Id.*, pp. 8, 21, 28 n.16. That Andrew "booked and paid for" the trip rests on C5's account alone. *Id.*, p. 25. By C5's own account, Andrew took her passport for the stated purpose of booking holiday flights and returned it after she asked to go home. ECF#68-1, ¶¶ 157–158. This is not human trafficking.

**F. Counts 22-23 (C6)**

C6 made allegations against Andrew only after police contacted her in January 2025. ECF#68-1, ¶ 162. Count 22 charges rape. C6 dated Andrew between June and September 2016. *Id.*, ¶ 166. C6 says they regularly spent the night together and had sex. According to C6, sex "was always very forceful but consensual," but she never consented to "violence within the sex." *Id.*, ¶¶ 167-68. There is no allegation that Andrew forced C6 to have the intercourse charged in Count 22; her account cannot

establish probable cause that he raped her. The government recasts her words as "initially consensual," ECF#74, p. 28, but she said the sex was "always very forceful but consensual." ECF#68-1, ¶ 167. And the government concedes Count 22 charges "multiple vaginal rapes" as "a single count," ECF#74, p. 28, leaving, like Counts 12 and 14, no particular act to test.

Count 23 relates to human trafficking. The government claims that Andrew arranged C6's travel to Romania with the intention that she would be sexually exploited. The chart prepared by the government says Andrew "booked and paid for C6's travel to Romania." ECF#74-2, p. 4. However, the government's own memorandum says only that C6 was "likely" transported at the Tates' expense, ECF#74, p. 53, and according to Detective Marshall, C6 herself does not know who paid for her flight to Romania. ECF#68-1, ¶ 172.

C6 admits that she "expected to do some clothed webcam work from Romania." ECF#68-1, ¶ 175. She signed a MyFreeCams agreement six days before she flew. *Id.*, ¶¶ 172, 186. And she does not say who "made" her perform naked on webcam; she asserts only that "she was made" to do so. The request says C6's passport "was taken from her and locked away," without saying by whom. ECF#68-1, ¶ 173. It does not name Andrew as a person who controlled the webcam work. *Id.*, ¶ 175. The one specific threat the government attributes to Andrew concerned smoking, not webcam work. ECF#74, p. 29. C6 was paid £26,454.52, ECF#68-1, ¶ 190, and after leaving she booked her own flight back to Romania. *Id.*, ¶ 189. There is thus no probable cause to believe

that Andrew "arranged and facilitated" C6's travel or that he used force, fraud, or coercion to make her engage in commercial sex work.

**G. Counts 24, 25, 27–29, 31–37, and 39–42 (the Images Counts)**

In Counts 24, 25, 27–29, 31–37, and 39–42, Andrew is accused of making and distributing indecent images of a child and possession of extreme pornographic images. ECF#68-1, ¶ 192. According to the government, 168 of the images on the devices depicted the same female, allegedly 17. *Id*., ¶ 200. Counts 24, 25, 27-29, and 31-37 relate to images of the alleged 17-year-old. The U.K. asserts that the female's passport shows she was 17 during the relevant period. *Id*. But the passport is not in the record, and the U.K. has not identified her to the government or the Court. The request says "the officer was provided with a photograph of the child" to "assist with that identification." ECF#68-1, ¶ 200. The Court has not seen that photograph, and the request does not say how each of the 168 files was matched to it. Both the identification and the alleged age of the female rest on documents the Court has not seen. The government therefore cannot establish probable cause that she was 17, and not 18, when the images were made and distributed.

As to the seven counts charging Andrew with allegedly making 168 indecent images of a child (Counts 31 through 37), the Court should deny certification because the United Kingdom has not provided facts or evidence from which the Court can find probable cause that the images and videos are unlawful.

Counts 31 through 37 allege that Andrew made a specific number of images or videos that fall within a specific category. For example, Count 31 alleges that Andrew made "36 Category A images and videos appearing within exhibit AT01." ECF#68-1 at p. 54. Count 32 alleges that Andrew made 13 Category B images and videos of a child. Count 33 alleges that Andrew made 41 Category C images and videos of a child. And so on. Together, Counts 31–37 allege that Andrew made 168 unlawful images and videos of a child.

But for each count, the United Kingdom does not describe all the videos and images charged in that count. Instead, an unnamed appropriately trained officer, whose training is not provided, describes only one image or video per count, which the United Kingdom calls "a representative example." *Id.* at pp. 143–146, ¶¶ 260–267. The other images and videos are not described at all. For example, for Count 31, which charges that Andrew allegedly made 36 unlawful Category A images and videos of a child, only one video is described, with the statement that this video is an example for the remaining 35 images, which are not described. The same is true of every count. Of the 168 alleged videos and images for which the United Kingdom seeks Andrew's extradition for prosecution, only seven are described. For the remaining 160 alleged images and videos, the Court has no facts or evidence to determine whether they are unlawful. This is insufficient to establish probable cause to certify Counts 31 through 37.

Whether there is probable cause to believe that an image is an unlawful depiction of a child is a legal determination that the Court must make based *on facts*. *See United*

*States v. Brunette*, 256 F.3d 14, 17–19 (1st Cir. 2001) (officer's stated conclusion that images were lascivious, without a description of the images or an opportunity for the judge to view them, did not establish probable cause for a search warrant). And without a description of what each image depicts, the Court cannot determine whether the images are unlawful under United States law.

The record shows that the Court cannot reliably credit the United Kingdom's classifications of the images / videos. The United Kingdom appears to have classified the same video differently in support of two different counts: In Count 30, the U.K. describes a video showing an alleged female child seated behind Andrew in lingerie, kissing his neck, and then kissing an adult female who enters and removes her bra, and classifies that video as *Category C*. ECF#68-1 at p. 142, ¶ 257. But in Count 37, the United Kingdom offers what appears to be the same video, showing the alleged child in lingerie behind Andrew, kissing his neck, and then kissing an adult female whose breasts are exposed, as its "representative example" of *Category B*. *Id.* at p. 146, ¶ 266.[5]

Additionally, the U.K. has alleged that Andrew "made" the indecent images of the alleged 17-year-old because the images were stored on devices the U.K. attributes to him. *Id.*, ¶ 259. The U.K.'s theory is that it "has inferred that A. TATE took an action that caused the images to exist on that particular device." ECF#74, p. 36. It infers "making" from storage alone. ECF#68-1, ¶ 259. But the presence of a file on a device

[5] The United States is not seeking certification on Count 30, but it does seek certification on Count 37.

believed to be Andrew's does not establish probable cause that Andrew *made* the file or the images. And while the government recasts the making counts as Andrew having "persuaded or enticed" the female to produce, or "produced," the images, the U.K. has not charged this. ECF#74, pp. 4, 54. And in Count 35, the U.K. describes the image of the female as a "self-photograph" or a selfie, meaning Andrew did not make the image at all. ECF#68-1, ¶ 264.

Nothing in the U.K.'s allegations (¶¶ 260–267) establishes probable cause that Andrew made any of the charged images, and because the United Kingdom has described only eight of the 168 images, the Court should deny certification of those charges.

In Counts 39–42, Andrew is accused of possession of extreme pornographic images related to intercourse with an animal and obscene images relating to serious injury to genitals, found on two devices seized from his home. ECF#68-1, ¶¶ 268-272. No distribution, sale, or intent to distribute is alleged. The U.K. claims that the images portrayed in an "explicit and realistic way" intercourse with a live animal, but it is unknown from the U.K.'s description if the images are real; the U.K. merely alleges that "a reasonable person looking at the image would think that any such person or animal was real." And, as to Counts 39 and 40, there is no factual recitation; the U.K. has only tracked the statutory language in alleging that Andrew possessed these images. ECF#68-1, p. 147. Thus, there is no probable cause on these counts, nor any showing that the conduct would violate the government's analogue, Fla. Stat. § 828.126(6),

which criminalizes sexual activities involving animals. ECF#74-2, p. 5; *see Brunette*, 256 F.3d at 17 (agent's legal conclusion "parroting the statutory definition…absent any descriptive support and without an independent review of the images, was insufficient to sustain the magistrate judge's determination of probable cause.").

Additionally, Counts 41 and 42 fail because they are not dually criminal, as explained in Part V(E), *infra*, but also because the Florida analogue, Fla. Stat. § 847.011(2), is a second-degree misdemeanor punishable by sixty days and cannot support extradition alone. Under Article 2(5), an offense punishable by less than one year may be included only if extradition has been granted for an extraditable offense. *See* Treaty, art. 2(5). If the remaining 37 counts fail, as they should, Andrew cannot be extradited on Counts 41 and 42.

## V. Counts 1, 2, 7, 8, 9, 10, 19, 22, and 39-42 Are Not Dually Criminal.

### A. Counts 1 and 2 Are Not Dually Criminal Because Webcam Work is Legal and is Not Considered Prostitution in the United States.

Extradition requires that "the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312. The inquiry asks whether "the particular act charged," taken as true, would be criminal here. *Arias Leiva v. Warden*, 928 F.3d 1281, 1293 (11th Cir. 2019). Counts 1 and 2 charge Andrew with human trafficking under Section 2(1) of the Modern Slavery Act 2015, which reaches a person who "arranges or facilitates the travel of another person ("V") with a view to V being exploited." ECF#68-1, p. 166.

The government claims that the American analogues for Counts 1 and 2 are 18 U.S.C. §§ 2421 and 2422, which prohibit transporting, or coercing or enticing, a person to engage in prostitution or other criminal sexual activity. But C1 never engaged in prostitution; she claims only that she did webcam work for about a week on each of two trips in 2016. Florida defines prostitution as "the giving or receiving of the body for sexual activity for hire," and the sexual activity must involve the sexual organ "of another" or penetration "of another." Fla. Stat. § 796.07(1). A woman performing alone on camera for viewers in other countries gives her body to no one. Adult webcam performance is lawful in the United States.

By her own account, C1 went to Romania voluntarily because she needed money, and each time she disliked the work, she left within a week. Because Counts 1 and 2 are not dually criminal, the Court should decline to certify them.

**B. Count 10 is Not Dually Criminal Because Webcam Work is Not Prostitution in the United States.**

Count 10 charges controlling prostitution for gain under Section 53 of the Sexual Offences Act 2003, between May 1 and September 2, 2015. ECF#74-2, p. 2. But C3 says she refused to have sex for money and only did webcam work. ECF#68-1, ¶¶ 95–99. Webcam work is not prostitution in the United States, and it is legal.

The government offers three Florida analogues: deriving support from the proceeds of prostitution (Fla. Stat. § 796.05, charged as an attempt); compelling another to become a prostitute (Fla. Stat. § 796.04); and offering another for prostitution or lewdness (Fla. Stat. § 796.07(2)(b), which carries a maximum of 60 days, well short of

the Treaty's one-year threshold, see Treaty, art. 2(1)). ECF#74-2, p. 2. Each depends on prostitution, defined as the giving or receiving of the body for sexual activity for hire. C3 performed alone in her own home for remote viewers; she never gave or received her body for sexual activity for hire. The Court should decline to certify Count 10.

**C. Counts 8, 19, and 22 Are Not Dually Criminal Because Each Complainant Consented to the Intercourse Charged.**

Counts 8 (C3), 19 (C5), and 22 (C6) charge rape under Section 1 of the Sexual Offences Act 2003. Yet each complainant says the intercourse was consensual; what she did not consent to was choking or other rough conduct during it. C3 consented to vaginal intercourse but "did not consent to choking." ECF#68-1, ¶ 91. C5 says the same: "While C5 initially consented to vaginal sexual intercourse with A. TATE, she did not consent to being slapped, hit or choked." ECF#74, p. 24; ECF#68-1, ¶¶ 143–145. Although she wanted him to stop, "she did not tell him to stop" and "just let it happen." *Id.*, ¶ 144. C6 likewise "consented to vaginal sexual intercourse, but she did not consent to choking or suffocation." *Id.*, ¶¶ 167–168.

The government's theory on each count is that unwanted conduct during consensual intercourse made the intercourse itself rape. That theory works in England only because of Section 75 of the Sexual Offences Act 2003, under which violence used immediately before or during the act gives rise to a presumption that the complainant did not consent and that the defendant lacked a reasonable belief otherwise. *Id.*, pp. 158–160; ECF#74, p. 48. American law has no such presumption. The government's

analogues are aggravated sexual abuse by force, 18 U.S.C. § 2241(a)(1); sexual abuse of a person physically incapable of declining participation or communicating unwillingness, § 2242(2)(B), or without consent, § 2242(3); and sexual battery of a physically helpless person, Fla. Stat. § 794.011(4)(b), or without consent, § 794.011(5)(b). Each requires that the sexual act itself be forced or nonconsensual.

Here, all three complainants say the sexual act was consensual. Section 2241(a)(1) requires that force cause the sexual act; it did not. The remaining statutes require that the act occur without consent or with a person unable to refuse; it did not. Taken as true, the particular act charged is consensual intercourse during which other conduct is alleged. *Arias Leiva*, 928 F.3d at 1293. Because that conduct does not satisfy any of the government's analogues, certification on Counts 8, 19, and 22 should be denied.

**D. Counts 7 and 9 Are Not Dually Criminal Because the Request Does Not Allege the Elements of Any Analogue the Government Pleads.**

Counts 7 and 9 charge Andrew with assault occasioning actual bodily harm under Section 47 of the Offences Against the Person Act 1861 for choking C3 during intercourse. As to Count 7, C3 says she "initially consented to sexual intercourse." ECF#74, pp. 15–16; ECF#68-1, ¶ 87. She never alleges that she did not consent to choking; indeed, she only "thinks that he choked her." *Id.* She also says Andrew "slapped or spanked her on her buttocks" and she "was shocked because it was not how she expected it to be," which describes surprise, not a lack of consent. *Id.*

Count 9 charges choking during the autumn 2015 encounter. ECF#68-1, ¶ 92. C3 is not sure she ever told him to stop. *Id.* For Count 9, the government also pleads 18 U.S.C. § 113(a)(1), which requires an assault with intent to commit a § 2241 or § 2242 offense (aggravated sexual abuse or sexual abuse). ECF#74-2, p. 2. The chart describes Count 9 as the "[s]ame incident as Count 8," *id.*, and the rape charged in Count 8 fails for the reasons stated in Part V(C), *supra*. There was no sexual abuse because C3 consented to intercourse with Andrew.

These charges are viable in England only because, as the government acknowledges, English law holds that "a person cannot consent to the infliction of actual bodily harm" outside recognized exceptions such as sport. ECF#74, p. 49; ECF#68-1, p. 165 ("consent was no defence where the activity caused actual bodily harm and exposed the complainant to a risk of serious injury."). The government's analogues contain no such rule. For Count 7, it offers 18 U.S.C. § 113(a)(8), Fla. Stat. § 784.041, and Fla. Stat. § 784.031. ECF#74-2, p. 1. But Florida's domestic battery by strangulation statute reaches only a person who impedes breathing or circulation against the will of the other person. Fla. Stat. § 784.041(2)(a). Section 784.031 likewise reaches only nonconsensual conduct, and 18 U.S.C. § 113(a)(8) requires an assault, which is by definition nonconsensual. Section 784.031 also did not exist until October 1, 2023, nine years after the conduct charged in Count 7. Ch. 2023-237, Laws of Fla. None of these statutes criminalizes consensual conduct, and nothing in C3's account of Count 7 suggests that Andrew had reason to believe the intercourse or the choking was

unwelcome; as to Count 9, she "cannot be sure" that she ever told him to stop. ECF#68-1, ¶ 89. Because consensual choking is not a crime in the United States, the Court should deny certification on Counts 7 and 9.

### E. Counts 39-42 are not Dually Criminal Because Possession of Extreme Pornography is Not Illegal in the United States.

The four extreme pornography counts charge Andrew with possession of pornography, two counts relating to images depicting sexual intercourse with an animal and two counts relating to images depicting an act that resulted or was likely to result in serious injury to a person's genitals. ECF#68-1, ¶¶ 268-272. No distribution, sale, or intent to distribute is alleged. ECF#74, p. 37. "[T]he First and Fourteenth Amendments prohibit making mere private possession of obscene material a crime." *Stanley v. Georgia*, 394 U.S. 557, 568 (1969).

In *Stall v. State*, the Florida Supreme Court noted that *Stanley* applies to the very statute the government pleads for Counts 41 and 42: "To the extent that § 847.011(2), Fla.Stat. (1985 & Supp.1986), criminalizes mere possession for private, individual use, that subsection is unconstitutional." 570 So. 2d 257, 259 n.4 (Fla. 1990). The court explained, "*Stanley* protects an individual's private possession of obscene materials, and our research discloses no Florida cases where the state prosecuted individuals merely for possessing obscene materials for their private use." *Id*. at 259. Accordingly, Counts 41 and 42 fail. As to Counts 39 and 40, the request does not say whether the images are real or generated; if they do not actually depict sexual contact with an animal, they are

not criminal under Florida law. And § 828.126, the government's analogue, ECF#74-2, p. 5, did not reach possession of any image until October 1, 2022, seven years after the possession charged. Ch. 2022-212, § 4, Laws of Fla. Accordingly, the Court should deny certification on Counts 39-42.

### VI. Andrew Tate Preserves Every Objection Committed to the Secretary of State.

Andrew Tate expressly preserves for the Secretary of State every ground for denying surrender that the Treaty and the extradition statute commit to the Executive, including that the request is politically motivated, Treaty, art. 4(3), and the United Kingdom's delay in seeking his extradition. *See Martin*, 993 F.2d at 829.

## Conclusion

The Court should decline to certify Andrew Tate's extradition on all counts because certifying extradition on anonymous, unsworn allegations would deny him the due process he needs to defend against the charges. The Court should also deny certification on Counts 1, 2, and 10 and the 29 counts added by the August 5, 2026 warrant because no sworn complaint supports them. The Court should deny certification on all counts because they lack probable cause, and on Counts 1, 2, 7, 8, 9, 10, 19, 22, and 39–42 because they are not crimes in the United States.

In the alternative, the Court should direct the United States to request the complainants' identities and their recorded interviews from the United Kingdom under Article 10 of the Treaty, and to provide them to the Court and to counsel, before ruling. Any certificate the Court issues should identify, for each count certified, the conduct,

the dates, and the complainant number on which certification rests, so that the rule of specialty under Article 18 of the Treaty can be applied after surrender.

Respectfully submitted,

*/s/ Thomas Maniotis*
**THOMAS MANIOTIS**
Florida Bar No. 122414
EQUITY LEGAL, PLLC
5201 Blue Lagoon Drive, Floor 8
Miami, Florida 33126
(305) 629-3219
tamaniotis@equitylegal.net

*/s/ Joseph D. McBride*
**JOSEPH D. MCBRIDE**
New York Bar No. 5445879
THE MCBRIDE LAW FIRM, PLLC
305 Broadway, Suite 700
New York, New York 10007
(917) 757-9537
jmcbride@mcbridelawnyc.com
Admitted Pro Hac Vice
Co-Counsel for Emory Andrew Tate

/s/ *Howard Srebnick*
*/s/ Alexa Klein*
**HOWARD SREBNICK** (FBN 919063)
**JACKIE PERCZEK** (FBN 042201)
**ALEXA KLEIN** (FBN 1002299)
**JAKE GOLDMAN** (FBN 1074657)

/s/ *Stephen James Binhak*
**STEPHEN JAMES BINHAK**
Florida Bar Number 736491
LAW OFFICE OF STEPHEN JAMES BINHAK, PLLC
One Southeast Third Avenue, Suite 1800
Miami, Florida 33131
(305) 361-5500
binhaks@binhaklaw.com