**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.** 26-mj-03260-LOUIS

**IN THE MATTER OF THE EXTRADITION**
**OF EMORY ANDREW TATE,**

_____________________________________________/

## REPLY IN SUPPORT OF EXTRADITION

The United States respectfully replies to Emory Andrew Tate's ("A. TATE") opposition to a certificate of extraditability. A. TATE has failed to overcome the strong evidence submitted by the United Kingdom ("U.K.") in support of certification of extradition. In his response, he seeks to avoid extradition by making procedural objections unsupported by the statute or the United States' extradition treaty with the U.K. (the "Treaty") and issuing demands for discovery unavailable in extradition proceedings. His arguments also rest on misunderstandings of the U.K. charges, a selective reading of the complainants' allegations, antiquated views of consent, and factual and credibility arguments reserved for trial in the U.K. The authenticated evidence establishes probable cause and dual criminality for the offenses presented, and the Court should certify A. TATE's extradition.

## ARGUMENT

### I. THE COURT'S EXTRADITION ANALYSIS IS ANCHORED TO THE U.K.'S EXTRADITION REQUEST, NOT THE PROVISIONAL ARREST COMPLAINT

A. TATE attempts to skirt extradition on almost all charges for which the United States has sought certification (except for Counts 3-9) by erroneously claiming that the Court is prohibited from certifying his extraditability on charges that were not presented in the government's Provisional Arrest Complaint. ECF No. 81 at 6-9. His approach is tethered to an incorrect

interpretation of the extradition statute, ignores contrary treaty language, would cause unnecessary judicial inefficiencies, and gives more rights to extraditees than to domestic criminal defendants. The Court should reject it.

When interpreting a statute, the Court starts by discerning the text's ordinary meaning. *E.g.*, *Heyman v. Cooper*, 31 F.4th 1315, 1318-19 (11th Cir. 2022) (internal citations omitted). Here, A. TATE's argument turns on the meaning of 18 U.S.C. § 3184, which sets forth the Court's role in extradition proceedings. The first sentence of the statute explains that a judge "may, upon complaint made under oath," "issue a warrant for the apprehension of the person so charged" with "having committed within the jurisdiction of any foreign government ***any*** of the crimes provided for by such treaty or convention." 18 U.S.C. § 3184 (emphasis added). This sentence plainly means that a complaint seeking an arrest warrant need not allege every possible foreign crime for which the fugitive is accused. Rather, the complaint need only present sufficient information to justify the fugitive's arrest for the purpose of initiating extradition proceedings. This reading is confirmed by the next sentence of the statute, which addresses what happens after a fugitive is arrested. The statute directs the extradition court to hold a hearing to determine whether the request from the foreign country presents "evidence sufficient to sustain the charge[s] under the proper treaty or convention." *Id.* It is at this stage that the extradition court considers the full set of charges presented in the requesting country's extradition request and determines whether the fugitive is extraditable, and if so, on what charges. The procedure used in this case, and every other extradition case across the country, tracks the process laid out in the statute.

Importantly, neither the statute nor the Treaty requires crimes presented in the provisional arrest warrant to match exactly the charges later sought for extradition, and A. TATE does not present any legal authority to the contrary. ECF No. 81 at 6-9. Indeed, the Treaty in Article 12(4),

which carries the force of law, permits the government to swear to a complaint before the requesting state has submitted its formal request for extradition outlining all of the charges and providing documents in compliance with the Treaty. Accordingly, it is simply of no consequence that the U.K. obtained an arrest warrant and formally sought extradition on new, additional charges after A. TATE's provisional arrest in the United States.[1] *See*, *e.g.*, *Koskotas v. Roche*, 931 F.2d 169, 174-75 (1st Cir. 1991) (rejecting fugitive's challenge to new charges presented in a formal extradition request after a provisional arrest); *Matter of Extradition of Mainero*, 990 F. Supp. 1208, 1215 (S.D. Cal. 1997) (same).

To the extent A. TATE attempts to portray the provisional arrest scheme as unusual or unfair, it is not. Indeed, it is reminiscent of ordinary criminal proceedings that are initiated by complaint. In such cases, the prosecution need not allege every possible offense in a complaint; rather, it must allege only sufficient facts to justify the person's arrest on at least one charge. The investigation then continues, and a grand jury ultimately decides on which charges the prosecution can proceed. A. TATE fails to acknowledge this similarity or to distinguish that process from the provisional arrest process in extradition proceedings.[2] He is also unable to establish prejudice when he is on full notice of the charges for which his extradition is sought and has a full and fair opportunity to present both written and oral argument against his extraditability. A. TATE's claim boils down to a legally unsupported complaint about the standard extradition process, which, if

---

[1] This is consistent with the generally accepted principle that a provisional arrest request becomes moot after the requesting state submits its formal extradition request. *See*, *e.g.*, *Martinez v. United States*, 828 F.3d 451, 470 (6th Cir. 2016) (en banc).

[2] To the contrary, much of A. TATE's arguments against his detention were based on his allegation that extradition proceedings are criminal proceedings and should be held to the same standards. *See generally* ECF. No. 23.

adopted, would give extraditees greater benefits than domestic criminal defendants. The Court should quickly dismiss it.[3] *See Bingham v. Bradley*, 241 U.S. 511, 517 (1916) (rejecting argument in extradition proceeding because it "savor[ed] of technicality"); *see also Shapiro v. Ferrandina*, 478 F.2d 894, 902 (2d Cir. 1973) (finding that arguments "savoring of technicality" are "particularly inappropriate in dealings with foreign nations").

## II. THE UNITED KINGDOM'S ANONYMIZATION OF THE COMPLAINANTS' IDENTITIES DOES NOT PRECLUDE CERTIFICATION OF EXTRADITION

A. TATE repeatedly characterizes the allegations against him as "anonymous accusations" and argues that due process bars certification unless the complainants' identities are disclosed. ECF No. 81 at 4, 17. The premise is false, and the conclusion does not follow. Unsworn summaries of evidence, including anonymized victim and witness statements by foreign law enforcement or prosecutors, are typical and accepted forms of evidence to establish probable cause in extradition proceedings. Moreover, the requested alternative relief that the Court "direct the United States to request the complainants' identities and their recorded interviews from the United Kingdom," *id.* at 17, is unjustified and unauthorized under basic tenants of extradition law.

### A. The Victims are Anonymized but Not Anonymous

With respect to the faulty premise: the complainants are neither anonymous to the requesting state nor unknown to law enforcement. Each has been identified to U.K. authorities,

---

[3] Even if A. TATE's argument had merit, which it does not, any remedy would result in a waste of judicial resources because the principle of double jeopardy does not apply to successive extradition proceedings. *E.g.*, *Voloshin v. Ridenour*, 299 F. 134, 138 (5th Cir. 1924) (citing *Collins v. Loisel*, 262 U.S. 426 (1923)); *see also Matter of Extradition of Bravo*, Dkt. No. 19-mc-23851, 2023 WL 6462456, at *16 (S.D. Fla. Oct. 3, 2023). Thus, if the Court limited its review to Counts 3-9 solely because they were listed in the government's provisional arrest complaint, the government could simply file an amended complaint in a new proceeding based on a request that includes all of the charges.

provided statements, participated in interviews, and, in many instances, furnished corroborating evidence, such as photographs, travel records, banking records, electronic communications, and witness information. This is not a case in which U.K. authorities are relying on anonymous tips or have otherwise failed to establish that the unnamed complainants are sufficiently reliable.

Instead, their identities have been withheld from A. TATE pursuant to U.K. law to protect the complainants' privacy and safety at this stage of proceedings. If A. TATE voluntarily returns to the U.K., or is extradited there to face prosecution, the complainants' identities will be disclosed in accordance with U.K. law. Indeed, a U.K. Court has already rejected A. TATE's effort to obtain the complainants' identities before submitting to the jurisdiction of the U.K. courts. In *The King (on the application of Tate) v. Director of Public Prosecutions*, [2026] EWHC 1600 (Admin) at ¶ 53, the U.K. Court observed that "[t]he claimants will be provided with the identities of the complainants if and when they are surrendered to and prosecuted in this jurisdiction." Thus, A. TATE seeks the very same relief that was already denied by the U.K. courts. The U.K. has essentially applied the same rule that United States' courts routinely apply when addressing whether a fugitive should be disentitled from pursuing claims or information prior to submitting to the jurisdiction of the U.S. court. *See*, *e.g.*, *United States v. Shaloub*, 855 F.3d 1255, 1259 (11th Cir. 2017) (discussing the fugitive disentitlement doctrine). This is not a novel concept at this stage of the proceedings.

**B. <u>Unsworn Summaries of Evidence Are Typical and Sufficient in Extradition</u>**

A. TATE protests that the extradition request "contains no sworn statement from any complainant" and relies on a summary of the U.K.'s evidence. ECF No. 81 at 12-13; *see also id.* at 28 (questioning the absence of identity documents of the alleged minor who appeared in the images implicated in Counts 24, 25, 27-29, 31-37, and 39-42). He essentially argues that the U.K.

should be forced to turn over all of its evidence before probable cause may be assessed. He does not point to any treaty provision, statute, or law that sets such a requirement—because none exists.[4]

Rather, it is hornbook extradition law that the requesting country need not submit the underlying evidence that supports probable cause. *See*, *e.g.*, *Matter of Extradition of Rangel*, Dkt. No. 24-cv-80208, 2024 WL 2219167, at *3 (S.D. Fla. May 7, 2024) ("[T]he country seeking extradition is not required to produce all its evidence at an extradition hearing") (quoting *Quinn v. Robinson*, 783 F.2d 776, 815 (9th Cir. 1986)); *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984) (holding extradition court properly denied fugitive's discovery request for tapes containing incriminating phone conversations intercepted by Italian police and which supported probable cause to extradite fugitive).

It is equally firmly established that hearsay evidence is admissible in extradition proceedings, and unsworn documents may support a probable cause showing. *See, e.g.*, *Collins*, 259 U.S. at 317 ("[U]nsworn statements of absent witnesses may be acted upon by the committing magistrate . . . ."); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164 (11th Cir. 2005) (probable cause determination based on an unsworn bill of indictment); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *4 (S.D. Fla. May 28, 2015) ("A certification of extradition may be and usually is based entirely on the authenticated documentary evidence and information provided by the requesting government."). In *Afanasjev*, the Eleventh Circuit upheld the extradition court's findings that were based on unsworn documents, explicitly stating that "[f]ederal law does not require all documents submitted for extradition purposes to be made under oath." 418 F. 3d at 1164. The Court should reject A. TATE's identical argument.

---

[4] For example, Article 8 of the Treaty sets forth the "Required Documents" necessary to support a request for extradition but does not require swearing of any statement of fact or law.

**C. <u>A. TATE is Not Entitled to Discovery of the Victims' Identities or Recordings</u>**

A. TATE is not entitled to disclosure of the complainants' identities during extradition because he has no right to discovery in these proceedings. *See, e.g., Rangel*, 2024 WL 2219167, at *3; *Prasoprat v. Benov,* 421 F.3d 1009, 1014 (9th Cir. 2005).[5] Because an extradition hearing is not intended to serve as a mini trial, courts routinely deny requests designed to obtain evidence for the future defense of the foreign prosecution. *E.g.*, *Koskotas*, 931 F.2d at 175; *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976).

The likely purpose of A. TATE's requested disclosure reveals why seeking such evidence is improper. A fugitive may not use an extradition hearing to contest or impeach witness credibility, litigate affirmative defenses, or introduce evidence that merely contradicts the requesting state's proof. *See*, *e.g.*, *In re Extradition of Martinelli Berrocal*, Dkt. No. 17-cv-22197, 2017 WL 3776953, at *9 (S.D. Fla. Aug. 31, 2017) (citing *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993); *Shapiro v. Ferrandina*, 478 F.2d 894, 900-01 (2d Cir. 1973); *Collins*, 259 U.S. at 316-17. As courts within this Circuit have repeatedly recognized, the "acid test" of witness reliability occurs at trial, not during extradition proceedings. *Shaw*, 2015 WL 3442022, at *9 (quoting *Cheng Na-Yuet v. Baird*, 734 F. Supp. 988, 996 (S.D. Fla. 1990)). Indeed, permitting competing factual accounts "would convert the extradition into a full-scale trial, which it is not to be." *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir. 1981).

---

5 In addition to having no *per se* constitutional right to discovery, international fugitives likewise do not have a statutory right to discovery. *See*, *e.g.*, *In re Koskotas*, 127 F.R.D. 13, 28 (D. Mass. July 13, 1989); Fed. R. Crim. P. 1(a)(5)(A). A. TATE's citation to Article 10 is misplaced, as this only calls for supplementation when the "Requested State," here the United States, believes that additional information is necessary to proceed.

Most tellingly, A. TATE never explains what admissible, explanatory evidence he might uncover with the disclosure of the complainants' identities. He identifies no possible evidence that would negate, much less obliterate, probable cause instead of merely contradicting the requesting state's evidence or attacking witness credibility. That omission is dispositive.[6] This is also what distinguishes his case from *Matter of Extradition of Ameen*, on which he so heavily relies. *See* ECF No. 81 at 12-15. In *Ameen*, 2:18-mj-152, 2021 WL 1564520 (E.D. Cal. Apr. 21, 2021), the extradition court recognized it was going against a large body of caselaw in weighing the fugitive's alibi evidence against the reliability of the evidence in the extradition request but felt it was obligated to do so based on the strength of the respective parties' evidence. Unlike *Ameen*, there is no apparent reliability concern with the complainants' statements in this case. Plus, nothing would preclude A. TATE from raising an alibi defense during proceedings in the U.K.

The Court's task is to determine whether competent evidence establishes probable cause, not to facilitate pretrial investigation into the credibility of anticipated witnesses. The Court can readily assess contextual source reliability without knowing the victims' names, as it frequently does in the domestic criminal context.[7] *See, e.g.*, *United States v. Martinelli*, 454 F.3d 1300, 1307 (11th Cir. 2006) (upholding probable cause for search warrant where complainants were unnamed, noting, "[a]lthough the affidavit does not specifically name the twenty-three businesses or

---

[6] The government offered to provide an unredacted version of the U.K.'s Extradition Request under Protective Order but A. TATE declined. *See* ECF No. 69 at 2 n.1. If A. TATE truly needed the complainants' identities or more specific dates on which the alleged offenses occurred so that he could present "explanatory evidence," he most certainly would have taken the offer. The unredacted version contains information that would aid in the identification of the complainants, such as dates related to their relationship with A. TATE, residential locations, airport transits, and the identity of others present in Romania during the relevant time periods.

[7] This is particularly so in the sexual abuse context, where it is an accepted practice in this district to keep victim identities protected through anonymization until as close to trial as possible.

individuals listed on the report from the Better Business Bureau, or the specific names of the complainants the officer contacted, those people and entities were neither anonymous nor confidential. Indeed, the affiant officer actually contacted several of them. Plainly they were not unknown. They were simply named victims of a crime who relayed information to the police.").

**D. The Rule of Specialty is Not Implicated**

To the extent that A. TATE suggests that nondisclosure of the complainants' names implicates the Rule of Specialty, *see* ECF No. 81 at 14, that argument also lacks merit. The Rule of Specialty is a doctrine that is "based on international comity" and "stands for the proposition that the requesting state, which secures the surrender of a person, can prosecute that person only for the offense for which he or she was surrendered by the requested state," with certain exceptions. *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1305 (11th Cir. 2000) (quotation omitted); *see also* Treaty, Art. 18. As a preliminary matter, A. TATE's argument regarding the Rule of Specialty is speculative and unripe, as he has not even been found extraditable yet.

Setting that aside, however, there is no rational reason to believe the U.K. would violate the Rule of Specialty due to A. TATE being surrendered on charges supported by anonymized complainants. Here, the charged offenses, statutory provisions, approximate dates, and underlying factual allegations have all been disclosed, and A. TATE is on ample notice of the offenses for which he has been charged in the U.K.[8] The complainants' identities are known to the U.K. authorities and are merely redacted in the warrants and anonymized in the remaining materials

---

[8] A. TATE contends that he "lacks meaningful notice of the accusations and cannot defend against them," see ECF No. 81 at 13, but also separately admits that "extradition law does not permit him to defend on the merits." *Id*. at 17.

submitted in support of extradition.[9] There is no reasonable risk that the U.K. will engage in the sort of bait-and-switch A. TATE hypothesizes, substituting one complainant for another after extradition has been granted.

A. TATE asks this Court to do what neither extradition law nor due process authorizes or requires and what a U.K. court has already declined to do: compel pre-surrender disclosure of the complainants' identities.[10] This Court should decline. The limited nature of extradition proceedings, longstanding restrictions on discovery and credibility challenges, and principles of international comity all point in the same direction. The complainants' identities are not necessary to the certification determination before this Court, and their redaction in the U.K.'s extradition request provides no basis to deny extradition.

## III. PROBABLE CAUSE REMAINS UNDEFEATED

None of the additional arguments raised by A. TATE defeat probable cause. They largely amount to attempts to litigate guilt instead of extraditability, including repeated arguments that the complainants actually consented to the conduct and invitations for the Court to assess the complainants' credibility. However, for purposes of determining probable cause, the extradition court "must accept as true all of the statements and offers of proof by the demanding state," reserving the weighing of evidence and making of credibility determinations for the courts in the

---

[9] As the Romanian court previously recognized in granting the U.K.'s extradition request, anonymization creates "no fear whatsoever" of difficulties concerning observance of the rule of specialty because the identities are known to the British authorities and are withheld only to protect the complainants' privacy and safety. ECF No. 30-1 at 6; ECF No. 30-2 at 8.

[10] A court in the United States does not have the authority to demand that a foreign country provide specific documents to support or resolve questions in that country's extradition request. *See In re Extradition of Drayer*, 190 F.3d 410, 414-15 (6th Cir. 1999); *see also* U.S. Const., Art. III, § 2 (addressing the U.S. courts' scope of authority).

requesting country – which is where the determination of guilt will be made. *Schmeer v. Warden of Santa Rosa Cty. Jail*, 2014 WL 5430310, at *4 (N.D. Fla. Oct. 22, 2014) (citation and internal quotation marks omitted); *see also, e.g.*, *Collins*, 259 U.S. at 316; *Quinn*, 783 F.2d at 791; *Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997) (evidence submitted in the extradition request must be considered as true); *Extradition of Marzook*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996) (same); *Extradition of Atta*, 706 F. Supp. 1032, 1050-52 (E.D.N.Y. 1989) (same). The Court "need only 'determine whether there is competent evidence to justify holding the accused to await trial, not whether the evidence is sufficient to justify a conviction.'" *Bozilov v. Seifert*, 983 F.2d 140, 143 (9th Cir. 1992) (quoting *Collins*, 259 U.S. at 316); *see Kastnerova v. United States*, 365 F.3d 980, 987 (11th Cir. 2004). Several themes emerge from A. TATE's probable cause challenge that warrant correction:

A. TATE repeatedly attempts to isolate individual allegations, individual statements, and individual counts from the broader evidentiary record, but that is not how probable cause is assessed. *See*, *e.g.*, *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (reaffirming the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations). The evidence presented by the U.K. does not consist of a series of unrelated accusations viewed in a vacuum. Rather, multiple independent complainants describe remarkably similar patterns of sexual and physical violence, recruitment, manipulation, coercion, and exploitation. Those accounts are, in turn, frequently corroborated by documentary evidence, including travel records, financial records, electronic communications, photographs, and witness statements.

Indeed, as set forth in the government's opening brief, each complainant's account[11] and corroborating evidence independently satisfies the probable cause hurdle as to each charge. Viewed collectively, however, the evidence is even more compelling, revealing a coherent and highly consistent pattern in which vulnerable women were recruited through promises of romance and economic opportunity, subjected to varying forms of control, coercion, violence, and exploitation, and used for the financial benefit of A. TATE and his associates. The Court should therefore reject A. TATE's invitation to parse individual allegations or statements strictly in isolation and instead evaluate the evidence as probable cause jurisprudence requires: as a whole.

### A. <u>The Rape and Assault Charges are Amply Supported Because Consent to One Act is not Consent to Every Act</u>

Another recurring flaw in A. TATE's argument is his erroneous assumption that evidence of consent to one act establishes irrevocable consent to all acts occurring within the same encounter or future encounters. It does not. Throughout his response, A. TATE repeatedly points to facts that a complainant agreed to meet him, entered or stayed in a relationship with him, accompanied him to a hotel, initially consented to sexual intercourse, or otherwise voluntarily participated in some aspect of an encounter. He then treats those facts as dispositive of consent to different conduct. But consent is act specific. Consent to intercourse is not consent to strangulation. Consent to meet is not consent to violence. Consent at the outset of an encounter is no longer consent after it has been withdrawn or the participant is physically incapable of providing it. Nor

---

[11] A. TATE's attempt to distinguish Fla. Stat. § 794.022(1) misses the point. ECF No. 81 at 16. The statute reflects Florida's judgment that a sexual-assault victim's testimony does not require corroboration to sustain a conviction beyond a reasonable doubt. It follows *a fortiori* that such testimony may meet the lesser probable cause standard.

does evidence that a complainant willingly participated in some conduct preclude a finding that other conduct was accomplished through force, coercion, intimidation, or the absence of consent.

A. TATE's arguments illustrate the point.[12] As to Counts 8 and 9, he argues that because C3 "initially consented to vaginal sexual intercourse," he reasonably believed the entire encounter was consensual. ECF No. 81 at 21. His argument lacks legitimacy because he failed to acknowledge C3's precise statement that she "did not consent to choking" and her statements that she struggled to breathe, likely told A. TATE to stop because she was being hurt and thought he was going to kill her, and that he ignored clear physical signs of her discomfort, including her attempt to loosen his grip and remove his hands from her neck.[13] *Id.* He makes a similar argument for the assault charged in Count 7, but C3 stated that she was not warned about, and did not give her consent to, the rough nature of the sex and that she sustained injuries in the form of marks on her neck as a result.

As to Counts 11 and 13, A. TATE states that "nothing in the allegation suggests that C7 did not consent." ECF No. 81 at 22. However, he again omits the allegation that he choked C7 unconscious and continued to have sexual intercourse with her whilst she was unconscious. *Id.* Consent cannot be obtained from an unconscious victim. He also argues, with respect to Counts

---

[12] Given the intended brevity of a Reply, the government refers the Court back to its Opening Memorandum in Support of Extradition, ECF No. 74, for additional factual details supporting each count. The government notes that A. TATE does not assert that the violent rapes and assaults at the heart of Counts 3-6 involving C2 (rape and assault), Counts 12 and 14 involving C7 (rape and assault), or Count 20 involving C5 (rape) were consensual.

[13] A. TATE's reliance on part of a text exchange with C3 is misplaced. First, the text demonstrates C3's uncertainty around choking. *See* ECF No. 68-1 at 91 ("*I'm scared. And excited. Not sure how I feel right now*.") (emphasis added). Second, even if a text message demonstrated unequivocal interest in choking, a participant in sexual activity can withdraw their consent or permission at any time during the act. A. TATE also ignores the other message from C3 recovered from his phone, in which C3 unequivocally asked him "*not to rape her*." *Id.*

15-17, that C7's agreement "to meet and rent a hotel room together" with A. TATE essentially negates the allegation of the violent sexual assault that followed. That is absurd. A. TATE further argues that "nothing in C7's account suggests that she did not consent to intercourse or that Andrew did not reasonably believe she consented." *Id*. at 23. While A. TATE's reasonable belief as to consent will ultimately be an issue of fact for the trier of fact, it is worth noting that, according to C7, A. TATE grabbed her by the throat, threw her on the bed face down and vaginally penetrated her, at which point she lost consciousness. He later forced her to perform oral sex on him, exerting such force on her head that she vomited. ECF No. 68-1 at 97.

As to Count 19, he argues that "because C5 admits the intercourse was consensual, there is no probable cause." *Id*. at 25. His claim is belied by his own acknowledgment that C5 "did not consent to the force used by Andrew Tate during intercourse." *Id*. at 25. Moreover, his brief omits the details of what C5 alleges not to have consented to, which included, among other violent acts, A. TATE strangling C5 to the point she could not breathe, pinning her hands down after she tried to remove his from her neck, and continuing penetration to ejaculation over her efforts to remove his hands from her neck. ECF No. 68-1 at 104-105. Any reasonable person would recognize that C5's efforts to remove A. TATE's hands from her neck during intercourse demonstrated, or at least signaled, that C5 no longer consented to the intercourse or the strangulation.

And, as to the one count of rape involving C6 (Count 22), A. TATE focuses on the absence of allegations that the intercourse itself was compelled at the start but ignores her direct statements that A. TATE repeatedly suffocated C6 during intercourse by forcing her face into the bed, continued to penetrate her despite her efforts to lift her head away, and engaged in conduct to which she expressly states she never consented. *Id*. at 112-113.

In each instance, the argument rests on the same mistaken premise: that consent to one act forecloses the possibility that a complainant did not consent to another. It also ignores a legal presumption that A. TATE acknowledges in his dual criminality argument section: under U.K. law, the use of violence immediately before or during the act gives rise to a presumption that the complainant did not consent and that the defendant lacked a reasonable basis to believe otherwise. *See* ECF No. 81 at 34; ECF No. 68-1 at 158-160.[14] Probable cause is therefore established on this basis alone.

At an extradition hearing, the Court need not determine whose account – that of the six complainants or Andrew Tate's – is to be believed.[15] The relevant question is whether the U.K. has presented competent evidence supporting probable cause for the charged U.K. offenses. The fact that a complainant voluntarily entered a relationship, agreed to meet, rented a hotel room, or consented to some sexual activity does not preclude her from declining consent to other conduct that occurred during the same or separate encounters. To hold otherwise would effectively convert initial consent into a blanket authorization for any subsequent sexual or violent act, regardless of its nature or degree, a proposition unsupported by law or logic.

---

[14] That the complainant was asleep or "otherwise unconscious at the time of the relevant act" gives rise to the same presumption. *Id.* at 159.

[15] For example, A. TATE argues that the complainants are not credible because they reported years after the events at issue or only after law enforcement contacted them. But credibility attacks are not appropriate for extradition and, in any event, neither fact undermines, let alone obliterates, probable cause. Delayed reporting and police investigation are not indicative of fabrication. Courts recognize that delays are common in sexual-assault cases. *E.g.*, *United States v. Kollmar*, No. 19-mj-70677-MAG-1 (KAW), 2021 WL 179606, at *3, 7 (N.D. Cal. Jan. 19, 2021)-("The fact that a rape victim delays reporting does not suggest a credibility problem; delay in reporting is common in such cases.").

### B. <u>The U.K.'s Trafficking Statute Does Not Require Force or Sexual Contact</u>

A. TATE repeatedly attacks probable cause for the U.K.'s trafficking counts by arguing that: (1) the complainants voluntarily traveled to Romania and were not physically forced to do so; (2) some complainants were not forced to engage in webcam work; and (3) certain webcam work involved online sexual performances rather than in-person sexual contact with another individual. *See* ECF No. 81 at 18, 19, 21, 24, 26. These arguments misunderstand the charged U.K. offenses and conflate the distinct inquiries of probable cause and dual criminality.[16]

At this stage, the Court's task is to determine whether there is competent evidence supporting the offenses charged *by the U.K.* The Court is not free to rewrite the elements of the U.K. offenses by importing requirements that do not appear in U.K. law. As explained in the government's Opening Brief, ECF No. 74 at 52, the relevant U.K. trafficking offenses criminalize arranging or facilitating the travel of another person with a view to that person's exploitation. ECF No. 68-1 at 166. The U.K. trafficking statute does not require that the victim is physically forced to travel, physically restrained, or transported against her will. Rather, the focus is whether the defendant arranged or facilitated the travel and did so with a view toward exploitation as defined under U.K. law.[17]

---

[16] For example, in arguing against probable cause for the trafficking counts related to C7, A. TATE asserts that "[t]he acts C7 describes performing on camera involved no other person," and "[t]hose acts fall outside Fla. Stat. Ann. § 796.07(1), and the government identifies no other offense for which anyone could be charged under 18 U.S.C. 2421 or 2422." ECF No. 68-1 at 24-25. These dual criminality arguments are addressed below at pp. 20-23, *infra.*

[17] Under Section 3 of the Act, a person is "exploited" under Section 2(1) in one of two independent ways that are relevant here. First, controlling prostitution for gain, which is defined as "intentionally control[ing] any of the activities of another person relating to that person's prostitution in any part of the world… for or in the expectation of gain for himself or a third person." *Id.* at 170. Second, and alternatively, if the person is subjected to "force, threats or deception designed to induce him or her- (a) to provide services of any kind…" *Id.* at 168-169.

The U.K. offense of trafficking also does not require proof that the victim engaged in physical sexual activity with third parties. Prostitution is defined broadly under U.K. law and encompasses conduct undertaken for commercial sexual purposes regardless of whether it involves interpersonal physical contact. *See id*. at 171-72. Thus, A. TATE's repeated emphasis on whether a complainant traveled under compulsion or duress or physically engaged in sex with another person attacks elements that simply do not exist in the charged offenses.

### C. The Extradition Request Presents Sufficient Facts that A. TATE Distributed and Made Indecent Photos of a Minor and Possessed Extreme Pornographic Images

A. TATE presents several arguments to try to convince the Court that there is no probable cause that he distributed and made (produced) more than 150 images depicting the same minor child, as well as possessed four images of extreme pornography. *See* ECF No. 81 at 28-32. However, like other portions of his probable cause argument, he ignores dispositive evidence in the record and misconstrues U.K. law.

With respect to the charges involving images of a minor for which certification is sought (Counts 24-25, 27-29, 31-37), A. TATE erroneously claims that the extradition request fails to prove that the person depicted in the images was under the age of 18. Here, U.K. authorities have a copy of the minor's passport, which confirms that the minor was 17 years' old when A. TATE's devices were confiscated, confirming that the minor must have been no older than 17 when the images were created. ECF No. 68-1 at 122-23. While A. TATE complains that the extradition request does not include a copy of the passport, ECF No. 81 at 28, the U.K. was not required to provide one. As discussed above, *supra* pp. 6-7, probable cause can be established through statements of law enforcement officials.

Interestingly, A. TATE makes this argument in the face of objective evidence that he ignores in his brief and confirms he *knew* the female depicted in the images was a minor when the images were made and distributed. Specifically, the extradition request contains descriptions of separate text exchanges with the minor's father and his brother Tristan Tate ("T. Tate"), in which A. TATE admits that the person in the images is a minor. ECF No. 68-1 at 123-24. Thus, A. TATE's attempt to cast doubt on the minor's age lacks credibility.

His remaining arguments about the charges of making indecent photographs of a minor (Counts 31-37) fare no better. First, he argues that probable cause is not established because the U.K. charged as a single count the making of multiple, equally classified indecent images of a minor but only provides a description of a single exemplary image for each count. *Id.* at 28-30. Notably, however, A. TATE does *not* allege that the exemplary images are lawful, thus seemingly conceding that all of the counts of making indecent images (Counts 31-37) include at least one unlawful image. In any event, it is common in cases involving child sex abuse material to include multiple images in a single count. *See United States v. Chilaca*, 909 F.3d 289 (9th Cir. 2018) (finding that possession of multiple devices in the same location with images of child pornography and access to cloud-based storage gave rise to only a single count of unlawful possession pursuant to of 18 U.S.C. § 2252(a)(4)(B)); *see also United States v. Elliot*, 937 F.3d 1310 (10th Cir. 2019) (holding that, in regards to a violation of 18 U.S.C. § 2252A(a)(5)(B), charging the defendant with five counts of CP possession for five different devices that were found in his bedroom that contained CP was multiplicitous). A. TATE does not cite to any law to the contrary.

Second, A. TATE claims that the request does not present sufficient facts to establish that A. TATE "made" the images in question, claiming that "the presence of a file on a device believed to be Andrew's does not establish probable cause that Andrew *made* the file or the images." ECF

No. 81 at 30-31 (emphasis in original). However, the extradition request confirms that this is exactly the type of conduct that is criminalized in the U.K. as making an indecent image of a minor. Indeed, the U.K. asserts that A. TATE is liable because "[it] can therefore be inferred from the circumstances that those images came to be stored as a result of some act on [A. TATE's] part," and therefore, he "did something to cause that image to exist on that particular device; to produce it by his action; or to bring it about." ECF No. 68-1 at 142. This is enough to establish probable cause, but even if it were not, the request also contains evidence that A. TATE caused the images to come about by directing the minor child to perform certain sexual acts on camera or by appearing in the videos. *See* ECF No. 68-1 at 133-42, 146.

Lastly, with respect to the charges related to possession of extreme pornographic images, A. TATE fails to challenge probable cause for two of the counts—Counts 41-42 (criminalizing possession of two images depicting sexual violence). Accordingly, the Court should find probable cause on these offenses. For the other two charges related to possession of extreme pornographic images portraying bestiality (Counts 39-40), A. TATE claims the request lacks probable cause because the U.K. failed to prove the images are unlawful.[18] ECF No. 81 at 31-32. However, he fails to explain what requirements under U.K. law are missing. With respect to the images depicting bestiality (Counts 39-40), he fails to explain why the description of the images in the extradition request—that a person was performing an act of intercourse with an eel and a horse—is insufficient to establish illegality when the U.K. statute criminalizes images of "a person performing an act of intercourse or oral sex with an animal (whether dead or alive)." ECF No. 68-

---

[18] To the extent A. TATE alleges a lack of dual criminality as another basis upon which to deny certification on Counts 39-42, *see* ECF No. 81 at 31-32, he is improperly conflating probable cause and dual criminality, which are separate requirements under the Treaty. The government responds to A. TATE's dual criminality arguments below.

1 at 180. That the U.K. does not expressly state whether the image portrayed real or simulated acts, that is not a requirement under U.K. law; U.K. law requires only that "a reasonable person looking at the image would think that any such person or animal was real." *Id.* Accordingly, A. TATE has failed to defeat probable cause with respect to Counts 39-42.

## IV. DUAL CRIMINALITY EXISTS ON ALL COUNTS

In assessing whether the Treaty covers the offenses for which the U.K. seeks extradition and the State Department has authorized to proceed, the Court should examine the description of criminal conduct, taken as true, that the U.K. has provided and determine whether that conduct, if it had been committed in the United States, would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See*, *e.g.*, *Arias v. Warden*, 928 F.3d 1281, 1292-93 (11th Cir. 2019); *Gallo-Chamorro*, 233 F.3d at 1306. This is commonly referred to as the dual criminality requirement. A. TATE contests dual criminality for only twelve (12) of the thirty-nine (39) offenses- none of his arguments hold water.

### A. U.S. Law Supports a Finding that Complainants did not Consent to the Alleged Rapes and Assaults

The government addresses dual criminality only for the rape and assault counts that A. TATE discusses in his brief—Counts 7, 8, 9, 19, and 22.[19] A. TATE's challenge to dual criminality of these counts turns on allegations that the complainants consented to the charged conduct, or, stated another way, he claims that there is an absence of evidence that the victims did *not* consent. *See id.* His argument is both factually and legally incorrect.

---

[19] By failing to address the remaining counts, A. TATE has essentially conceded dual criminality on Counts 3-6, 11-17, and 20. *See id.* at 34-37.

For purposes of the dual criminality analysis, the Court should presume the allegations presented in the extradition request are true and determine whether those facts could be charged as a crime in the United States. *Arias*, 928 F.3d at 1293 ("The dual criminality inquiry asks only whether 'the particular *act charged*,' taken as true, would be 'criminal in both jurisdictions.'") (emphasis in original).

As discussed above in the context of probable cause, the complainants' statements relating to Counts 8, 9, 19, and 22 confirm that the complainants did not consent to the conduct and that a reasonable person in A. TATE's position would have known they did not consent. *See supra* pp. 12-15. This same lack of consent, or inability to provide consent, establishes dual criminality under the U.S. statutes presented by the government in its previously submitted dual criminality chart.[20] *See* ECF No. 74-2.

In addition to inaccurately describing the facts, A. TATE's theory lacks any sound basis in the law. Essentially, he asserts that he would not be held liable for any of the conduct in Counts 7, 8, 9, 19, and 22 had it been committed in the United States because the women consented to the sexual intercourse that preceded his violent conduct. This is not how the law works. A. TATE does not cite to nor is the government aware of any law pointing to a *per se* rule that a person's consent to start sexual intercourse legally binds their consent for everything that occurs thereafter.

### B. Enticement or Transport for "Any Sexual Activity for which Any Person can be Charged" is Unlawful in the United States

---

[20] To the extent A. TATE alleges lack of dual criminality because the U.S. analog statute was not in effect at the time the crime was committed, he misunderstands the law. Unless a treaty provision states otherwise, extraditability is determined based on the law that exists at the time extradition is considered, not when the crime was committed. *See*, *e.g.*, *Nezirovic v. Holt*, 779 F.3d 233, 238 (4th Cir. 2015) (citing *Hilario v. United States*, 854 F. Supp. 165, 176 (E.D.N.Y. 1994) and *U.S. ex rel. Oppenheim v. Hecht*, 16 F.2d 955, 956 (2d Cir. 1927)).

A. TATE has waived any dual criminality challenge to Counts 18, 21, and 23, and instead focuses on a claim that Counts 1, 2 and 10 are not dually criminal because "webcam work is not prostitution in the United States." ECF No. 81 at 32-34. However, the dual-criminality inquiry does not turn on whether the sexual activity occurred through a webcam rather than face-to-face. The question is whether the underlying conduct would be criminal if committed in the United States. Here, the U.K. alleges that A. TATE recruited women, arranged their travel, directed and controlled their participation in commercial sexual performances, and profited from sexually explicit acts performed for paying customers. That conduct falls comfortably within the scope of 18 U.S.C. §§ 2421 and 2422.

With respect to Counts 1 and 2 involving C1, federal law prohibits knowingly persuading, inducing, enticing, coercing, or transporting another person "with intent that such individual" engage in prostitution ***or*** "any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. §§ 2421, 2422. These provisions do not require a completed act of prostitution or sexual activity, only that the transportation or enticement occurred with the intent that such individual engage in the unlawful sexual activity.[21] Given the underlying allegations that A. TATE and his brother attempted to coerce the women they recruited and transported to engage in increasingly sexualized conduct, up to and including sex acts with other people for money (*i.e.* prostitution), dual criminality is established. Further, even if completed sexual acts were required,

---

[21] The Supreme Court in *Cleveland v. United States*, 329 U.S. 14, 20, *rehearing denied*, 329 U.S. 830 (1946), stated that "guilt under the Mann Act turns on the purpose which motivates the transportation, not on its accomplishment," citing *Wilson v. United States*, 232 U.S. 563, 570-571, (1914). *See, also e.g.*, *United States v. Wilkerson,* 702 Fed. App'x 843 (11th Cir. 2018) (finding evidence sufficient for jury to find beyond a reasonable doubt that defendant, if he had completed sex act he attempted to induce, would have violated Florida statute that criminalized such sexual activity).

the phrase "unlawful sexual activity" is not limited to physical sexual intercourse between two persons.[22] Under Florida law, it is unlawful to offer, procure, induce, or otherwise cause a person to engage in prostitution *or any other lewd or indecent act*. Fla. Stat. Ann. § 796.07(2)(b). At a minimum, the commercial sexual webcam performances alleged by the U.K. with respect to C1, which included masturbation and nudity performed for paying customers, plainly constitute "sexual activity for which any person can be charged with a criminal offense" because such conduct falls within Florida's prohibition on lewd and indecent acts. With respect to Count 10 involving C3,[23] which included nudity and masturbation, as well as A. TATE's attempts to persuade her to use sex toys, are also dually criminal under this same Florida statute prohibiting the offering of another for lewd or indecent acts.

**C. Possession of Multiple Images Depicting Bestiality and Extreme Sexual Violence is Criminal under Florida Law**

A. TATE contests dual criminality for only four of the sixteen image-related charges – Counts 39-40 (possession of images depicting bestiality) and Counts 41-42 (possession of images depicting extreme violence to a person's genitals). As A. TATE acknowledges, private possession of obscene material is not an offense in the United States because it is protected activity under

---

[22] The term "sexual activity" is not limited to physical sexual contact between two persons. *See* 18 U.S.C. § 2427 ("In this chapter, the term 'sexual activity for which any person can be charged with a criminal offense' does not require interpersonal physical contact."); *see also United States v. Fugit*, 703 F.3d 248, 256 (4th Cir. 2012) ("[T]he phrase 'sexual activity' in § 2422(b) denotes conduct connected with the 'active pursuit of libidinal gratification' on the part of any individual—nothing more, nothing less—and, therefore, does not incorporate an invariable requirement of interpersonal physical contact.").

[23] The allegations involving C3 also include an attempt by A. TATE at inducing her to become a prostitute, having sexual intercourse with men for money, see ECF No. 68-1 at 85, which would be unlawful as an attempt under Fla. Stat. Ann. § 796.04 (forcing, compelling or coercing another to become a prostitute).

First and Fourteenth Amendments to the U.S. Constitution. *See* ECF No. 81 at 37 (citing *Stanley v. Georgia*, 394 U.S. 557, 568 (1969)). However, the government does not base its dual criminality argument exclusively on possession.[24] Rather, the government's theory for dual criminality is based on a presumption under Florida law that the possession of three or more similar obscene images is "prima facie" evidence of a person's intent to distribute the obscene images. *See* Fla. Stat. Ann. § 847.011(1)(b). This offense is considered a first-class misdemeanor and is punishable by a maximum of one year in prison. Fla. Stat. Ann. §§ 847.011(1)(a)-(b); 775.082(4)(a).

A. TATE appears to concede that "distribution, sale or intent to distribute" obscene material would not run afoul of the Constitution. *See id.* Moreover, he does not contest that the images underpinning Counts 39-42 are considered obscene under Florida law.[25] *See* ECF No. 81 at 37-38; Fla. Stat. Ann. § 847.001(12) (defining obscenity); *see also* Fla. Stat. Ann. § 828.126(6) (criminalizing the production, distribution, or possession of any pornographic image or video of a person and an animal engaged in sexual contact). Thus, there is no dispute that the conduct underlying Counts 39-42—the possession of the four extreme pornographic images—could be prosecuted in the United States of an offense that carries a penalty of "one year or more," as required by the Treaty.

---

[24] A requesting country need not establish that its crimes (or the elements of the crimes) are identical to crimes in the United States. *Zhenli Ye Gon v. Holt*, 774 F.3d 207, 217 (4th Cir. 2014) (collecting cases). Thus, the fact that the foreign offense may be broader than its U.S. analogue, or vice versa, does not defeat dual criminality. *See Arias*, 928 F.3d at 1293 ("Dual criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours.") (internal quotation marks and citation omitted); *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("The primary focus of dual criminality has always been on the conduct charged.").

[25] A. TATE asserts that the images depicting bestiality (Counts 39-40) are not criminal under Florida law because "the request does not say whether the images are real or generated," but Florida's definition of "obscene" does not appear to distinguish between real and generated images. *See* Fla. Stat. Ann. § 847.001(12).

## CONCLUSION

For the foregoing reasons, the United States requests that the Court determine that the submission on behalf of the United Kingdom is sufficient to sustain the charges under the provisions of the applicable Treaty and certify the extradition of A. TATE for the charges sought to the Secretary of State for possible surrender to the United Kingdom.

Dated: November 25, 2026

Respectfully submitted,

YARA LORENZO KLUKAS
ACTING UNITED STATES ATTORNEY

By: */s/ Alejandra L. López*
ALEJANDRA L. LÓPEZ
Assistant United States Attorney
Fla. Bar No. 37132
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9241
Email: Alejandra.Lopez@usdoj.gov

By: */s/ Abbie D. Waxman*
ABBIE D. WAXMAN
Assistant United States Attorney
Fla. Bar No. 109315
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9240
Email: Abbie.Waxman@usdoj.gov

A. TYSEN DUVA
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

By: */s/ Kerry A. Monaco*
KERRY A. MONACO
Associate Director
Office of International Affairs
U.S. Dep't of Justice, Criminal Division
Court ID: A5503560
1301 New York Avenue NW
Washington, DC 20530
Tel.: (202) 616-4798
Email: Kerry.Monaco2@usdoj.gov

By: */s/ Rachel M. Yasser*
RACHEL M. YASSER
Trial Attorney
Office of International Affairs
U.S. Dep't of Justice, Criminal Division
Court ID: A5503561
1301 New York Avenue NW
Washington, DC 20530
Tel.: (202) 674-5702
Email: Rachel.Yasser2@usdoj.gov

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on November 25, 2026, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF, which caused the same to be served on Howard Srebnick, Esquire, Jackie Perczek, Esquire, Thomas Maniotis, Esquire and Joseph McBride, Esquire, counsel for the Defendant.

*/s/ Alejandra L. López*________
Alejandra L. López
Assistant United States Attorney